| PETITION FOR: | Docket No. | Commonwealth of Massachusetts<br>The Trial Court<br>Probate and Family Court |
|---|---|---|
| ☐ Resignation of a Trustee<br>☒ Removal of a Trustee<br>☒ Appointment of a Successor Trustee | | |

| In re 849 South Washington Street Realty Trust<br>case name<br>(Petition to Remove Trustee and Other Relief) | Bristol                          Division |
|---|---|

The Petitioner(s) (hereafter "Petitioner"), an interested person(s), makes the following statements:

1.  Petitioner is:   H1 Lincoln, Inc. d/b/a Majestic Honda

    Name:       **James**                    **E.**        **Balise, as President of H1 Lincoln, Inc.**
    _First Name_                _M.I_              _Last Name_

    **122 Doty Circle**                                        **West Springfield**    **MA**    **01089**
    (Address)                    (Apt, Unit, No. etc.)        (City/Town)        (State)    (Zip)

    Primary Phone #:   **(413) 733-8604**

    Interest of the Petitioner in the matter (e.g. Trustee, Beneficiary, etc):   **Creditor by virtue of Sup. Ct. Judgment**

2.  Identify the Trust and Settlor (e.g. ABC Trust, Trust under written instrument by Jane Smith, under the will of Jane Smith dated 1/1/12, etc.):

    **849 South Washington Street Realty Trust; Alfredo M. Dos Anjos**

    Date of Trust:     **June 9, 2000**        Dates of Amendments, if any:  **unknown**
    (date)

    A copy of the trust and any amendments are attached or are on file with the Court.

    Venue for this proceeding is proper in this court because:

    **The trust has owned real estate located in Bristol County.  Trust created and administered in Bristol County.**

3.  Current Trustee(s) is/are  ☐ the Petitioner  **AND/OR** ☒ as follows:

    Name:       **Alfredo**                    **M.**        **Dos Anjos**
    _First Name_                _M.I_              _Last Name_

    **355 Elm Street**                                        **Seekonk**    **MA**    **02771**
    (Address)                    (Apt, Unit, No. etc.)        (City/Town)        (State)    (Zip)

    Primary Phone #:   **unknown**

4.  Persons interested in this trust and their representatives (Guardian, Conservator, etc.) are:

    ☐ as stated in the Petition dated _____ (date)        ☒ OR as follows:

| Name | Address | Interest | Indicate if this person is: |
|---|---|---|---|
| **Beneficiaries unknown as Trustee refused to produce their names** | **Upon information and belief, some of the beneficiares may be Trustee's minor grandchildren.** | | ☒ Minor<br>☐ Incompetent |
| **See attached request for preliminary relief and order to produce a beneficiary schedule** | | | ☒ Minor<br>☐ Incompetent |
| **so parties can be given notice.** | | | ☒ Minor<br>☐ Incompetent |

MPC 266 (1/16/13)

5.  The following person(s):

_____**Alfredo Dos Anjos**_____  of  _____355 Elm Street, Seekonk, MA 02771_____
(Name of Trustee)                                    (Address)

was named or appointed Trustee(s) in the above described trust; **AND**

☐ has agreed to **resign** as Trustee.
**OR**

☒ should be **removed** as Trustee for the following reasons:

☒ The Trustee has committed a serious breach of trust;

☐ There is a lack of cooperation among co-Trustees that substantially impairs the administration of the trust;

☒ The Trustee is unfit;

☒ The Trustee is unwilling or persistently fails to administer the trust effectively;

☒ The removal of the Trustee best serves the interests of the beneficiaries;

☒ A substantial change in circumstances has occurred;

☐ Removal is requested by all qualified beneficiaries;

☒ Removal best serves the interests of all the beneficiaries and is not inconsistent with a material purpose of the trust and a suitable co-Trustee or successor Trustee is available.

\* Preliminary Relief is required due to a possible statutory limitation of action due to Trustee's failure to act.

6.  ☒ The trust instrument does not provide for the appointment of a successor Trustee, and the Petitioner requests

Name:  _____**Anthony**_____  **R.**  _____**Nesi**_____
       First Name              M.I       Last Name

_____**15 Pine Road**_____  _____  **Mattapoisett**  **MA**  **02739**
(Address)                    (Apt, Unit, No. etc.)   (City/Town)  (State)  (Zip)

Primary Phone #: **(508) 930-0301**

Name:  _____**Steve**_____  **M.I**  _____**Hanna**_____
       First Name                       Last Name

_____**15 Pine Road**_____  _____  **Mattapoisett**  **MA**  **02739**
(Address)                    (Apt, Unit, No. etc.)   (City/Town)  (State)  (Zip)

Primary Phone #: **(508) 930-0301**

Name:  _____**Gary**_____  **P.**  _____**Shannon**_____
       First Name              M.I       Last Name

_____**ONE MONARCH PLACE**_____  **SUITE 1900**  **Springfield**  **MA**  **01144**
(Address)                    (Apt, Unit, No. etc.)   (City/Town)  (State)  (Zip)

Primary Phone #: **(413) 733-3111**

to be appointed by the Court.

7.  Supporting documentation an a detailed summary of the Petitioner's basis for requesting the removal as well as any additional relief being requested, are attached and incorporated herein by reference.

Petitioner requests that the Court: (check all that apply)

☐ Approve the Trustee's resignation.

☒ Remove the Trustee.

☒ Appoint a successor Trustee to serve

   If applicable, the Trustee shall serve:

   ☐ without sureties on the bond

   ☒ with sureties on the bond with the penal sum amount of $  **$1,000,000.00**

Petitioner also requests:

An emergency hearing for the Court to decide upon Petitioner's request for preliminary relief in the form of (1) Production by the Trust of its Schedule of Beneficiaries, (2) Suspension of Dos Anjos as Trustee and the appointment of a co-fiduciary during this case, (3) a declaration that Petitioner may commence an action for breach of fiduciary duties against Dos Anjos to preserve such claim, as detailed more fully herein and in the allied papers.

## SIGNED UNDER THE PENALTIES OF PERJURY

I certify under the penalties of perjury that the foregoing statements are true to the best of my knowledge and belief.

Date: _____ **July 2, 2020** _____     _____
                                                          Signature of Petitioner

Information on Attorney for Petitioner, if any            _____
                                                          Signature of Attorney

                                                          **John J. Egan**
                                                          (Print name)
                                          Egan, Flanagan and Cohen, P.C.
                                          **67 Market Street, P.O. Box 9035**
                                                          (Address)                    (Apt, Unit, No. etc.)

                                                 **Springfield**           **MA**    **01102-9035**
                                                  (City/Town)              (State)      (Zip)

                                          Primary Phone #:  **(413) 737-0260**

                                          B.B.O. #  **151680**

                                          Email:  **jje@efclaw.com**

                                          _____
                                          Michael G. McDonough, BBO #682128
                                          Egan, Flanagan and Cohen, P.C.
                                          67 Market Street, P.O. Box 9035
                                          Springfield, MA 01102-9035
                                          (413) 737-0260; (413) 737-0121
                                          Email:  mgm@efclaw.com

                                          _____
                                          Edward J. Casey, BBO #077310
                                          Coogan Smith, LLP
                                          144 Bank Street, P.O. Box 2320
                                          Attleboro, MA 02703
                                          (508) 222-0002
                                          Email:  ejc@coogansmith.com

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF THE TRIAL COURT

BRISTOL, SS.                                    PROBATE AND FAMILY COURT

---

IN RE 849 SOUTH WASHINGTON STREET
REALTY TRUST

(PETITION FOR REMOVAL OF TRUSTEE AND
OTHER RELIEF)                                   CIVIL ACTION NO.

---

ADDENDUM TO PETITION FOR REMOVAL OF TRUSTEE AND OTHER RELIEF

## INTRODUCTION

**[I]f fraud is used to avoid or circumvent the provisions or purposes of this chapter, any person injured thereby may obtain appropriate relief against the perpetrator of the fraud or restitution from any person....**

**G.L. c. 190B, § 1-106.**

1.      The instant petitioner has obtained a judgment in the Hampden County Superior Court, which includes monetary damages against the 849 South Washington Street Realty Trust and Alfredo Dos Anjos as Trustee (the "Trust") in the amount of $13,052,485.39.  The judgment is based upon knowing and willful unfair and deceptive misconduct by the Trustee, Alfredo Dos Anjos.  The Trust possesses the right to sue its trustee Dos Anjos for breach of fiduciary duty for creating this massive liability for the Trust.  Dos Anjos, as trustee, refuses to prosecute the Trust's claim for breach of fiduciary duty against himself.  Dos Anjos is purposely squandering this claim, which is an asset of the Trust, to the detriment of the Trust's beneficiaries and creditors.  By this action, petitioner seeks to remove Dos Anjos as trustee and obtain equitable relief to preserve the interests and assets of the Trust, including this chose in action, for the benefit of the Trust's beneficiaries and creditors.  The initial misconduct of Dos Anjos as trustee

occurred on August 9, 2017, but the finding, by jury, of breach of contract and breach of the covenant of good faith and fair dealing was rendered on September 28, 2018. The finding by the Court of willful and knowing violations of G.L. c. 93A was rendered on January 28, 2019, and the Court found additional 93A violations on April 30, 2020. A judgment was entered on June 16, 2020. Thus, the date the Trust's cause of action arose for breach of fiduciary duty against Dos Anjos may be subject to dispute. Consequently, the Court must act immediately to preserve the rights of the Trust, its beneficiaries and creditors.

PARTIES

2.      The petitioner, H1 Lincoln, Inc. (hereinafter the "petitioner"), is a Rhode Island corporation with a principal place of business located at 122 Doty Circle, West Springfield, Hampden County, Massachusetts. Its principal is James E. Balise, Jr. Petitioner has registered with the Secretary of the Commonwealth to do business in Massachusetts.

3.      The Trust is a realty or nominee trust created by a Declaration of Trust dated June 9, 2000, recorded in the Bristol County Registry of Deeds at Book 8832, Page 224, with a usual place of business at 355 Elm Street, Seekonk, Bristol County, Massachusetts. A copy of the declaration of trust is incorporated by reference herein and attached as Exhibit A.

4.      The defendant, Alfredo Dos Anjos (hereinafter "Dos Anjos"), is a Florida resident who was the settlor of and is the present Trustee of the Trust who maintains a usual place of business at 355 Elm Street, Seekonk, Bristol County, Massachusetts.

5.      Dos Anjos refuses to disclose the identity of the beneficiaries, however, upon information and belief the beneficiaries include Dos Anjos himself, his wife, children, and minor grandchildren.

2

FACTS

6.     On or about October 28, 2016, the petitioner entered into a long-term lease which was negotiated and executed by Dos Anjos (the "Lease"). The Lease is incorporated by reference herein and attached as Exhibit B.

7.     Although a part of the leasehold premises included in the Lease was owned by the Trust, the Lease did not provide for the Trust to receive any of the millions of dollars of rent to be paid by the petitioner over the life of the Lease, which would be in effect for at least 23 years and up to 43 years.

8.     Rather, Dos Anjos provided for that rental income to be paid to two LLCs he owned and controlled, which, upon information and belief, had different owners and beneficiaries than the Trust. While the Trust owned the leased premises, this was not disclosed in the Lease. Dos Anjos listed the two LLCs as the landlords under the lease. The LLCs that Dos Anjos listed to receive the rent payments were South Washington Street, LLC and 849 South Washington Street, LLC (the "LLCs").

9.     Dos Anjos has refused to disclose the beneficiaries of the Trust and/or the individuals holding beneficial interests in the LLCs, however, upon information and belief, some of the beneficiaries of the Trust are his spouse and family members.

10.    After having executed the Lease of real estate belonging to the Trust, Dos Anjos accepted a $150,000 deposit under the terms of the Lease and deposited none of those funds into the accounts of the Trust. Instead, Dos Anjos deposited those funds into a third LLC which he also owned and/or controlled.

11.    On or about August 9, 2017, after the petitioner had paid the $150,000 security deposit in full and made substantial monetary investments including all of the steps required to

3

move its business from Rhode Island to the site of the leased premises in Massachusetts, Dos Anjos purported to "cancel" the Lease which covered the real estate owned by the Trust and keep the $150,000 security deposit.

12.     From August 9, 2017, until December 26, 2017, Dos Anjos refused to negotiate in good faith with the petitioner to restore the Lease. Petitioner offered to satisfy every additional demand made by Dos Anjos in addition to the previously agreed upon terms of the Lease. Instead of honoring his obligations under the Lease, Dos Anjos engaged in conduct aimed to "string along" the petitioner and wrongfully extort from the petitioner economic concessions not due under the Lease. Dos Anjos later described his tactics as "fishing."

13.     On December 27, 2017, the petitioner herein filed a Superior Court complaint against the lessor LLCs, not the Trust. That case is docketed as *H1 Lincoln, Inc. d/b/a Majestic Honda v. South Washington Street, LLC, et al.*, Hampden Superior Court, Civil Action No. 17-899.

14.     Subsequently, by stipulation of the parties to the Superior Court matter and approved by the Superior Court, the Trust and its Trustee were made party *nunc pro tunc* to the complaint referenced in Hampden Superior Court Civil Action No. 17-899 (the "Superior Court Action"), along with three other trusts for which Dos Anjos also served as trustee and were similarly situated. The stipulation is incorporated by reference herein and attached as Exhibit C.

15.     The Superior Court Action was tried before a jury in September of 2018. The jury found that the Lease remained in full force and effect and that the defendants had breached the contract and the covenant of good faith and fair dealing. The jury found delay damages in the amount of $4,462,500. Judge Mark D Mason, Associate Justice of the Superior Court,

4

further found that petitioner was entitled to fees and costs under the contract in the amount of $425,912.62.

16.    Petitioner's remaining claims under G.L. c. 93A were tried at a bench trial that occurred in October 2018 – January 2019. In his initial 93A Findings of Fact and Rulings of Law, Judge Mason found that the defendants, through the knowing and willful conduct of Dos Anjos, engaged in multiple knowing and willful acts of unfair and deceptive misconduct in violation of G.L. c. 93A. Judge Mason doubled the underlying delay damages from $4,462,500 to $8,925,000, and he awarded additional attorneys' fees of $108,947 and expenses (including expert fees and costs) in the amount of $113,507.51. Judge Mason's initial 93A Findings of Fact and Rulings of Law, dated January 28, 2019, are incorporated by reference herein and attached as Exhibit D.

17.    After Judge Mason issued his rulings with respect to G.L. c. 93A it was revealed that Dos Anjos had deceived the petitioner all along as to who truly owned the land that made up the leased premises in order to try to avoid any judgment or attachment affecting the real estate. In over 25 instances, including pleadings, judicial admissions, deposition testimony, trial testimony, affidavits and representations by Dos Anjos's counsel, Dos Anjos and his agents falsely represented to H1 Lincoln, Inc., the jury, and Judge Mason that the land was owned by the two landlord LLCs. However, in 2019, when petitioner sought to enforce the award of specific performance and obtain financing for construction at the site, petitioner learned that the land was actually owned by the Trust.

18.    Even after the petitioner confronted Dos Anjos and his agents about the many deceptions, Dos Anjos continued to deceive petitioner about the true ownership of the land and

attempted to extract from petitioner improper economic concessions in a repeat of Dos Anjos's misconduct in 2017.

19.     Dos Anjos's continued deceptions and unfair and deceptive conduct significantly delayed petitioner in its municipal permitting and building necessary to build its business at the leased property. This was in violation of the defendants' obligations to cooperate under the Lease and pursuant to the Court's order within its Findings of Fact and Rulings of Law in the initial G.L. c. 93A trial. Upon petitioner's Motion under Rule 60, in August of 2019 the Superior Court re-opened the bench trial on the issues of additional violations of G.L. c. 93A, additional delay damages, and additional attorneys' fees.

20.     At the re-opened 93A trial, Dos Anjos, his daughter, and his real estate attorney each refused to answer questions pertaining to their management of the Trust by asserting their constitutional privilege against self-incrimination and the attorney-client privilege.

21.     Judge Mason took under advisement whether to refer Dos Anjos's potentially larcenous and perjurious misconduct to the Hampden County District Attorney's Office and/or the Attorney General's Office. The Court heard from other witnesses and drew adverse inferences against the Trust based upon Dos Anjos's invocations and refusals to testify.

22.     At the conclusion of the re-opened 93A trial, the Court found that the defendants (which included the instant Trust and its Trustee) had once again, through Dos Anjos, willfully and knowingly violated G.L. c. 93A. The Court awarded additional delay damages of $1,592,250, which it doubled to $3,184,500, along with attorneys' fees and costs in the amount of an additional $294,618.26. Judge Mason's re-opened 93A Findings of Fact and Rulings of Law, dated April 30, 2020, are incorporated by reference herein and attached as Exhibit E.

  
23.     Based on the outcome of the jury and bench trials in the Superior Court Action, the Trust and its Trustee are now subject to the monetary consequences of its Trustee's (Dos Anjos') misconduct.

24.     Consequently, the Trust and its Trustee are subject to a judgment issued by the Court which has present monetary damages of $13,052,485.39. This figure does not include substantial interest dating back to the date of the breach, which the jury determined was August 9, 2017. A copy of the judgment is incorporated by reference as if fully stated herein and attached as Exhibit E.

25.     Similar litigation is ongoing against Dos Anjos individually in the U.S. District Court for the District of Massachusetts (the "Federal Court Action").

26.     As trustee, Dos Anjos was obliged at all times to act in the best interest of the Trust and its beneficiaries and creditors. He did not. Instead, through willful and knowing misconduct, Dos Anjos took a multimillion-dollar asset owned by the Trust (commercial land with a decades-long commercial land Lease) and through his misbehavior converted that asset into a multimillion-dollar liability all to the disadvantage of the Trust, its beneficiaries and creditors.

27.     As a result, the Trust has a cause of action against Dos Anjos for his breach of fiduciary duty but has no independent Trustee to evaluate and proceed to monetize said cause of action to address the claim of its creditor because of Dos Anjos's demonstrable conflict of interest.

28.     At present, the Trust has but two assets: (1) any land, the value of which is less than the judgment, and (2) the claim against Dos Anjos for breach of fiduciary duty.

29.     The petitioner as a creditor has a beneficial interest in the right of the trust to recover property or, in this case, pursue its action for breach of fiduciary duty against its breach trustee. Petitioner as a creditor has an interest in the trust competently, suitably and timely asserting this action against Dos Anjos.

30.     Dos Anjos is unfit to continue on as trustee as a result of having committed serious breaches of trust. Dos Anjos's misconduct and the staggering nature to which he has cost the Trust many millions of dollars have created a conflict of interest between his duties as trustee and his own self-interest.

31.     Dos Anjos is unwilling and persistently failing to administer the trust effectively. He has refused to subjugate his own interest to that of the Trust and preservation of its assets. Dos Anjos's further refusal to assert a claim for breach of fiduciary duty against himself risks the claim becoming time-barred on August 9, 2020 should the statute of limitations be construed to have begun to run as of the date of Dos Anjos's breach of lease with the petitioner (August 9, 2017) rather than the later date of the judgment obtained by the petitioner against Dos Anjos.

32.     The judgment in the Superior Court Action constitutes a substantial change that makes removal of Dos Anjos as trustee as the manner to best serve the interests of the beneficiaries and creditors. To preserve, file, and/or assign this claim against Dos Anjos, a new trustee must be appointed. Dos Anjos has indicated he intends to appeal said judgment.

33.     Finally, a nominee trust or realty trust, as here, is interpreted by the courts as a mere partnership or agency relationship. The beneficiaries are at risk of being subjected to the judgment if the trustee fails to preserve trust assets by which its creditor's judgment may be satisfied. Thus, the proposed removal of the conflicted and self-dealing trustee, Dos Anjos, best

8

serves the interests of all interested beneficiaries and creditors and is not inconsistent with a material purpose of the Trust.

34.     Three suitable successor Trustee have been proposed as indicated on Petitioner's MPC 266.

35.     Without the relief requested herein, the Trust, beneficiaries and petitioner will suffer substantial damages as a result of Dos Anjos's waste of a significant trust asset by failing to assert the claim for breach of fiduciary duty against himself.

36.     Upon information and belief, Dos Anjos, personally and/or through entities in which he has a controlling interest, has substantial personal assets which would be available to satisfy the anticipated judgment's shortfall.

## REQUESTED REMEDY 1

### ORDER THE TRUST AND DOS ANJOS TO PRODUCE SCHEDULE OF BENEFICIARIES

37.     All other paragraphs of this Petition are incorporated as if stated fully herein.

38.     Pursuant to G.L. c. 203E, §§ 706(c) and 1001(b), pending a final resolution on petitioner's request to remove Dos Anjos as trustee, petitioner seeks the issue of a short order of notice setting a date upon which this Court will hear the petitioner's request that a preliminary order be issued compelling the Trust and Dos Anjos to produce the Schedule of Beneficiaries of the Trust existing from the date the Lease was executed (October 28, 2016) through the present so that said beneficiaries can be given notice of this action.

## REQUESTED REMEDY 2

### PENDING A FINAL RESOLUTION ON THIS PETITION FOR REMOVAL, SUSPEND DOS ANJOS'S ABILITY TO ACT AS TRUSTEE AND APPOINT A SPECIAL FIDUCIARY

39.     All other paragraphs of this Petition are incorporated as if stated fully herein.

40.     Petitioner requests that a suitable guardian ad litem be appointed to protect the interests of any minor or unascertained beneficiaries, if any.

41.     Pursuant to G.L. c. 203E, §§ 706(c), 1001(b)(2), 1001(b)(5), 1001(b)(6), and 1001(b)(10), pending a final resolution on petitioner's request to remove Dos Anjos as trustee, petitioner requests that the Court suspend Dos Anjos's ability to act as trustee of the Trust until the completion of the instant action and also appoint a special fiduciary during the pendency of this matter to take possession, administer and preserve the interests and assets of the Trust for its beneficiaries and creditors.  Petitioner requests that the Court order the said co-trustee or special fiduciary to prosecute any action against Dos Anjos for breach of his duties as Trustee.

## REQUESTED REMEDY 3

### TO PREVENT WASTE, PERMIT PETITIONER TO COMMENCE ACTION AGAINST DOS ANJOS BEFORE THE CLAIM IS POTENTIALLY TIME-BARRED

42.     All other paragraphs of this Petition are incorporated as if stated fully herein.

43.     Pursuant to G.L. c. 203E, §§ 706(c) and 1001(b)(10), as well as G.L. c. 231A, § 1, declare that (1) petitioner possesses an interest in the enforcement of the claim against Dos Anjos for breach of fiduciary duty and (2) petitioner may bring a civil action against Dos Anjos to enforce such claim on behalf of the Trust and its beneficiaries, who until now have refused to do so, to preserve and prosecute such claim as an interest and asset of the Trust for its beneficiaries and creditors.

## REQUESTED REMEDY 4

### REMOVE DOS ANJOS AS TRUSTEE AND REPLACE HIM WITH SUCCESSOR TRUSTEE

44.     All other paragraphs of this Petition are incorporated as if stated fully herein.

45.     Pursuant to G.L. c. 203E, §§ 706 and 1001(b), petitioner requests that the Court

remove Dos Anjos as trustee and replace him with a wholly independent trustee and such other

relief, including attorney's fees, costs, interest, or other relief as this Honorable Court may deem

appropriate.  Three alternative successor trustees have been proposed on petitioner's MPC 266.

**THE PETITIONER DEMANDS A TRIAL BY JURY ON ANY CLAIMS SO TRIABLE.**

THE PETITIONER,
H1 LINCOLN, INC.,
BY ITS ATTORNEYS,

John J. Egan, BBO #151680
Michael G. McDonough, BBO #682128
Egan, Flanagan and Cohen, P.C.
67 Market Street, P.O. Box 9035
Springfield, MA 01102-9035
(413) 737-0260; Fax (413) 737-0121
Email: jje@efclaw.com; mgm@efclaw.com

Edward J. Casey, Esq., BBO #: 077310
Coogan Smith, LLP
144 Bank Street - P.O. Box 2320
Attleboro, MA 02703
T: (508) 222-0002
Email: ejc@coogansmith.com

17052-190843\381713

11

<u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the above document was caused to be served upon Alfredo Dos Anjos and that a copy was also sent to Attorney Richard Briansky, the attorney of record for Mr. Dos Anjos, by mail and electronic mail on July 2, 2020.

Michael G. McDonough

# Exhibit A

# Declaration of Trust of 849 South Washington Street Realty Trust and Certificate of Trustee

BK  8832 PG  224
06/12/00 09:51 25719

# DECLARATION OF TRUST
## OF
## 549 SOUTH WASHINGTON STREET REALTY TRUST

DECLARATION OF TRUST made this 9ᵗʰ day of June, 2000 by Alfredo M. DosAnjos, hereinafter referred to as the Trustee.

The Trustee hereby DECLARES that he and his successors in trust will hold any and all of the property that may be transferred to or acquired by him in his capacity as Trustee, (hereinafter referred to as "the Trust Premises") in trust for the purposes hereinafter contained:

1. This Trust shall be designated and known as the

### 549 SOUTH WASHINGTON STREET REALTY TRUST.

2. A. The entire beneficial interest of this Trust shall be vested in the persons named in a Schedule of Beneficial Interests of even date, signed by the Trustee and the Beneficiaries, in the proportion therein set forth.

B. The term "Beneficiaries" wherever used herein shall mean the persons named in the Schedule of Beneficial Interests referred to above as it may be amended by the Trustee and the Beneficiaries from time to time. The Trustee shall not be affected by any assignment or transfer of any beneficial interest by any Beneficiary until receipt by the Trustee of written notice that such assignment or transfer has in fact been made. The Trustee may, without impropriety, be or become a Beneficiary hereunder and exercise all rights of a Beneficiary with the same effect as though he or she were not a Trustee.

3. A. This Trust shall continue until terminated in the manner provided in Paragraph 6B or on the sale and conversion into cash of the Trust Premises, whichever event shall first occur provided, however, that this Trust shall terminate in any event twenty (20) years after the death of the original Trustee herein named.

B. Upon the termination of the Trust, the Trust Premises shall automatically vest in the Beneficiaries hereof as tenants in common if more than one, in proportion to their respective interests, or in the name of the sole Beneficiary, if only one, subject to any mortgages, leases, contracts, or other encumbrances on the Trust Premises then existing.

4. A. The purposes for which the Trust is formed and the functions to be carried on by the Trustee are limited to holding the record legal title of the Trust Premises for the benefit of the Beneficiaries. The Trust shall not engage in any functions other than the holding of record legal title to the Trust Premises, and such functions as are necessarily incidental thereto, and is intended to be merely a nominee trust, so-called, for Federal and State income tax purposes.

B. Except as herein provided in the case of the termination of this Trust, the Trustee shall have no power to deal in or with the Trust premises, except as directed in writing by all of the Beneficiaries. Upon such direction, the Trustee may borrow money,

1

BK 8832 PG 225

sell, mortgage or otherwise dispose of all or any part of the Trust Premises, lease all or any part thereof by one or more leases for a term or terms which may extend beyond the date of any possible termination of this Trust, grant or acquire rights and easements, guarantee obligations of the Beneficiaries and secure such guarantees by a mortgage on the Trust Premises; enter into agreements or arrangements with respect to the Trust Premises, enter into partnership agreements for the acquisition and/or management of the Trust Premises, acquire property and leasehold interests in property, and take such other action as the Beneficiaries may direct, provided, however, that the Trustee shall not be required to take any action so directed which will, in the opinion of the Trustee, expose him to any personal liability unless first indemnified to the satisfaction of the Trustee.

The Trustee shall not be required to inquire into the propriety of any direction received from the Beneficiaries. Any person dealing with the Trustee shall be fully protected in accordance with the provisions of Paragraph 8 hereof.

5. The Beneficiaries of this Trust, in their own right, shall have the control of the management, operation and handling of the Trust Premises, and all matters related thereto and the Trustee shall have no duty with respect to such management, operation or handling of the Trust Premises or other matters related thereto, including without limitation, the collection of income, payment of taxes, provision of insurance, engaging in litigation or otherwise, except on written direction of the Beneficiaries, and after payment to the Trustee of all money necessary to carry out said instructions.

6. A. This Declaration of Trust may be amended from time to time by the Trustee with the written consent and approval of the Beneficiaries by an instrument in writing signed by the then Trustee or Trustees hereunder and acknowledged by one or more of them, but no such amendment shall, without the written consent of the Trustee hereunder, increase the liability or duties of the Trustee from that originally provided herein.

The amendment shall be effective upon the recording with the Bristol County Northern District Registry of Deeds of the instrument of amendment or a Certificate of Amendment which sets forth the exact terms of such amendments which has been signed by a majority of the Trustees or the Trustee, if only one, and acknowledged in the manner required for recording.

B. This Trust may be terminated at any time by all of the Beneficiaries, or if there be only one Beneficiary by the sole Beneficiary, by delivering to all of the Trustees (or to the Trustee, if at that time there shall be only one Trustee) of an instrument in writing setting forth such termination and signed by any one or more of the Beneficiaries and acknowledged in proper form for recording. This Trust may also be revoked and terminated at any time by any one or more of the Trustees by delivering to the Beneficiaries (and to the other Trustee, if such revocation and termination is by less than all of the Trustees) of an instrument in writing setting forth such revocation and termination and signed by any one or more of the Trustees and acknowledged in proper form for recording.

Upon delivery of such instrument to the Trustees (or the Trustee, if at that time there shall be only one Trustee) or to the Beneficiaries, as the case may be, the Trustee or Trustees shall acknowledge receipt of the same and the same shall be

202

BK 8832 PG 228

recorded in the Registry of Deeds in which this Declaration of Trust is recorded. Such termination shall be effective upon the recording of such instrument with said Registry of Deeds.

7. No Trustee shall be liable for any error of judgment or for any loss arising out of any act or omission in the execution of the Trust so long as he acts in good faith but in any event, any Trustee shall be liable and accountable only for his own individual acts, receipts, neglects, and defaults, and not for those of any other Trustee, or of any person employed by him, or of any bank, trust company, broker or other person or entity with whom or wherein any monies or securities belonging to the Trust may be deposited nor for any defect in title of any property acquired by the Trust, and nor for any loss of property unless such occurs as a result of his own wilful acts or omissions, and he shall be entitled to indemnity in the execution of the terms or provision hereof except for such wilful acts or omissions.

8.    A.  No person dealing with any person who appears of record in the Bristol County Northern District Registry of Deeds as the Trustee hereof shall be bound to inquire further as to the person who is then the Trustee hereunder.  The receipt by the Trustee for monies or other items paid or delivered to him shall be conclusive evidence to the persons paying or delivering the same of the payment or delivery of such monies or other items to the Trust, and, no purchaser, lender or other persons from whom the Trustee shall receive any money, property or credit shall be under any liability or responsibility to see to the proper application thereof or to see that the terms and conditions of the Trust have been complied with.  No license of court shall be required to authorize or validate any transaction entered into by the Trustee, and the Trustee shall have full power and authority to execute all deeds and other instruments necessary or proper to effectuate such transactions.

.B.  Every agreement, mortgage, pledge, note assignment, transfer, check, deed, extension, release, discharge and other writing or document executed by the person appearing from the records in the Bristol County Northern District Registry of Deeds, to be the Trustee hereunder, shall be conclusive evidence in favor of every person relying thereon or claiming thereunder, that at the time of the execution and delivery thereof this Trust was in full force and effect and that the Trustee executing and delivering such instrument was duly authorized, empowered and directed by the Beneficiaries to execute and deliver the same, and that such instrument is valid, binding, effective and legally enforceable.

9.    A.  Any Trustee hereunder may resign by written instrument signed and acknowledged by such Trustee and recorded at the Bristol County Northern District Registry of Deeds.

B.  One or more additional Trustee and successor Trustees may be appointed by the Trustee or Trustees then holding such office.

.C.  One or more additional Trustee and successor Trustees may also be appointed, and any Trustee may be removed, by an instrument or instruments in writing signed by all of the Beneficiaries and acknowledged by one or more of them.

3

203

BK 8832 PG 227

D. In the case of any and all appointments or removals, such instrument of appointment or removal, or a certificate by any Trustee naming the Trustee or Trustees appointed or removed, and, in the case of an appointment, the acceptance in writing by the Trustee or Trustees so appointed, shall be so recorded. Upon the appointment of any succeeding Trustee or additional Trustee or Trustees, the title to the Trust Premises shall thereupon and without the necessity of any conveyance be vested in said succeeding or addition Trustee or Trustees jointly with the remaining Trustee or Trustees, if any. Any succeeding Trustee shall have all the rights, powers, authority, and privileges as if named as an original Trustee hereunder. No Trustee shall be required to furnish bond.

E. Any change of Trustees hereunder shall not affect any person not having actual notice thereof until a certificate signed and acknowledged as herein provided is recorded in the Bristol County Northern District Registry of Deeds and such certificate shall be conclusive evidence to all persons of any fact therein recited. The Schedule of Beneficiaries signed by the Trustee when recorded shall be conclusive evidence as to the facts set forth therein. However, such recording shall not be required to validate or effectuate any act done pursuant to the terms of this instrument nor to establish the rights of the Beneficiaries listed therein.

10. Nothing herein, and no act of any Trustee, and no instrument executed by any Trustee shall create or impose on the Trustee any personal liability. In every contract and instrument made or executed by the Trustee, reference shall be made to this instrument, and a provision included that the same is executed by the Trustee with the express understanding and agreement that nothing therein contained shall be construed as creating any personal liability or obligation on the part of the Trustees or the Beneficiaries and that every person now or hereafter claiming any right or security under any such instrument shall look solely to the Trust property for the payment thereof and the enforcement of any lien thereby created or the enforcement of any covenant, condition, obligation or agreement contained therein.

The terms "Trustee" or "Trustees" when used in this instrument shall each include both singular and plural where the context so requires or permits. In the event there shall be more than two Trustees, any action required or permitted by the Trustee shall require a majority. In the event there are only two Trustees, any single Trustee, acting alone may exercise all of the rights, duties and powers of the Trustee hereunder.

IN WITNESS WHEREOF, the said Alfredo M. DosAnjos has signed these presents in token of their acceptance of this Trust, intending these presents to take effect as an instrument under seal on the day and year first above written.

_____
Alfredo M. DosAnjos

201

BK  8932 PG  228

## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                                                    June 9, 2000

Then personally appeared the above-named Alfredo M. DosAnjos, known to me,
and acknowledged his execution of the foregoing Declaration of Trust to be his free act
and deed, before me,

_____
David O. Manoogian - Notary Public

My commission expires 12/15/2000.

Misc./DosAnjos 848 Realty Trust

5

205

BK  8832  PG  229
06/12/00  09:51  25720

SEE 8832-224

## 849 SOUTH WASHINGTON STREET REALTY TRUST

### Certificate of Trustee

Alfredo M. DosAnjos, Trustee of 849 SOUTH WASHINGTON STREET REALTY TRUST under a Declaration of Trust dated June 9, 2000, recorded with the Bristol County Northern District Registry of herewith, certifies that:

1. I am the sole incumbent Trustee of the Trust;

2. The Trust has not been revoked or terminated and all amendments, if any, hereto have been recorded with said Deeds;

3. Pursuant to the Trust, when specifically authorized and directed by the beneficiaries of the Trust, the Trustee has full right, power and authority to deal with any property owned or held by the Trust with the same force and effect as though such property were individually owned;

4. The Trustee, by instruments in writing signed by all the holders of beneficial interests under the Trust, have been duly authorized and directed to (1) purchase from Stanley P. Gavlick and Jane T. Gavlick for the sum of $725,000.00 the land together with the buildings and improvements thereon located at 849 South Washington Street, North Attleborough, Massachusetts; and (2) to execute such other agreements, instruments and documents as the Trustee deems necessary in order to effectuate the purchase of said premises.

5. No beneficiary is a minor, a corporation selling all or substantially all its Massachusetts assets, or personal representative of an estate subject to estate tax liens, or is now deceased or under any legal disability.

ALFREDO M. DOSANJOS
as Trustee aforesaid

206

BK 8932 PG 230

## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                                                        June 9, 2000

Then personally appeared before me the above-named Alfredo M. DosAnjos as Trustee of 849 South Washington Street Realty Trust and acknowledged the foregoing instrument to be his free act and deed as Trustee of said Trust.

David C. Manoogian - Notary Public

My commission expires 12/15/2000.

Misc./849 S. Wash. St. RT Trustee's Certificate

2

207

# Exhibit B

# The Lease

10/18/16
EXECUTION COPY

LOCATION: North Attleboro, Massachusetts

LEASE

between

HI LINCOLN, INC. d/b/a MAJESTIC HONDA,

as Tenant

and

849 SOUTH WASHINGTON STREET, LLC

And

SOUTH WASHINGTON STREET, LLC,

collectively as Landlord

dated *OCTOBER 28, 2016*



TABLE OF CONTENTS

1.   Leased Property ............................................................................1
2.   Demolition and Construction of Buildings and Improvements. ............1
3.   Lease Term....................................................................................3
4.   Rent/Deposit/Right of First Refusal/Contingencies. ..........................4
     I)   Rent: ...................................................................................3
     II)  Deposit. ...............................................................................5
     III) Right of First Refusal............................................................5
     IV) Contingencies ......................................................................5
5.   Signs and Communications Equipment. ..........................................6
6.   Taxes. ...........................................................................................6
7.   Maintenance, Repairs and Replacement, .........................................7
8.   Payment of Utility Bills ..................................................................8
9.   Alterations......................................................................................8
10.  Mechanics' Liens ............................................................................9
11.  Insurance, ......................................................................................9
12.  Damage by Fire or Other Casualty. ...............................................11
13.  Condemnation. ..............................................................................12
14.  Assignment and Subletting ............................................................13
15.  Use ..............................................................................................14
16.  Warranties and Representations......................................................14
17.  Estoppel Certificates .....................................................................17
18.  Subordination, Non-Disturbance and Attornment ...........................17
19.  Change of Landlord .......................................................................18
20.  Tenant's Financing.........................................................................18
21.  Tenant's Property and Subordination of Landlord's Lien .................18
22.  Short Form of Lease; Commencement Date Agreement....................19
23.  Expiration of Term and Holding Over.............................................19
24.  "For Rent" Signs ...........................................................................19
25.  Easements ....................................................................................19
26.  Events of Tenant's Default .............................................................20
27.  Landlord's Remedies .....................................................................20
28.  Events of Landlord's Default; Tenant's Remedies............................22
29.  Waiver...........................................................................................23



30.  Compliance with Applicable Laws ........................................................23

31.  Notices ..................................................................................23

32.  Brokers ..................................................................................24

33.  Miscellaneous ............................................................................24

34.  Tenant's Right to Terminate .............................................................26

35.  Confidentiality ........................................................................28

36.  Survival ................................................................................28

37.  Conflict ................................................................................28



## EXHIBITS

"A"     Site Plan

"A-1"   Legal Description

"B"     Memorandum of Lease

"C"     Commencement Date Agreement



10/18/16
EXECUTION COPY

849 South Washington Street
865 South Washington Street
North Attleboro, Massachusetts

## LEASE

This LEASE is made as of the 28th day of OCTOBER, 2016, by and between 849 South Washington Street, LLC and South Washington Street, LLC, Massachusetts limited liability companies, having an address at c/o Pride Hyundai, 11 Taunton Avenue, Seekonk, Massachusetts 02771 (collectively "Landlord"), and HI LINCOLN, INC. d/b/a Majestic Honda, a Rhode Island corporation, having an address at c/o Balise Auto Group, 122 Doty Circle, West Springfield, Massachusetts 01089 ("Tenant"). The date this Lease is executed and delivered by both parties hereto shall be referred to hereinafter as the "Effective Date."

### WITNESSETH:

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Leased Property.  Landlord demises and leases to Tenant and Tenant leases and takes from Landlord, commencing on Landlord's delivery of the Land and Buildings (as defined below) to Tenant, all those certain "Premises" consisting of the Land, the Buildings and the Other Improvements (all as defined in Section 2), as and when same are constructed or renovated. The "Land," as that term is used herein, shall mean that approximately 6.42 acre tract of land, comprising a parcel of 1.85 acres at 849 South Washington Street (the "849 Parcel") and a parcel of 4.57 acres at 865 South Washington (the "865 Parcel"), located in the City of North Attleboro, Massachusetts, including (i) all improvements thereon and appurtenances thereto, including but not limited to the building containing 9,232 square feet on the 849 Parcel (the "849 Building"), and the building containing 18,675 square feet on the 865 Parcel (the "865 Building"), and (ii) all improvements hereinafter constructed on the Premises by Tenant in accordance with the terms hereof.  The Land is shown on Exhibit "A" hereto (the "Site Plan"), and is more particularly described by metes and bounds or platted lot legal description on Exhibit "A-1" attached hereto and made a part hereof.

2.     Demolition and Construction of Buildings and Improvements.

(a)     Tenant shall determine during the Feasibility Period as defined in Section 4(IV)(b) below, whether the 849 Building or the 865 Building, or both (collectively, the "Existing Buildings, and each one, an Existing Building"), will need to be demolished to accommodate Tenant's planned use of the Property.  If Tenant determines that either or both of the Existing Buildings will need to be demolished in connection with Tenant's planned use of the Property, or that any new buildings need to be constructed ("New Buildings"), Tenant shall give Landlord written notice of such determination within the Feasibility Period ("Demolition/New Buildings Notice").  If Tenant fails to furnish Demolition/New Building Notice within the Feasibility Period, Tenant shall be deemed to have elected not to demolish either of the Existing Buildings or construct New Building, Demolition/New Buildings Notice shall include preliminary site plans and elevations for Tenant's proposed development of the Property, which

shall be in reasonable detail, but which shall not be construction drawings, showing the size, location, and materials of the building or buildings Tenant plans to construct in place of the demolished Existing Building or Existing Buildings or in addition to Existing Buildings. Within fifteen (15) days after Landlord's receipt of the Demolition/New Building Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant if Landlord reasonably withholds consent to such new construction, in which event this Lease shall terminate as of the date of Landlord's written notice and the parties shall have no further obligation to one another except those obligations that expressly survive termination hereunder including provisions set forth with respect to the Tenant's deposit as set forth in Section 34(a) below If Landlord fails to terminate this Lease within such fifteen (15) day period, Landlord shall be deemed to have waived the right to terminate this Lease pursuant to this Section 2(a), and Tenant shall be permitted to demolish Existing Building or Buildings or construct New Buildings as described in Tenant's Demolition/New Buildings Notice; provided, however, that under no circumstances shall any Existing Building be demolished or New Buildings be constructed until Tenant has secured a demolition permit for the Existing Buildings *and* building permit for the New Building or Buildings and associated improvements, and secured adequate financing for the construction of the New Buildings and site work associated therewith. Notwithstanding the foregoing, Landlord acknowledges that Tenant's present intention is to demolish the 865 Building and the 849 Building and replace with a prototypical Honda dealership facility. Tenant shall submit to Landlord during the Feasibility Period a prototypical elevation showing the materials and general architectural appearance of the Honda dealership facility and reasonably detailed plans for the Tenant's proposed improvements for the review and approval of the Landlord, which such approval shall not be unreasonably withheld.

(b)    Commencing after the Land Delivery Date, Tenant shall have the right to construct on the Land at Tenant's expense one or more buildings (collectively, the "New Buildings," and together with any of the Existing Buildings not planned for demolition pursuant to subsection 2(a) above, the "Buildings"), together with loading ramps, sidewalks, trash compactor, transformer pad, security gates, trenching and drainage system, and other appurtenances and improvements to the Land, and the utilities, roads, and storm water management areas serving the Land necessary or desirable for the operation of the Property as an automobile sales facility with appurtenant service and wholesaling, or for the other uses permitted under this Lease, including but not limited to parking areas, security fencing, signs, curb cuts and median breaks, interior building fixtures (collectively, the "Other Improvements," which term shall not include furniture or Trade Fixtures, as hereinafter defined, and movable equipment). The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements." "Trade Fixtures," as that term is used herein, shall mean all vehicle lifts, service equipment, racking systems, kiosks, counters, cases, signs, shelving and similar fixtures that are owned by Tenant and to be used in the operation of the business conducted on the Premises but not any Trade Fixtures that currently are located in the Existing Buildings and owned by Landlord or any entity affiliated with Landlord The Improvements initially constructed or renovated by Tenant shall be constructed or renovated, as applicable, in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to Improvements constructed by Tenant shall remain with Tenant throughout the Term, as hereinafter defined, but shall automatically pass to Landlord upon expiration or earlier termination of the Term without the necessity of further writing. Upon the expiration or earlier termination of this Lease, and within



fifteen (15) days after written request from Landlord, Tenant shall furnish to Landlord an instrument in recordable form confirming the transfer of title in and to the Improvements to Landlord, such instrument to be in form and substance reasonably satisfactory to Tenant. The cost of preparing and recording any such instrument shall be borne by Landlord.

(c). Notwithstanding anything contained in this Lease to the contrary, the Landlord shall have the right for a period of ninety (90) days after the Land Delivery Date to enter any of the Existing Buildings that tenant has elected to demolish under this Lease to (i) remove the existing heating, ventilating and air conditioning systems in any such Existing Building, including all ducts, wiring, boilers, compressors and all other components thereof and to keep said systems as Landlord's property; and (ii) remove from the Existing Buildings all furnishings, materials and equipment (including service bay lifts and equipment) that Tenant has not agreed to purchase at a price acceptable to the Landlord, Tenant shall undertake no demolition of any of the Existing Buildings until the earlier of the expiration of said ninety (90) day period or upon written notice from the Landlord that such systems, materials, furnishings and equipment have been removed.

3. _Lease Term_: Subject to Tenant's right to terminate this Lease as set forth in Section 34, the initial term (the "Main Term") of this Lease shall commence on the Land Delivery Date, as defined in the Construction Provisions (also referred to herein as the "Commencement Date"), and shall end on the date that is twenty three (23) years after the Commencement Date; provided, however, that if the Commencement Date is other than the first day of a calendar month, the Main Term shall expire on the last day of the calendar month containing the twenty-third (23rd) anniversary of the Commencement Date.

In addition to the Main Term, provided no monetary Event of Default (as defined below), or material non-monetary Event of Default, shall have occurred and remain uncured, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified in Section 4 below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable. In order to avoid any forfeiture or inadvertent lapse of such Renewal Option, if Tenant shall fail to give any such notice within the one hundred eighty (180) day time limit and shall not have given Landlord prior written notice of its intent not to exercise its Renewal Option, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, until ten (10) business days after Landlord shall have given Tenant a written notice of Landlord's election to terminate the Renewal Option. Tenant may exercise its Renewal Option at any time prior to the expiration of such ten (10) business day period. Notwithstanding the foregoing, in the event Tenant shall not have exercised its Renewal Option on or before the date which is one hundred twenty (120) days prior to the expiration of the Main Term or current Option Term, as applicable, Tenant shall be deemed to have waived such Renewal Option and no notice from Landlord shall be required to effect such waiver. Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the Term (defined below) of this Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant.



The Main Term and Option Periods are, collectively, the "Term." The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the Commencement Date, except that, if the Commencement Date is other than the first day of a calendar month, the first Lease Year shall begin on the Commencement Date and shall end on the last day of the calendar month containing the first anniversary of the Commencement Date.

    4.   <u>Rent/Deposit/Right of First Refusal/Contingencies.</u>

      I) <u>Rent</u>.

       (a)    Provided this Lease has not been terminated by either party pursuant to the provisions hereof, Tenant agrees to make payments, each in the amount of [    ] ("Interim Rentals"), commencing upon Tenant providing notice to Landlord requiring that the current vehicle storage arrangements with Nissan Village be terminated and the date on which Landlord provides notice to the Tenant that Nissan Village has vacated the leased premises, to allow for the commencement of the Improvements or otherwise (the "Land Delivery Date"), and continuing every thirty (30) days thereafter until, but not including, the Rent Commencement Date, as hereinafter defined. Interim Rentals shall be paid to the address given for Landlord in Section 31 hereof, unless and until thirty (30) days after Landlord gives Tenant written notice of a change of address of the party to whom rents shall be payable. Landlord shall have not less than sixty (60) days to physically remove stored vehicles from the premises. In no event shall the Landlord be liable to Tenant for any delays caused by the failure of the current storage tenant, Nissan Village, to cease its storage operations and vacate the Premises. For the purposes of clarity The Interim Rentals payments shall commence on the date the Landlord gives notice to the Tenant that Nissan Village has completely vacated the leased premises. The Rent Commencement Date indicated in Paragraph 4(I)(b)(ii) immediately below shall be extended by the number of days in excess of the sixty (60) day period set forth herein to allow the Landlord to remove stored vehicles from the leased premises.

       (b)    Tenant shall pay base rent ("Base Rent") in equal monthly installments, in advance, beginning on the date (the "Rent Commencement Date") that is the earlier of (i) the Tenant commencing business operations at the Premises, or (ii) nine (9) months from the date of the execution of this Lease; and continuing on the first day of each calendar month succeeding the Rent Commencement Date throughout the Term, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in Section 31 hereof, unless and until thirty (30) days after Landlord gives Tenant written notice of a change of address or of the party to whom such rents shall be payable. Under no circumstances shall Tenant be required to divide rents paid under this lease among more than two parties. Base Rent shall be paid pursuant to the following schedule:

| Period | | | Annual Rent | | Monthly Rent | |
|---|---|---|---|---|---|---|
| Lease Year 1 | to | Lease Year 3 | $ | | $ | |
| Lease Year 4 | to | Lease Year 8 | $ | | $ | |
| *Except [   ] per month deferred during year 4 until the end of year 5, when a lump-sum payment [   ] is due within 21 days. | | | | | | |
| Lease Year 9 | to | Lease Year 13 | $ | | $ | |
| Lease Year 14 | to | Lease Year 18 | $ | | $ | |
| Lease Year 19 | to | Lease Year 23 | $ | | $ | |

4



| Option Terms (if exercised) | | | $ | | | $ | |
|---|---|---|---|---|---|---|---|
| Lease Year 24 | to | Lease Year 28 | $ | | | $ | |
| Lease Year 29 | to | Lease Year 33 | $ | | | $ | |
| Lease Year 34 | to | Lease Year 38 | $ | | | $ | |
| Lease Year 39 | to | Lease Year 43 | $ | | | $ | |

(c)    Base Rent and all other sums and charges required to be paid by Tenant under this Lease (such other sums and charges, "Additional Rent") shall be deemed "rent" for all purposes of this Lease and are herein sometimes referred to collectively as "Rent." Except as otherwise specifically set forth in this Lease, this Lease shall be a completely net lease and Tenant shall pay to Landlord, net throughout the Term, the Base Rent and all other sums required to be paid by Tenant pursuant to this Lease, free of any offset, abatement, or other deduction, except as expressly provided in this Lease, and without notice, and except as expressly provided herein, Landlord shall not be required to make any payment of any kind whatsoever with respect to the Premises after delivery of the Land to Tenant.

II)    Deposit.  Upon the execution of this Lease, Tenant will deposit with Landlord the sum of $150,000 as a good faith Deposit, which Deposit shall be equally applied to the first 6 months of full Base Rent at $25,000 per month. The Deposit or any remaining portion thereof, shall be forfeited to Landlord as liquidated damages should Tenant default on its obligations under this Lease prior to the entire Deposit being applied toward Base Rent as described in this Paragraph or forfeited to Landlord in accordance with the provisions of Paragraph 34(a) below. No interest shall be paid on the Deposit.

III)    Sale In the event the Landlord decides during the term of this Lease to offer the leased premises for sale through a real estate agent or a brokerage firm the Landlord shall provide Tenant with notice thereof. This provision shall not grant Tenant an option to purchase or a right of first refusal with respect to the leased premises nor shall this provision be noted on any notice of lease executed by the parties for recording at the applicable registry of deeds. The notice set forth herein is simply as a courtesy to the Tenant.

IV)    Contingencies.  The following contingencies are conditions to the commencement of the Main Term of this Lease:

a.  Tenant will have thirty (30) days from the signing of this Lease, to obtain Honda approval for its intended Honda automobile dealership franchise to be operated at the Premises, and if this contingency is not satisfied by that time, the Deposit shall be refunded and the obligations of the parties shall terminate, unless this contingency is waived by Tenant, or unless this contingency is extended by mutual agreement of the parties.

b.  Tenant shall have two (2) months from the full and complete execution of this Lease by the parties to conduct its due diligence examinations to determine if the Premises are suitable for Tenant's intended purpose ("Due Diligence Period").  Tenant shall have nine (9) months from the date of the execution of this Lease, expressly including the aforesaid Due Diligence Period, for Tenant to complete its additional studies, investigations and tests, and to obtain any and all necessary permits for Tenant's proposed renovations and/or new

5



construction, and for the operation of the Tenant's business (hereinafter the period of time after the conclusion of the Due Diligence Period and for a period of seven (7) months from the conclusion of the Due Diligence Period called the "Feasibility Period"). Any election not to proceed by the Tenant, whether at the conclusion of the Due Diligence Period or the Feasibility Period, shall be based on the credible opinions and findings of the independent experts and professionals engaged by the Tenant at Tenant's expense and shall not be based on the opinions and findings of employees of the Tenant.

5.   Signs and Communications Equipment.

(a)   Signs. Tenant shall have the right to install or erect such signs and attachments on the Premises as Tenant shall deem necessary or desirable, provided such signs meet the requirements of applicable law. The maintenance of all such signs and attachments shall be the responsibility of Tenant. All signs shall be at the Tenant's sole risk of loss and Landlord shall have no responsibility for any loss or damage to any such sign. Prior to the expiration or earlier termination of this Lease, Tenant shall remove all signs or other attachments installed by or on behalf of Tenant and shall repair any damage to the Premises resulting from such removal, all at Tenant's sole cost and expense, failing which Landlord may do so at Tenant's expense.

(b)   Communications Equipment. Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable. Prior to the expiration or earlier termination of this Lease, Tenant shall remove any satellite dish and related equipment and Tenant shall repair any damage to the roof occasioned by such removal, failing which Landlord may do so for Tenant at Tenant's expense.

6.   Taxes.

(a)   Taxes Contemplated Hereunder. The term "Real Estate Taxes" shall mean all present and future taxes, special and general assessments, water rents, rates and charges, sewer rents and other governmental impositions and charges of every kind and nature whatsoever, extraordinary as well as ordinary which are applicable to the period of time commencing with the date of this Lease (with Landlord being responsible for such charges applicable to the period of time prior to the date of this Lease even if not yet due and payable), including charges or impositions in lieu of or in addition to taxes on real estate and including any tax or excise levied against Landlord on account of Landlord's interest in this Lease or the rents collected hereunder, and each and every installment thereof which shall or may during the term of this Lease be charged, levied, laid, assessed, imposed, or become due and payable, including tax liens upon or for or with respect to the Land or the Premises or any part thereof, or any of the Improvements, together with all interest and penalties thereon, under or by virtue of all present or future laws, ordinances, requirements, orders, directives, rules or regulations of all federal, state, or local governmental authorities whatsoever. Nothing contained in this Lease, however, shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord.



(b)   Payment of Real Estate Taxes.  Landlord represents and warrants to Tenant that the Premises constitute one or more whole and separate tax parcels under all applicable taxation jurisdictions.  Tenant shall pay, or cause the payment of, all Real Estate Taxes attributable to the period during the term of this Lease commencing upon execution of this Lease, before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof.  Real Estate Taxes shall be prorated as of the execution of this Lease and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.  Tenant's obligation to pay its prorated share of Real Estate Taxes for the Lease Year in which the Term expires or terminates shall survive such expiration or termination.

(c)   Contest of Real Estate Taxes and/or Assessed Valuation of Property.  Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes, or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so.  In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof, all at Tenant's cost and expense payable to Landlord as Additional Rent.  Tenant shall give Landlord written notice of any contest or challenge pursuant to this Section 6(c) within thirty (30) days after the commencement thereof, and shall provide Landlord additional information about the general status thereof upon written request of Landlord.  Tenant must, in all events, pay any Real Estate Taxes which are being contested pursuant to this Section 6(c) prior to the commencement of any action or proceeding by any taxing authority in the nature of a levy and sale, or in the nature of a sanction against Landlord. Tenant shall be responsible for any and all penalties and interest assessed against the Premises as a result of Tenant's actions in contesting the Real Estate Taxes or of Tenant's delay in payment of Real Estate Taxes during Tenant's prosecution of such contest, and shall hold Landlord harmless from any sanctions, penalties, interest or other costs imposed against Landlord or the Premises by the applicable taxing authority as a result of Tenant's contest.

(d)   Payment Following Appeal.  Upon the termination of the proceedings set forth in subsection (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings, in which event Tenant shall so pay such Real Estate Taxes), Tenant shall pay such Real Estate Taxes (or Tenant's prorata share, as applicable) as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings.  Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises (or, to the extent such refund is allocable to any year during which Tenant's obligation to pay Real Estate Taxes begins or ends, then relating or allocable to the portion of such Real Estate Taxes for which Tenant is responsible under this Lease), as well as any reimbursement awarded of costs, fees and expenses for such protest or reassessment from the appropriate taxing authority.

7.   Maintenance, Repairs and Replacement.



(a)    Except (i) for repair or replacement the need for which arises from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or contractors), or (ii) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the exterior and interior, and the structural and non-structural elements of the Building and the Premises, and for the maintenance and replacement of the roof of the Building, Tenant's obligations hereunder shall include, but not be limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems which serve the Premises. All maintenance, repairs and replacements shall be conducted in a good and workmanlike manner and in accordance with all applicable codes and regulations after obtaining all permits for any such work from applicable permitting authorities at such times as shall be necessary or appropriate to maintain the condition and appearance of the Premises in a good and sightly condition (including aesthetic condition) and repair. During the last five (5) years of the Term of the Lease, as the same may be extended, Tenant shall be obligated to so install or construct alterations or incur expenditures pursuant to this Section; provided, however, that if Tenant is required to expend any sum in satisfaction of its obligations hereunder, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles ("GAAP"), or the Internal Revenue Code and Regulations, whichever authorization period is shorter, over the remainder of the Term (without consideration to the exercise of any additional Renewal Options), then Landlord shall reimburse Tenant for the portion of such cost equal to the contemplated expenditure times a fraction (the "Reimbursement Fraction"), the numerator of which is the number of months over which such expense can be fully amortized under GAAP, less the number of months remaining in the Term (without consideration to the exercise of any Renewal Options not exercised by Tenant), and the denominator of which is the number of months over which such expense can be fully amortized in accordance with GAAP. Tenant shall perform such work and shall be entitled to recover the Reimbursement Fraction of the cost thereof within ten (10) days after submitting to Landlord paid invoices evidencing the amount of such cost, or other evidence of such cost reasonably requested by Landlord. Notwithstanding the foregoing, not less than thirty (30) days prior to commencing such work, Tenant shall furnish Landlord with written notice including a reasonably detailed description of the proposed repair, alteration, or replacement, and a good faith estimate of the cost thereof. Landlord shall have the right by written notice given to Tenant within fifteen (15) days after Landlord's receipt of Tenant's notice, to decline to participate in the cost of such repair, alteration, or replacement, in which event Tenant may elect either (i) to proceed with such repair, alteration, or replacement at Tenant's sole cost and expense, or (ii) to decline to perform such repair, alteration, or replacement, in which event Tenant shall have no obligation to perform such repair, alteration, or replacement prior to returning the Premises to Landlord.

8.    Payment of Utility Bills.  Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements, including, without limitation, parking lot lighting and Premises signage.

9.    Alterations.  During the Term, Tenant shall have the right, at its discretion and at its sole cost, without Landlord's consent, to make any alterations or modifications to the Premises and to the Improvements, including removing any or all of the Improvements as necessary or desirable for the use of the Premises by Tenant. Notwithstanding the foregoing, Tenant shall not



demolish all or a material part of the Existing Buildings without Landlord's consent, after notice to Landlord, such consent not to be unreasonably withheld but nonetheless in accordance with Sections 2(a) and 2(c) above. During the term of this Lease if Tenant shall not demolish all or a material part of any New Building constructed by Tenant until Tenant has delivered a notice to Landlord for the demolition of any of the New Buildings, Tenant shall not demolish all or a material part of any of the New Buildings, except to the extent described in the relevant notice, without Landlord's consent, not to be unreasonably withheld and only after obtaining a demolition permit for any of the New Buildings and a building permit for any replacement structures together with proof of adequate construction financing. Where Landlord's consent is required, Landlord's consent shall be deemed given unless Landlord furnishes Tenant with written objections to such proposal with (i) fifteen (15) days, with respect to requests for approval delivered prior to the Rent Commencement Date, and (ii) thirty (30) days, with respect to requests for approval delivered from and after the Rent Commencement Date, after Tenant's delivery to Landlord of a reasonably detailed description of the alterations proposed by Tenant together with plans and specifications therefor. Tenant shall cause all alterations performed by Tenant on the Premises to be lien-free and made and completed at Tenant's cost in a workmanlike manner using only materials that are new and that meet or exceed the standards and specifications of the original construction of the Improvements, and in compliance with all applicable laws. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in obtaining any and all licenses, building permits, certificates of occupancy or other governmental approvals (excluding changes in zoning districts or special use permits, the pursuit of which shall be subject to Landlord's consent in its sole discretion), which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

10. **Mechanics' Liens.** Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises, the party on account of whose actions such lien has or allegedly has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by posting a bond therefor in accordance with applicable law, or securing removal of such lien in another method reasonably acceptable to the other party hereto. The obligations under this Section 10 shall survive termination of this Lease or expiration of the term hereof.

11. **Insurance.**

(a) **Property Damage.** During the period of construction, Tenant shall keep or require its general contractor to keep, a policy of builders risk insurance covering loss or damage to the Improvements for the full replacement cost of all such construction. During the Term and all Option Periods, Tenant shall keep in full force and effect a policy of all risk, special form or equivalent form property insurance covering loss or damage to the Premises in the amount of the full replacement cost of the Buildings and other improvements on the Property, in an amount at least equal to the hard costs of construction, with a deductible that is commercially reasonable in light of Tenant's financial strength.



(b)     Liability Insurance.  During the Term, Tenant shall keep in full force commercial general liability insurance or garage liability insurance (collectively, "CGL"), with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and, at Landlord's written request, Landlord's first Mortgagee as additional insureds as their respective interests may appear.  The limits of such CGL policy shall be not less than $2,000,000.00 combined single limit for bodily injury and property damage, with a deductible that is commercially reasonable.

(c)     Workers' Compensation Insurance.  To the extent required by law, Tenant shall maintain workers' compensation insurance covering its employees in statutory limits.

(d)     Automobile Liability.  Tenant shall maintain at all times during the Term, garage liability insurance covering liability arising out of the use of (i) all Tenant owned vehicles, (ii) all vehicles hired or leased by Tenant and (iii) all non-owned and borrowed vehicles

(e) Earthquake.  Tenant shall maintain at all time coverage for damage to buildings caused by earthquakes, either by rider to any all hazards coverage policy required hereunder or by separate policy.

(f) Form of Policies.  All insurance required by this Section shall be with insurers licensed or otherwise permitted to conduct business in the Commonwealth of Massachusetts.  Any insurance hereunder may be provided under blanket policies of insurance.  All property insurance maintained by Tenant pursuant to Section 11(a) shall name Tenant as insured (and any related entities or any financing institution providing financing), and Landlord as additional insured, as their interests may appear, and, so long as the Premises are mortgaged pursuant to a mortgage of which Tenant has received written notice, shall be subject to a standard mortgagee clause in favor of Landlord's first mortgagee, if any.  All insurance, required by Section 11(b), shall be in the name of Tenant, and shall name Landlord and any first mortgagee as additional insureds.

(e)     Intentionally Omitted.

(f)     Policy Provisions.  All policies of insurance enumerated above shall be provided by insurance carriers having at policy commencement a Best rating of not less than A-VIII; provided, however, that if the rating of any such insurer falls below such level, such rating reduction shall not constitute a default hereunder provided all renewals of such policies shall be with carriers with a Best rating of not less than A- VIII at the time of such renewal.  An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this Section 11.

(g)     Waiver of Right of Recovery and Subrogation.  With respect to any loss covered by insurance or required to be covered by insurance hereunder, Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, or for loss of income on account of fire or other casualty; and each party's aforesaid policies of insurance shall, to the extent available, contain

10



appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h)   Evidence of Insurance.  Upon commencement of the Term, Tenant shall cause to be issued to Landlord certificates of insurance evidencing compliance with the applicable covenants of this Section 11.  Each such certificate shall provide that at least thirty (30) days' notice of cancellation shall be given to the certificate holder.

(i)   Indemnities.

(i)   Except if arising from the negligent or willful acts of Landlord or its agents or employees after the Land Delivery Date (to the extent that Section 11(h) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from any and all claims, costs, liability, damage, losses or expense, including reasonable attorneys' fees and court costs at trial and all appellate levels, for any death, damage or injury to persons, or property occurring after the Land Delivery Date on the Premises or the driveways and entranceways thereto, or resulting from or relating to Tenant's use thereof; and (ii) any failure on the part of the Tenant to perform or comply with any covenant required to be performed or complied with by Tenant under his Lease.

(ii)   Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that Section 11(h) is inapplicable thereto), Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage, losses or expense, including reasonable attorneys' fees and court costs at trial and all appellate levels, for any death, damage or injury to persons or property occurring on the Premises or the driveways and entranceways thereto arising prior to the Land Delivery Date, or resulting from or relating to Landlord's use thereof, if any, and arising after the Land Delivery Date.

12.   Damage by Fire or Other Casualty.

(a)   In the event of a fire, earthquake or other casualty, causing destruction or damage to the Improvements during the first twenty (20) Lease Years, or such a casualty occurring after the end of the twentieth Lease Year such that the cost to repair and reconstruct damage is equal to or less than thirty seven and one half percent (37.5%) of the then-total replacement cost of the Improvements as a whole, this Lease shall not terminate except as expressly set forth herein, and Base Rent and, other charges shall continue to be paid by Tenant pursuant to the terms of this Lease.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds to the extent of the damage to the Premises, as applicable, Tenant shall complete reconstruction of the Building and Other Improvements to that condition existing immediately prior to such casualty, with such alterations as may be permitted under Section 9 hereof.  All such reconstruction and repair shall be done by Tenant lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law.  Any insurance proceeds remaining after completion of the reconstruction and repair shall belong to Tenant.

(b)   In the event of a fire, earthquake or other casualty, causing destruction or damage to the Improvements and having a repair and reconstruction cost of more than thirty seven and one half percent (37.5%) of the then-total reconstruction cost of the Improvements taken as a whole, which casualty occurs after the end of the twentieth (20th) Lease Year, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and shall thereupon make available or assign, as applicable, to Landlord all insurance proceeds (together with any applicable deductible) paid or payable to Tenant.  In the event such insurance proceeds are less than the sum of (i) the amount necessary to remove any portion of the Improvements required to be removed prior to reconstruction of the Improvements, plus (ii) the amount required to reconstruct the Improvements, then Tenant shall pay Landlord such deficiency upon the exercise of such right of termination.  In the event Tenant does not elect to terminate this Lease as set forth above, then within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, as applicable, Tenant shall complete reconstruction of the Building and Other Improvements to that condition existing immediately prior to such casualty, with such alterations as may be permitted under Section 9 hereof.  All such reconstruction and repair shall be done by Tenant lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law.  Any proceeds remaining after completion of such reconstruction and repair shall belong to Tenant.

13.   Condemnation.

(a)   Definition of Taking and Substantial Taking.  For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises or any portion thereof or any right appurtenant thereto so taken is vested in the condemning authority or the date upon which possession of the Premises or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean so much of the Premises or the rights appurtenant thereto as, when taken, leaves the untaken portion unsuitable for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein.

(b)   Tenant's Rights Upon Taking or Substantial Taking.  Each party agrees to furnish the other a copy of any notice of a threatened or proposed Taking received by such party.  In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease.  All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)   Tenant's Rights Upon Less Than a Taking of Substantially All of the Premises.  In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or



taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award, to the extent that such relates to the Improvements (other than the Existing Buildings) and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto, and the portion of Landlord's award allocable to the Existing Buildings and the Premises (excluding any portion thereof paid in compensation for loss of income or reduction of future rents), which Landlord shall make available to Tenant for such restoration. If any Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord, such notice to be given not more than sixty (60) days after Tenant's receipt of notice of the impending Taking.

(d)     Rights Upon Temporary Taking.  Notwithstanding the foregoing, in the event of a Taking of the Premises or any portion thereof, for temporary use (specifically one not exceeding one hundred eighty (180) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by, reason of such Taking relating to the Premises for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained in this subsection (d) to the contrary notwithstanding, a temporary Taking for any period in excess of one hundred eighty (180) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subsection (b) or (c) above, as applicable.

(e)     Tenant's Right Upon Condemnation.  In the event of a Taking described in subsection (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of the Improvements constructed by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law, provided Tenant obtains a separate award therefor and provided, further, that Tenant shall not be entitled to any compensation for the value of its leasehold estate unless Landlord first recovers the fair market value of the Land.

14.     Assignment and Subletting.  Tenant shall have the right to sublet, assign, transfer, reassign and grant concessions or licenses in all or any part of the Premises (any one, a "Transfer") without Landlord's prior consent; provided, however, the use of the Premises is consistent with Tenant's use of the Premises or any other use allowed as a matter of right under the applicable zoning bylaw. In the event of such a Transfer, Tenant shall remain liable for all of Tenant's obligations to Landlord arising hereunder, except as hereinafter set forth. In the event Tenant assigns its interest in this Lease, then Tenant shall remain liable and responsible under this Lease; provided, however, if Tenant's assignee has a net worth equal to or greater than One Hundred Million Dollars ($100,000,000.00) (the "Minimum Net Worth"), Tenant shall be released from any liability under this Lease accruing from and after the effective date of such assignment. If such assignee does not have the Minimum Net Worth as of the effective date of such assignment, then Tenant shall not be released from liability.

13



Any instrument effecting an assignment or subletting of this Lease by Tenant shall be executed by Tenant and the assignee or sublessee. Each assignee for the benefit of Landlord shall agree to assume, be bound by, and perform all terms, covenants, and conditions of this Lease to be kept and performed by Tenant. After execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord.

15.  Use.  Tenant shall have the right to use the Premises for any use permitted under the current zoning for the Premises, or any change in zoning requested by Tenant with Landlord's consent which shall not be unreasonably withheld. Nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously for any use.

16.  Warranties and Representations.

(a)    Landlord represents, warrants and covenants to Tenant that:

(i).    Quiet and Peaceful Enjoyment.  Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises, subject to the terms of this Lease.

(ii)    Title.  Landlord's fee simple interest in the Premises is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, or any other encumbrances which would restrict Tenant's use of the Premises, other than restrictions and conditions arising from governmental laws, regulations, and ordinances applicable to the Premises, and the terms and conditions of this Lease. Landlord specifically covenants and warrants that no third party other than applicable governmental authorities has the right to prohibit the selling, renting, servicing, repairing or warehousing of automobiles from the Premises, or the right of approval over any feature of the Improvements or Tenant's signage.

(iii)    Certificate of Authority.  Landlord covenants that they are duly constituted limited liability companies under the laws of the Commonwealth of Massachusetts, and they are duly authorized to transact business in the Commonwealth of Massachusetts, and that the signatories in this Lease are duly authorized and empowered to act for and on behalf of Landlord. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of Landlord, and (b) the authority of the signatories hereto to bind Landlord as contemplated herein.

(iv)    No Litigation.  Landlord has not received written notice of any judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Premises which could preclude or interfere with the construction contemplated in Section 2 hereof or the occupancy and use of the Premises for the purposes herein contemplated.

(v)    Hazardous or Toxic Materials.  Landlord represents and warrants that the Land is free of Hazardous Substances, as defined below, and that no underground storage tanks exist on, in, or under the Premises now, and that the Land will be free of Hazardous

14



Substances, and that no such tanks will exist on, in or under the Premises as of the Commencement Date. In the event Hazardous Substances or underground storage tanks are discovered on the Premises in violation of Landlord's warranty, then Tenant shall have the right, but not the obligation, thirty (30) days after notice to Landlord and Landlord's failure to Remediate (as hereinafter defined), or, if Landlord cannot Remediate within thirty (30) days, then upon Landlord's failure to commence preparation of a plan to Remediate within such thirty (30) day period and diligently pursue the approval of such plan and the completion of the remediation work authorized by the approved plan to completion, to Remediate such contamination. Base Rent shall be abated from the date of discovery of such Hazardous Substances to the date the Remediation is complete. Notwithstanding the foregoing, in the event Remediation has not been completed within: (i) six (6) months after discovery of the Hazardous Substances, or if such Hazardous Substances or the Remediation conducted in connection therewith materially and adversely affect the construction of the Improvements or Tenant's business operations on the Premises; or, (ii) two (2) years after discovery of the Hazardous Substances, if such Hazardous Substances or the Remediation conducted in connection therewith do not materially and adversely affect the construction of the Improvements or Tenant's business operations on the Premises, Tenant shall have the right to terminate this Lease and recover from Landlord all costs incurred by Tenant in the negotiation of this Lease and in the investigation of the Premises, the pursuit of Permits, and the construction of the Improvements. Tenant's termination right shall be deemed waived if not exercised prior to the completion of the Remediation. All reasonable costs and expenses incurred by Tenant and arising from the discovery of the Hazardous Substances or the performance of the Remediation shall be payable to Tenant by Landlord upon demand.

(vi)    <u>Notices Affecting the Premises</u>.  Landlord shall instruct the appropriate office or agency of the City of North Attleboro to send to Tenant at the address for written notices set forth herein, any notice or other communication affecting the Premises or property adjoining, adjacent to, or near the Premises, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises or any such neighboring property.

(vii)    <u>Constructive Trust</u>.  Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes, if applicable) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(b)    Tenant represents, warrants and covenants to Landlord that:

(i)    <u>Tenant's Authority</u>.  Tenant is a duly constituted corporation organized under the laws of the State of Rhode Island; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the person executing this Lease on Tenant's behalf has the right and lawful authority to do so. Prior to the execution of this Lease the Tenant shall file as a foreign corporation with the Massachusetts secretary of state's office and furnish Landlord at the time of execution with evidence of (a) the existence of Tenant, (b) Tenant's qualification to do business in Massachusetts, and (c) the authority of the undersigned to bind Tenant as contemplated herein.

(ii)    <u>Tenant's Covenant as to Hazardous or Toxic Materials</u>:

15



(A)    Tenant hereby covenants that Tenant shall not cause or permit any "Hazardous Substances" (as hereinafter defined) to be placed, held, located or disposed of in, on or at the Premises or any part thereof except in accordance with all applicable laws, statutes, ordinances, and regulations.

(B)    Tenant hereby agrees to indemnify Landlord and hold Landlord harmless from and against any and all losses, liabilities, damages, injuries, expenses, including reasonable attorneys' fees, costs of any settlement or judgment and claims of any and every kind whatsoever paid, incurred or suffered by, or asserted against, Landlord by any person or entity or governmental agency as a result of the escape, seepage, leakage, spillage, discharge, emission, discharging or release from, the Premises of any Hazardous Substance, provided, however, that the foregoing indemnity is limited to matters arising solely from Tenant's violation of the covenant contained in Section (A) above in this Section 16(b)(ii).

(C)    For purposes of this Lease, "Hazardous Substances" shall mean and include those elements or compounds which are contained in the list of hazardous substances now or hereafter adopted by the United States Environmental Protection Agency (the "EPA") or the list of toxic pollutants designated by Congress or the EPA or which are now or hereafter defined as hazardous, toxic, pollutants, infectious or radioactive by any other Federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning, any hazardous, toxic or dangerous waste, substance or material, as now or at any time hereafter in effect. "Hazardous Substances," for the purposes of this Section 16, shall include petroleum products, asbestos, and polychlorinated biphenyls, and underground storage tanks unless installed, maintained, and closed in compliance with all applicable laws.

(D)    In the event Hazardous Substances are present on the Premises in violation of Tenant's covenant in Section 16(b)(ii) hereof, and Tenant fails to clean up, remove, resolve, minimize the impact of, or otherwise remediate such contamination in compliance with all applicable laws and regulations and to obtain a "no further action" or similar closure letter from the governmental authorities with jurisdiction over such Hazardous Substances permitting the development and use of the Premises as contemplated herein without further remediation (collectively, "Remediate"), then Landlord shall have the right, but not the obligation, thirty (30) days after notice to Tenant and Tenant's failure to Remediate, or, if Tenant cannot Remediate within thirty (30) days, then upon Tenant's failure to commence preparation of a plan to Remediate within such thirty (30) day period and diligently pursue the approval of such plan and the completion of the remediation work authorized by the approved plan to completion, to enter upon the Premises to Remediate such contamination. Notwithstanding the foregoing, in no event shall Tenant be afforded more than two (2) years after the approval of Tenant's remediation plan by the appropriate governmental agency or agencies, or any shorter time required for the completion of such remediation by the agencies in granting such approval, to complete such remediation. Tenant agrees to commence preparation of such plan promptly upon receipt of notice that such Hazardous Substances are present, to apply for approval of such plan promptly, and to pursue such approval diligently. All reasonable costs and expenses incurred by Landlord in the exercise of any such rights, which costs and expenses result from Tenant's violation of the covenants contained herein, shall be deemed Additional Rent under this Lease and shall be payable by Tenant to Landlord upon demand.



(c)    In the event there is a condition at variance with the representations and warranties of Landlord under this Section 16 with respect to the Premises which prevents or in any material way inhibits the use of the Premises or any part thereof for their intended purposes as described in Section 15(a) hereof by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity, or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default. In addition, in the event that any of the representations, warranties and covenants set forth in this Section 16 are untrue or incorrect, or in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

(d)    In the event Tenant violates its representations or warranties under this Section 16, Tenant hereby agrees to indemnify Landlord and hold Landlord harmless from and against any and all losses, liabilities, damages, injuries, expenses, including reasonable attorneys' fees, costs of any settlement or judgment and claims of any and every kind whatsoever paid, incurred or suffered by, or asserted against, Landlord by any person or entity or governmental agency as a result of the escape, seepage, leakage, spillage, discharge, emission, discharging or release from, the Premises of any Hazardous Substance, provided, however, that the foregoing indemnity is limited to matters arising solely from Tenant's violation of the covenant contained in Section 16(b)(ii)(A).

17.    Estoppel Certificates.  Without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other person or entity ("Person") specified in such request: (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto claimed by such certifying party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other factual matters which may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

18.    Subordination, Non-Disturbance and Attornment.  On or before the Land Delivery Date, Landlord shall deliver to Tenant with regard to any and all Mortgages (as defined below) encumbering the Premises that are superior in interest to this Lease, a non-disturbance and attornment agreement, executed by the holder of such Mortgage ("Mortgagee"). In addition, throughout the term, upon request from Landlord or its Mortgagee, Tenant agrees to execute and deliver to Landlord and its Mortgagee a non-disturbance and attornment agreement executed by the Mortgagee (as applicable) with regard to all future Mortgages that are subordinate in interest to this Lease and with regard to all renewals, modifications, replacements and extensions of such

17

Mortgages. Upon Tenant's receipt of the non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Mortgage in accordance with the terms of said agreement. As used in this Section 18, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Premises.

In the event of a foreclosure of any Mortgage, Tenant shall attorn to a Mortgagee of any purchaser at a foreclosure sale (any such foreclosure, or deed in lieu thereof, shall be referred to as a "Foreclosure") of a Mortgage only if such Mortgagee executes a nondisturbance and attornment agreement.

19.   Change of Landlord. Subject to Section 18 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were Landlord under the Lease, and Tenant hereby agrees to attorn to the Successor as its landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's failure to provide Tenant with notice of such Successor.

20.   Tenant's Financing. Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor: (i) a security interest in Tenant's trade fixtures not included as part of the Improvements, or, in Tenant's personalty, inventory and equipment not included as part of the Improvements (collectively, "Personalty"); (ii) the right to enter the Premises to realize upon any Personalty so pledged; and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness and must specifically state that it is subject and subordinate to Landlord's interest hereunder as to any portion of the Premises other than the Personalty. Should the Tenant's lender desire to utilize a leasehold mortgage financing arrangement the parties understand that an encumbrance or lien on the Tenant's interest in this Lease will be conveyed to Tenant's lender as collateral for the loan to the Tenant and that a leasehold mortgage or deed of trust may be required to allow the Tenant to develop the improvements to the leased premises. Tenant may encumber all or any portion of its interest in this Lease and the leasehold estate by mortgage, deed of trust or other security instrument upon obtaining the prior written consent of the Landlord, such consent not be unreasonably withheld. Upon Tenant providing notice of such financing to Landlord and upon request of Tenant, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder.

21.   Tenant's Property and Subordination of Landlord's Lien. All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly subordinates its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent



(whether in arrears or in advance) to the interest of any Tenant lender in the aforesaid Personalty of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such subordination, at any time or times hereafter upon Tenant's request.

22.   Short Form of Lease; Commencement Date Agreement.  Landlord and Tenant agree, simultaneously with the execution and delivery hereof, to execute a Short Form of Lease or Lease Memorandum in the form to be attached hereto as Exhibit B, setting forth such provisions hereof as may be required by State law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form to be attached hereto as Exhibit "C," once the Commencement Date has been established.  Recording costs for the short form lease or memorandum shall be shared equally by Landlord and Tenant.  The cost to record the Commencement Date Agreement shall be born by the party desiring to record the Commencement Date Agreement.  The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Short Form of Lease, Lease Memorandum, or Commencement Date Agreement.

23.   Expiration of Term and Holding Over.  All of the Personalty shall be removable by Tenant any time prior to, the expiration or earlier termination of this Lease.  In the event Tenant fails to so remove any or all of its Personalty, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate.  Those improvements that are integrated into the physical structure of the Building, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord.  Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted.  Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises.  No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant.  If Tenant remains in possession of the Premises after the termination of this Lease and without the execution of a new lease, Tenant shall be deemed to be occupying the Premises as a tenant at sufferance at an amount equal to one hundred fifty percent (150%) of the Base Rent and other charges payable for the period just prior to termination of this Lease and otherwise subject to all the covenants and provisions of this Lease insofar as the same are applicable to a month-to-month tenancy.

24.   "For Rent" Signs.  Tenant hereby permits Landlord during the last six (6) months of the Term (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, in a reasonable size and location so as to be visible to the public, on the parking lot of the Premises.  Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours, or at other hours by prior appointment, provided same does not unreasonably interfere with the conduct of Tenant's business.

25.   Easements.  Tenant shall have the right to grant, and  Landlord  and any and all Mortgagees, shall join in and acknowledge the grant of utility, access, storm water management,



or similar easements, for Tenant's conduct of its business or the expansion thereof, or for the operation of any alterations permitted by this Lease. Said utility and access easements shall be located in areas of the Premises which are not improved with buildings, outbuildings, or other permanent structures.

26.  Events of Tenant's Default. Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)  Failure to Pay Rent; Breach. (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent or Real Estate Taxes) (subject to Tenant's right of good faith contest with respect to Real Estate Taxes, as set forth in and as limited by Section 6(c) hereof), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue, in which event such delinquent amount shall accrue interest at the Default Rate; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion.

(b)  Bankruptcy. Any petition is filed by or against Tenant under any section or chapter of the Federal Bankruptcy Code, and, in the case of a petition filed against Tenant, such petition is not dismissed within sixty (60) days after the date of such filing.

(c)  Insolvency. Tenant becomes insolvent or transfers property in fraud of creditors.

(d)  Assignment for Benefit of Creditors. Tenant makes an assignment for the benefit of creditors.

(e)  Receivership. A receiver is appointed for any of Tenant's assets.

27.  Landlord's Remedies. After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)  Continue Lease. Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due, including any sums due for any Option Period for which a Renewal Option has been exercised. In the alternative, Landlord shall have the right to peaceably re-enter the Premises, without such re-entry being deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof. Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant, upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any

20

reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due to Landlord hereunder. If a sufficient amount to pay such expenses and sums shall not be realized, in Landlord's exercise of commercially reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action or actions therefor as such monthly deficiency shall arise and accrue. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

(b)    Terminate Lease. Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following as damages:

(i)    The "worth at the time of the award payment" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii)    The "worth at the time of the award payment" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award payment exceeds the amount of any sums (net of reletting costs and expenses) actually received by Landlord from the Premises after termination. Landlord shall have an affirmative obligation to attempt to mitigate its damages following termination, until the time of the award payment.

(iii).    The "worth at the time of the award payment" of the amount by which the Base Rent and all other charges which would have accrued after the time of the award payment for the remaining term of this Lease exceeds the Fair Market Rent ("FMR"), determined in the manner set forth below, for the remaining term of this Lease. The FMR shall be the fair market rent of the Premises, net of market brokerage commissions, as of the time of the award for a term equal to the remaining term of this Lease subsequent to the time of the award payment (assuming this lease had not been terminated) on an "as is" basis as determined by a licensed MAI appraiser selected by Landlord. At Tenant's option, Tenant may select an additional licensed MAI appraiser to estimate FMR and Tenant's appraiser and Landlord's appraiser shall select a third MAI appraiser to estimate the FMR, in which case the FMR shall be the median of the three appraisals. Tenant shall bear the cost of the appraisal process.

As used in this Section 27(b), the term, "worth at the time of the award payment", shall be computed by allowing simple interest at an accrual rate of the Default Rate for past due obligations, and a discount rate to net present value at the time of the award payment of eight percent (8%) per annum on anticipated future obligations or revenues, and mitigation amounts, with no interest or discount, on the amount of the obligations payable on, the date of such calculation. In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings. Landlord shall never



be entitled to dispossess Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)   Reimbursement of Landlord's Costs in Exercising Remedies.   Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, as Additional Rent, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(d)   Remedies Are Cumulative.   The various rights and remedies reserved to Landlord herein are cumulative, and Landlord may pursue any and all such rights and remedies, in addition to any other rights or remedies available at law or in equity, whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

28.   Events of Landlord's Default; Tenant's Remedies.   Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion.

Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity (to the extent not inconsistent with the specific provisions of this Lease), and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent due Landlord hereunder; or (ii) sue for damages, including interest, transaction costs and attorneys' fees as specified in subsection (i) above. In no event shall Tenant have any right to terminate this Lease as a result of an Event of Default by Landlord. Upon a breach of the warranties and representations contained in Section 16, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein and at law or in equity. All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall, upon judgment being entered in favor of

22



Tenant therefor, constitute liens against Landlord's interest in the Premises, which may be enforced by non-judicial means available under State law, or any other applicable proceedings. The various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies set forth herein (to the extent not inconsistent with the specific provisions of this Lease), whether at the same time or otherwise; provided that in no event shall Landlord be obligated to compensate Tenant for any speculative or consequential damages caused by Landlord's failure to perform its obligations under this Lease.

29. Waiver. If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

30. Compliance with Applicable Laws. During the Term, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Premises, and of the applicable board of fire underwriters or similar, respecting Tenant's use and occupancy of the Premises. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate as Additional Rent from Tenant with the next installment or installments of Base Rent.

31. Notices. Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given upon personal delivery, three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:      HI LINCOLN, INC.
                c/o Balise Auto Group
                122 Doty Circle
                West Springfield, MA 01089
                Attention: James E. Balise, Jr.

With a copy to:    Joseph A. Pacella, Esquire
                Egan, Flanagan and Cohen, PC
                67 Market Street
                Springfield, MA 01103

If to Landlord:    849 South Washington Street, LLC and
                South Washington Street, LLC
                c/o Alfredo DosAnjos
                41 Shore Road

Bristol, RI 02809

With a copy to:          Lisa Pariseault
                         c/o Pride Hyundai
                         11 Taunton Avenue
                         Seekonk, Massachusetts 02771

And a copy to:           David C. Manoogian, Esquire
                         Carriage Court
                         149 Pleasant Street
                         Attleboro, Massachusetts 02703

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this section.

32.   Brokers.  Landlord and Tenant each covenant that it has not dealt with any real estate broker or finder with respect to this Lease, except for Joshua Teverow ("JT").  Landlord shall pay JT a commission in accordance with a separate written agreement provided the conditions set forth therein have been satisfied in full, and Tenant shall pay JT a separate fee to be negotiated between Tenant and JT.  Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party either has or is purported to have dealt.

33.   Miscellaneous.

(a)   Headings and Gender.  All section headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease.  The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)   Construction.  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate section hereof.

(c)   Relationship of Landlord-Tenant.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(d)   Entire Agreement; Merger.  This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein.  This Lease cannot be changed or

24



modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(e)    Attorneys' Fees.   In the event Landlord is required to commence or has to commence any action or proceeding against Tenant by reason of any breach or claimed breach of any provision of this Lease, to enforce the terms of this Lease and/or to regain possession of the Premises Tenant agrees to pay Landlord its reasonable attorneys' fees, costs and expenses arising out of or related to such proceedings.

(f)    Partial Invalidity.   If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(g)    Consents.   Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(h)    Holidays.   If the day on which rent or any other payment due hereunder is payable, or the final day of any period of time to which this Lease refers, falls on a Saturday, a Sunday, or a day on which banks are not open for business in the Commonwealth of Massachusetts, then any payment made, notice given, or action taken on the next business day following the expiration of such period of time shall be as effective as if taken prior to the expiration of such period of time.

Applicable Law/Arbitration.   This Lease shall be construed in accordance with the laws of the Commonwealth of Massachusetts, and the parties agree that jurisdiction for all actions hereunder shall lie therein.  Any disputes arising directly or indirectly out of this Lease shall be decided in a court of competent jurisdiction in Massachusetts unless the parties agree to submit to binding arbitration in the Commonwealth of Massachusetts utilizing the services of the American Arbitration Association ("AAA") In the event of arbitration he arbitrators shall not have the power to order specific performance of any obligation or duty of any party to this Agreement or to issue injunctions in connection therewith or otherwise.

Arbitrators appointed by the AAA hereunder shall be appointed from the National Roster for Commercial Financial Disputes as provided in the relevant Rules unless otherwise mutually agreed to by the parties.  Arbitrators shall render their decisions in reasoned written opinions, and such decisions shall be appealable to a court of appropriate jurisdiction as being contrary to established statutory or case law, but not on the basis of determinations of fact made by such arbitrators.

(i)    Successors and Assigns.   All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party, except as otherwise expressly provided in this Lease.

(j).   Counterparts.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(k)   Trademarks and Trade Names.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification. All trademarks, trade names, service marks, signs and all other marks of identification used by Landlord in its business shall at all times remain the exclusive property of Landlord, and Tenant shall have no right, interest in, or title to any of Landlord's trademarks, trade names, service marks, signs or other marks of identification.

34.   Tenant's Right to Terminate.  Tenant shall have the right to terminate this Lease in the manner described below in the event any of the following conditions or obligations are not satisfied or performed:

(a)   Tenant's satisfaction with the results of Tenant's investigations of the Property.  Commencing on the beginning of the Due Diligence Period, Tenant shall have the right to conduct any and all studies, tests, evaluations and investigations, including but not limited to an evaluation by Tenant of the economic viability of Tenant's intended development of the Premises (collectively, the "Feasibility Studies") it may desire of the Premises, the title thereto, and Tenant's intended development thereof.  Tenant shall be permitted to enter upon the Premises to perform the Feasibility Studies, provided that Tenant shall give Landlord not less than 24 hours' advance telephonic notice (contact:  Al Anjos, telephone number:  508-889-1530) of such entry, and provided further that Tenant shall perform such Feasibility Studies in a manner that does not unreasonably interfere with the conduct of business on the Premises.  In order to facilitate the conduct of the Feasibility Studies, Landlord shall, to the extent such items are in Landlord's possession or control, furnish Tenant within ten (10) days after the Effective Date, with:  (i) Landlord's most recent title or policy for the Premises; (ii) Landlord's most recent topographical and/or ALTA survey(s) of the Premises, and parcel maps and/or subdivision plats containing the Premises; (iii) any and all soils and/or hazardous substance reports relating to the Premises; (iv) and site plans, building plans, and utility plans for the Premises; and (v) any other information or documents within Landlord's possession which may affect the development and operation of the Premises.  If, as a result of the Feasibility Studies and prior to the conclusion of the Due Diligence period Tenant determines in accordance with the provisions of Section 4(IV)(b) above, that the Premises are not suitable for Tenant's intended purposes, then Tenant may terminate this Lease by written notice given to Landlord.  The condition contained in this subsection (a) shall be deemed waived by Tenant unless Tenant terminates this Lease on or before the conclusion of the Due Diligence Period, or within two (2) business days thereafter.  If Tenant terminates the Lease pursuant to this subsection (a) at the conclusion of the Due Diligence Period, then the entire Deposit shall be returned to the Tenant.  If the Tenant terminates the Lease during or at the conclusion of the Feasibility Period the Tenant shall not be entitled to the return of all or any portion of the Deposit and the Landlord shall deem the Deposit as its sole and exclusive property and as liquidated damages hereunder.  Tenant agrees to return to Landlord all information pertaining to the Premises provided to Tenant by Landlord, such obligation to survive termination of the Lease and any permits, approvals and orders of

26



conditions obtained by the Tenant during the Due Diligence and/or Feasibility Period shall be assigned to the Landlord.

(b)   Landlord's delivery on or before the Land Delivery Date of subordination, non-disturbance and attornment agreements executed by any and all existing Mortgagees in a form reasonably satisfactory to Tenant simultaneously with the execution hereof.

(c)   Tenant obtaining any and all permits, approvals, licenses, consents, agreements and the like necessary or desirable for the construction, use and operation of the Premises (collectively, the "Permits"), including but not limited to, all of the following; (a) site plan approvals; (b) sanitary sewer, drainage and other utility permits (including without limitation, sewer connection and extension permits); (c) subdivision or platting approval; (d) zoning permits, special or conditional use permits, variances (but not rezoning); (e) environmental and wetland certifications, approvals, licenses, permits and the like, whether local, state or federal (including, without limitation, wetland mitigation approvals, relocation approvals, and water management district approvals, if applicable); (f) access permits, including, without limitation, any required curb cut permits or median break permits; (g) sign permits, approvals and/or variances for Tenant's exterior building and directional signs; and (h) any and all approvals required under any restrictive covenants or other encumbrances applicable to the Premises. Tenant agrees to apply for such permits as promptly as circumstances allow, taking into account the schedule, and the results, of due diligence and engineering work, and the time necessary in Tenant's reasonable judgment to discuss the project with neighborhood groups and governmental officials prior to filing applications. Tenant agrees to use due diligence and to expend customary application fees or other customary fees to secure such Permits; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation to obtain such Permits, or to agree to any condition imposed upon issuance of any such Permit that is unacceptable to Tenant in its sole discretion. The Landlord agrees to cooperate with the Tenant's efforts to obtain the Permits, provided that all such efforts to obtain the Permits shall be at Tenant's expense. Landlord agrees that it will, at Tenant's written request, sign all applications for Permits and shall not oppose any of Tenant's efforts to obtain the Permits; provided, however, that Landlord shall not be required to sign any permit or application, until the same is complete and in a form reasonably acceptable to Landlord. The condition to effectiveness of the Lease contained in this subsection (c) (the "Permitting Condition") shall be deemed waived unless Tenant exercises its right to terminate the Lease for failure of such condition within five (5) business days after the expiration of the Feasibility Period (the "Permitting Period"), or within two (2) business days thereafter; provided, however, that if at the end of the Permitting Period Tenant has applied for and is diligently pursuing the Permits, Tenant shall have the right to extent the Permitting Period for thirty (30) days by giving written notice of such election to Landlord prior to the expiration of the initial Permitting Period. Notwithstanding the above, the Permitting Period shall expire upon the Tenant obtaining the Permits. Tenant shall be contractually obligated to Lease the Premises if the Permits are obtained. If Tenant fails to diligently pursue the permits, Tenant shall be in default under this Lease.

(d)   Landlord's representations, warranties and covenants, including but not limited to those set forth in Section 16 herein, being true and accurate as of the Land Delivery Date.



The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived within the time period set forth above for the satisfaction of such condition (or Tenant in good faith believes that such condition will not be met within such period), the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion by notifying Landlord of the failure of such condition (such notice, with respect to the conditions described in subsections (a) and (c) above, to be given before two (2) business days after the expiration of the Feasibility Period or the Permitting Period, as applicable). In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other upon Tenant's delivery of said notice to Landlord.

35. Confidentiality. The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction. Copies of this Lease may be delivered pursuant to compulsory legal process or as evidence in a court of law, or otherwise to the bankers, lawyers, franchisors, prospective purchasers of the Premises or interests therein, accountants, and employees of the parties, but not to any other third parties without the consent of the other party. The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to, any third parties (except those parties or in those circumstances listed above) any of the terms, conditions or particulars in connection with this transaction. The foregoing shall not be deemed to prevent the discussion of the proposed development of the Premises by Tenant with governmental officials or neighborhood groups in the course of Tenant's pursuit of the Permits.

36. Survival. All indemnification obligations set forth in this Lease shall survive any expiration or termination of this Lease.

37. Conflict. The parties waive any conflict of interest of Joshua Teverow, Esquire ("JT") for JT preparing this Lease, and any related documentation; for JT assisting in the negotiations between the parties; and for Tenant to utilize JT as counsel. JT has indicated that he has in the past provided legal services to Tenant, and in the past has also provided legal services to Landlord. Landlord will utilize its independent counsel (David Manoogian, Esquire) in connection with this Lease and any related transactions. Landlord and Tenant acknowledge they each have sophisticated business experience, and that their decision to enter into this Lease and to accept the terms and conditions herein, are based on their own business judgments, with input from their respective accounting professionals and other professionals, and not based on any undue influence by JT or any other party.

WITNESS the following signatures and seals:

LANDLORD

849 South Washington Street, LLC, a
Massachusetts limited liability company

By: _____
Name: Alfredo Do Anjos
Title:

849 South Washington Street, LLC, a
Massachusetts limited liability company

By: _____
Name: Alfredo Dos Anjos
Title:

TENANT

H1 LINCOLN, INC, d/b/a Majestic Honda. a
Rhode Island Corporation.

By:

James B. Balise, Jr., President

# Exhibit C

# Stipulation Adding Trust as Defendant

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF THE TRIAL COURT

HAMPDEN, ss.
SUPERIOR COURT
CIVIL ACTION NO. 17-899

H1 LINCOLN, INC. D/B/A MAJESTIC HONDA,
       Plaintiff,

vs.

SOUTH WASHINGTON STREET, LLC;

849 SOUTH WASHINGTON STREET, LLC;

849 SOUTH WASHINGTON STREET REALTY
TRUST UNDER DECLARATION OF TRUST
DATED JUNE 9, 2000, ALFREDO DOS ANJOS,
TRUSTEE;

855 SOUTH WASHINGTON STREET REALTY
TRUST UNDER DECLARATION OF TRUST
DATED OCTOBER 2, 2008, ALFREDO DOS
ANJOS, TRUSTEE;

865 SOUTH WASHINGTON STREET REALTY
TRUST UNDER DECLARATION OF TRUST
DATED MAY 14, 1998, ALFREDO DOS ANJOS,
TRUSTEE;

and

COOPER AVENUE REALTY TRUST UNDER
DECLARATION OF TRUST DATED MAY 14, 1998,
ALFREDO DOS ANJOS, TRUSTEE.

       Defendants.

## STIPULATION FOR ENTRY OF AMENDED JUDGMENT

Pursuant to this Court's Order dated August 15, 2019, the Parties hereby file this

Stipulation for Entry of Amended Judgment, to amend the Judgment in the above action, entered

on August 6, 2019, to add the four defendants, identified below, to all counts:

1. 849 South Washington Street Realty Trust under Declaration of Trust dated June 9, 2000, Alfredo Dos Anjos, Trustee;

2. 855 South Washington Street Realty Trust under Declaration of Trust dated October 2, 2008, Alfredo Dos Anjos, Trustee;

3. 865 South Washington Street Realty Trust under Declaration of Trust dated May 14, 1998, Alfredo Dos Anjos, Trustee; and

4. Cooper Avenue Realty Trust under Declaration of Trust dated May 14, 1998, Alfredo Dos Anjos, Trustee.

DEFENDANTS,
BY THEIR ATTORNEYS,

PLAINTIFF,
BY ITS ATTORNEYS,

_Richard Briansky /MBM_
_w/ permission_

Richard Briansky, BBO #632709
Amy B. Hackett, Esq., BBO #676345
Eckert, Seamans, Cherin, & Mellott, LLC
Two International Place, 16th Floor
Boston, MA 02110
(617) 342.6867; Fax (617) 342-6899
Email: rbriansky@eckertseamans.com;
ahackett@eckertseamans.com

Dated: August 26, 2019

_[signature]_

John J. Egan, BBO #151680
Michael G. McDonough, BBO #682128
Egan, Flanagan and Cohen, P.C.
67 Market Street, P.O. Box 9035
Springfield, MA 01102-9035
(413) 737-0260; Fax (413) 737-0121
Email: jje@efclaw.com; mgm@efclaw.com

2

## CERTIFICATE OF SERVICE

I certify that a true copy of the above document was served upon the attorneys of record for each other party by email and first-class mail on August 26, 2019.

_____
Michael G. McDonough

17052-170828\372630

3

# Exhibit D

# Judge Mason's Initial 93A Findings of Fact and Rulings of Law, dated January 28, 2019

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 1779CV899

HI LINCOLN, INC. D/B/A MAJESTIC HONDA,
Plaintiff/Defendant-in-Counterclaim

vs.

SOUTH WASHINGTON STREET, LLC,
AND
849 SOUTH WASHINGTON STREET, LLC,
Defendants/Plaintiffs-in-Counterclaim

## FINDINGS OF FACT AND RULINGS OF LAW

### A. Background

I conducted a jury trial in the above-captioned matter during the period September 18, 2018 -- September 27, 2018. After trial, the jury returned the following Special Verdict:

a. The Plaintiff/Defendant-in-Counterclaim (the "Plaintiff") proved by a preponderance of the evidence that the Lease is in full effect.

b. The Defendants/Plaintiffs-in-Counterclaim (the "Defendants") did not prove by a preponderance of the evidence that their withholding of consent was exercised reasonably or that the termination of the Lease was valid.

c. The Plaintiff proved by a preponderance of the evidence that the Defendants breached the Lease when it terminated the Lease.

d. The Defendants' breach of contract occurred on August 9, 2017.

e. The Plaintiff proved by a preponderance of the evidence that the Defendants breached their covenants of good faith and fair dealing implied in the Lease.

1

f.  The Defendants' breach of the implied covenant of good faith and fair dealing occurred on August 9, 2017.

g.  The Plaintiff proved by a preponderance of the evidence that it suffered money damages as a result of the Defendants' breach of the Lease.

h.  The Plaintiff proved by a preponderance of the evidence that it suffered money damages as a result of the Defendants' breach of the implied covenant of good faith and fair dealing.

i.  The amount that would compensate the Plaintiff for the Defendant's breaches is $5,616,500 in compensatory damages.  Of this amount, $891,600 is for the Plaintiff's purchase of the Cash Land.

j.  The amount that would compensate the Plaintiff for the delay in operating the dealership to date is $3,762,500.

I reserved the plaintiff/defendant-in-counterclaim's claim for violations of G.L. c. 93A, §§ 2, 11 set forth in Count 5 of plaintiff/defendant-in-counterclaim's complaint, and on October 26, 2018, I conducted a jury-waived trial on Count 5. My findings of fact and rulings of law on Count 5 are set forth below.

**B.  Findings Of Fact**

After hearing, I find based upon a preponderance of the credible evidence as follows:

Plaintiff/Defendant-in Counterclaim is H1 Lincoln Inc. D/B/A Majestic Honda ("Plaintiff," "Majestic," "Tenant," and "Lessee").  James Balise ("Balise") is the principal of Plaintiff and the owner of approximately 24 automobile dealerships in Massachusetts, Connecticut, and Rhode Island.

In 2015, Balise Auto Group purchased Majestic Honda ("Majestic"), a new and

used Honda dealership located in Lincoln, RI.  To improve performance, Majestic sought to move to a more suitable location within its area of responsibility ("AOR") for selling Honda automobiles.

Defendant South Washington Street, LLC and Defendant 849 South Washington Street, LLC (together "Defendants," "South Washington Street," the "Dos Anjos entities," and "Landlord") own two adjacent properties located at 849 and 865 South Washington Street, North Attleborough, Massachusetts (hereinafter collectively referred to as the "Leased Property"). Alfredo Dos Anjos ("Dos Anjos") is the principal of the two Defendant entities and has owned approximately six new and used automobile dealerships over the course of his career.  At all times material hereto, Dos Anjos acted on behalf of the Defendants.  Currently, Dos Anjos operates one new and used automobile dealership, Pride Hyundai, in Seekonk, Massachusetts. He also owns and operates a finance company, Blackstone Finance.  Lisa Pariseault ("Pariseault"), Dos Anjos's daughter, manages Dos Anjos's Seekonk Hyundai dealership. Pariseault also serves as Dos Anjos's agent on behalf of Dos Anjos and the Defendants. At all times material hereto, the Plaintiff and the Defendants and their agents were engaged in trade or commerce in Massachusetts.

Dos Anjos owns land to the south of the Leased Property, which he rents to CarMax, a large national used car retailer, under a long-term lease with similar terms and conditions to the lease in this matter.

Dos Anjos formerly owned and operated new and used automobile dealerships out of the buildings located on the Leased Property.  Each parcel within the Leased Property contains one vacant building.  The Leased Property and its buildings had been vacant for several years before

3

2016, with the exception of a parking agreement that Dos Anjos entered into with a local Nissan dealer.

The Leased Property is located on Route 1, also known as South Washington Street, in North Attleborough, Massachusetts, adjacent to the intersection of Route 1 and Interstate-295. Interstate 95 intersects Interstate 295 just east of the Leased Property.  The Leased Property is a desirable location to sell new and used cars.  There are other new and used car dealerships nearby, including CarMax, Boch Toyota South, Boch Nissan South, Patriot Subaru, and others, giving the area the commonly known moniker of "Auto Road."  The Leased Property falls within Majestic's AOR with Honda.

The Leased Property falls within North Attleborough's Zoning District of C-30, which is a Business District for which the sale of new and used cars and the storage of vehicles is a permissible use.  In fact, Dos Anjos previously used the two lots for that same use.  The Leased Property also had, as of 2016, a pre-existing special permit for a planned business development for an automobile dealership.  No zoning changes were required to operate a new and used car dealership on the Leased Property.  Zoning on the Leased Property allowed for multiple additional uses all as set forth in North Attleborough's Town Zoning Bylaws.

In 2016, Majestic and South Washington Street each engaged the brokerage services of Joshua Teverow.  Teverow is an attorney, and the principal of Florida Automotive Consulting, LLC.  Florida Automotive Consulting, LLC and Dos Anjos entered into a consulting agreement on May 9, 2016.  The consulting agreement provides, in part, that Florida Automotive Consulting, LLC's duties were to "locate a Lessee for the Property for a long-term Lease" for Dos Anjos as the "Lessor."  The consulting agreement did not state that Teverow would be doing any legal work for Dos Anjos.  Paragraph 2 of the agreement differentiated Florida Automotive

Consulting, LLC's consulting role from prior legal services Teverow performed.   Paragraph 3 of

the consulting agreement stated that Dos Anjos would retain some other person as "local

counsel." Paragraphs 4 and 5 of the consulting agreement disclosed that Teverow would provide

assistance to the Lessee, and ¶ 9 stated that "[n]othing herein precludes the Consultant from

obtaining consulting fees from the Lessee for assistance in locating the Property, and for

providing other consulting services."

In August of 2016, Teverow arranged a meeting between Balise and Dos Anjos.

Pariseault was also present.  During the meeting, the parties discussed lease terms and

arrangements.  No documents were executed at the meeting.

Thereafter, Dos Anjos retained Attorney David Manoogian to represent him in leasing the

Leased Property to Majestic.  Dos Anjos had a prior relationship with Manoogian, who was his

real estate attorney dating back many years.  Dos Anjos retained Teverow to draft the Lease.

Teverow used the same form of lease that he had negotiated for Dos Anjos for CarMax, which

occupied property across the street from the Leased Property (the "Car Max Lease").

At the same time, Teverow represented Majestic while working with Majestic's real

estate attorney, Attorney Joseph Pacella.  Although Teverow claimed that he was representing

Balise in the negotiation of the Lease, he never disclosed to Dos Anjos that he represented Balise

in the lease negotiations.

The parties negotiated until October 28, 2016, when they executed a written lease (the

"Lease").  The named Tenant under the Lease is the Plaintiff in this case, "H1 Lincoln, Inc., d/b/a

Majestic Honda."  The Landlord is listed as the two Defendants, 849 South Washington Street,

LLC and 849 South Washington Street, LLC.  Paragraphs 32 and 37 of the Lease disclosed

Teverow's role and waived any possible conflicts of interest.  Balise and Dos Anjos each initialed

every page of the Lease and signed on the signature pages. Dos Anjos signed twice for each of his entities. Before signing on behalf of Majestic, Balise read the Lease several times over.

Dos Anjos claims to have never read the Lease before signing, purportedly because he does not understand legal documents. Dos Anjos's testimony is not credible in light of his decades of experience as an automobile dealer, experience with six dealership agreements with automobile manufacturers, experience as a commercial landlord, and his ownership and operation of a finance company. His experience has built a level of sophistication in commercial lease matters which cannot be denied or ignored.

Upon signing the Lease, Balise paid a deposit of $150,000 to the Defendants. The initial term of the Lease is for twenty-three (23) years. The Lease provides the Tenant with four options to extend the Lease for five (5) years each, for a total of forty-three (43) years. Rent under the Lease is to begin at $45,000 per month and, throughout the life of the Lease, rent will increase to as high as $82,699.65 per month. Under the Lease, Majestic received a reduction in rent during the first three years. All of said money, however, is to be repaid as deferred rent.

The Lease contains a "merger clause," by which the Lease language supersedes and makes invalid any reliance by any party on any purported prior discussions, negotiations or agreements. The merger clause states:

> Entire Agreement: Merger. This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

The Lease is unambiguous and clear. I have construed the Lease so as to enforce its unambiguous terms according to the plain meaning of the words. Its terms and conditions are unmodified by virtue of any extrinsic communications.

The Lease sets forth the level of Landlord approval necessary should the Tenant seek "demolition" or "construction" of a building on the Leased Property during the Lease's "Feasibility Period" as follows:

2.    <u>Demolition and Construction of Buildings and Improvements</u>.

(a)    Tenant shall determine during the Feasibility Period as defined in Section 4(IV)(b) below, whether the 849 Building or the 865 Building, or both (collectively, the "Existing Buildings, and each one, an Existing Building"), will need to be demolished to accommodate Tenant's planned use of the Property. If Tenant determines that either or both of the Existing Buildings will need to be demolished in connection with Tenant's planned use of the Property, or that any new buildings need to be constructed ("New Buildings"), Tenant shall give Landlord written notice of such determination within the Feasibility Period ("Demolition/New Buildings Notice"). If Tenant fails to furnish Demolition/New Buildings Notice within the Feasibility Period, Tenant shall be deemed to have elected not to demolish either of the Existing Buildings or construct New Building [sic]. Demolition/New Buildings Notice shall include preliminary site plans and elevations for Tenant's proposed development of the Property, which shall be in reasonable detail, but which shall not be construction drawings, showing the size, location, and materials of the building or buildings Tenant plans to construct in place of the demolished Existing Building or Existing Buildings or in addition to Existing Buildings. Within fifteen (15) days after Landlord's receipt of the Demolition/New Building Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant if Landlord reasonably withholds consent to such new construction, in which event this Lease shall terminate as of the date of Landlord's written notice and the parties shall have no further obligation to one another except those obligations that expressly survive termination hereunder including provisions set forth with respect to the Tenant's deposit as set forth in Section 34(a) below. If Landlord fails to terminate this Lease within such fifteen (15) day period, Landlord shall be deemed to have waived the right to terminate this Lease pursuant to this Section 2(a), and Tenant shall be permitted to demolish Existing Building or Buildings or construct New Buildings as described in Tenant's Demolition/New Buildings Notice; provided, however, that under no circumstances shall any Existing Building be demolished or New Buildings be constructed until Tenant has secured a demolition permit for the Existing Buildings *and* building permit for the New Building or Buildings and associated improvements, and secured adequate financing for the construction of the New Buildings and site work

7

associated therewith. Notwithstanding the foregoing, Landlord acknowledges that Tenant's present intention is to demolish the 865 Building and the 849 Building and replace with a prototypical Honda dealership facility. Tenant shall submit to Landlord during the Feasibility Period a prototypical elevation showing the materials and general architectural appearance of the Honda dealership facility and reasonably detailed plans for the Tenant's proposed improvements for the review and approval of the Landlord, which such approval shall not be unreasonably withheld.

The Tenant's concept site plan, which it originally submitted on May 24, 2017, and again on July 25, 2017, satisfied the "reasonably detailed" requirement set forth in ¶ 2(a).

With respect to the deposit, the Lease provides:

II)   Deposit. Upon the execution of this Lease, Tenant will deposit with Landlord the sum of $150,000 as a good faith Deposit, which Deposit shall be equally applied to the first 6 months of full Base Rent at $25,000 per month. The Deposit or any remaining portion thereof, shall be forfeited to Landlord as liquidated damages should Tenant default on its obligations under this Lease prior to the entire Deposit being applied toward Base Rent as described in this Paragraph or forfeited to Landlord in accordance with the provisions of Paragraph 34(a) below. No interest shall be paid on the Deposit.

The Lease further provides that if the "Tenant terminates the Lease during or at the conclusion of the Feasibility Period the Tenant shall not be entitled to the return of all or any portion of the Deposit…" under a section of the Lease captioned "Tenant's Right to Terminate."

With respect to the obtaining of permits, the Lease states at ¶ 9, that "[w]ithout cost or expense to Landlord, Landlord shall cooperate with Tenant in obtaining any and all licenses, building permits, certificates of occupancy or other governmental approvals … which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes." The Lease provides the Landlord with the "sole discretion" to consent or not consent to the Tenant's pursuit of "special use permits."

8

With respect to the Tenant's permissible "use" of the Leased Property, the Lease states that:

> Use.  Tenant shall have the right to use the Premises for any use permitted under the current zoning for the Premises, or any change in zoning requested by Tenant with Landlord's consent which shall not be unreasonably withheld.   Nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously for any use.

With respect to easements, the Lease states that:

> Easements.  Tenant shall have the right to grant, and. [sic] Landlord, and any and all Mortgagees, shall join in and acknowledge the grant of utility, access, storm water management, or similar easements, for Tenant's conduct of its business or the expansion thereof, or for the operation of any alterations permitted by this Lease. Said utility and access easements shall be located in areas of the Premises which are not improved with buildings, outbuildings, or other permanent structures.

With respect to Landlord's default and the Tenant's demand to cure, ¶ 28 of the Lease provides the following "Event of Default" by the Landlord: "Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured." Upon Landlord's Event of Default, the Tenant may "sue for damages, including interest, transaction costs and attorneys' fees."

Directly between the Leased Property and the CarMax site, which are each owned by Dos Anjos entities, lies a piece of land located at 115 Draper Avenue, North Attleborough, Mass., formerly owned by the Cash family (the "Cash Land").  Unbeknownst to Balise and Majestic, Dos Anjos had been trying to purchase the Cash Land for fifteen (15) years.  Dos Anjos and Pariseault used a broker named Tim McNamara in 2016 and early 2017 in their latest attempts to purchase the Cash Land.  Pariseault told McNamara that her father Dos Anjos "wants to buy everything around him" and proposed using a straw to buy the Cash Land from the Cash family.

9

After exchanging offers, on January 27, 2017, Dos Anjos and Pariseault offered to purchase the Cash Land for $800,000.

During an overlapping timeframe in late 2016 and early 2017, Balise and Dos Anjos were both attempted to purchase the Cash Land, with no knowledge of the other's involvement or offers. Utilizing a straw buyer, Balise also offered to purchase the Cash Land for $800,000. Nancy Jones, of the Cash family, accepted Balise's $800,000 offer in January of 2017. Jones rejected an offer from Dos Anjos for the same amount. Balise and the Cash family executed a quitclaim deed conveying the Cash Land to Balise on June 30, 2017 (the deed is dated incorrectly as July 30, 2017). The deed for the Cash Land was recorded on July 6, 2017.

Nothing in the Lease prohibited either the Tenant or the Landlord from acquiring parcels of land abutting the Leased Property. Neither party had any obligation to the other to disclose its attempts to purchase the Cash Land. Neither party disclosed to the other their interest in acquiring the Cash Land.

The Leased Property and the Cash Land are both zoned as C-30 and can both be used for a new and used automobile dealership, storage of vehicles, and other uses. Nothing within the Zoning By-Laws prevents Majestic from operating an automobile dealership or vehicle storage on the Cash Land and the Leased Property. Majestic could do so without a special permit for a planned business development for the Cash Land. In particular, Majestic could develop the Leased Property under its pre-existing permit for a planned business development and separately proceed with its plan for the Cash Land under the less formal "site plan review" process. Alternatively, Majestic could obtain a separate special permit for a planned business development for the Cash Land itself. The only difficulty with permitting the two properties separately, from Majestic's perspective, would be an increased open space requirement of 10%

10

on the Cash Land only, which would equate to losing a few parking spaces. Lastly, one special permit for a planned business development could be used for the entire project if the Landlord agreed to sign off on the special permit application.

On May 24, 2017, Majestic sent a concept site plan to the Defendants showing Majestic's proposed demolition and construction of one of the buildings on the Leased Property and proposed renovation of the second building with an orange roof. The May concept site plan also displayed an intended use of the Cash Land by clearly depicting parking for "new vehicle inventory" and "new vehicle display" on the Cash Land along with other uses that are not portrayed on other land featured on the plan, such as the neighboring CarMax land.

Dos Anjos reviewed the plans in May and was on notice on receipt of the plans that Majestic intended to use the Cash Land together with the Leased Property. Indeed, Pariseault recognized the Cash Land when she saw the concept site plan. Dos Anjos's testimony that he did not recognize the Cash Land on the plans in May as depicted on the concept site plan is unpersuasive.

Importantly, Dos Anjos revealed his true intentions in ultimately terminating the Lease when he stated, "I can assure you, and everybody, if I had discovered [the Cash Land was on the Concept Plan in May], I would have cancelled the deal right then and there. We would not have gone to July 25. It would have been done right then and there."

Majestic's May submission included a request to merge the two parcels owned by the Defendants. Dos Anjos assented to the merger so long as Majestic would agree to preserve the existing curb cuts and drainage facilities. Pursuant to ¶ 2(a) of the Lease, the Defendants had fifteen (15) days from receipt of the May 24, 2017, correspondence to object to any demolition and construction.

11

The Defendants neither objected to the May concept site plan nor attempted to terminate the Lease within the fifteen-day time period.  Accordingly, pursuant to ¶ 2(a) of the Lease, the Defendants waived their right to terminate the Lease, and Majestic was entitled to take steps to demolish and build, as set forth in the May concept site plan, subject to the provisions of ¶ 2(a). Balise called Dos Anjos multiple times about the May submission in order to discuss the plans with Dos Anjos.  Dos Anjos did not return Balise's calls.

On July 12, 17, and 21, of 2017, a team of Majestic representatives (including Balise, Steve Cabral and Ed Casey) contacted and met with residential neighbors of the Leased Property to hear their concerns for Balise's proposed project.

In June and July of 2017, Majestic's representatives met with and solicited feedback from town officials, including North Attleborough's Town Planner, Nancy Runkle.

On or about July 25, 2017, in accordance with ¶ 2(a) of the Lease, Majestic Honda issued a notice of its intent to demolish buildings and construct a new building on the site.  Majestic re-sent the same concept site plan to the Defendants and included building elevations with its second submission.  The Site Plan again depicted the Cash Property being used as a parking lot. In its correspondence, Majestic agreed that it would satisfy Dos Anjos's curb cut and drainage requirements for merging the Lease Property lots as previously discussed in Manoogian's May 30, 2017 letter.  Majestic's counsel suggested that Dos Anjos and Balise "do a site walk, discuss any concerns and see on the ground what is planned."  Balise suggested Dos Anjos contact him with any questions or concerns he might have.  Defendants did not respond to Balise's suggestions.

On July 25, 2017, Manoogian sent Dos Anjos a detailed recitation of Dos Anjos's contractual rights and responsibilities under the Lease. That same day, Manoogian e-mailed a PDF copy of Majestic's site plan package to Dos Anjos and Pariseault, writing:

"Lisa and Al:

See below and attached. Balise is moving forward with the lease. The attached coincides with the email I previously sent to Al outlining the notices due from Balise and Al's actions upon receipt. I agree with Balise's counsel that at this point a site walk would be beneficial. Please let me know when Al would be available to meet on site with me and Balise's reps.

Thanks.

Dave"

On the morning of July 28, 2017, Manoogian and Dos Anjos spoke on the telephone. In an email to Dos Anjos and Pariseault later that day, Manoogian summarized the content of the morning telephone conversation. Manoogian's email noted that Dos Anjos's "specific concern" during the call was "that [Dos Anjos] did not contemplate the demolition of one of the building on the premises (old Dodge store) and its replacement with another new building and the renovation of the newer existing building."

Manoogian's email of July 28, 2017, also advised Dos Anjos and Pariseault: "Before sending a notice to terminate the lease on or before August 10, 2017 or scheduling a meeting prior to said date with Balise's representatives in order to discuss your concerns, please be advised as follows, . . ." after which Manoogian copied and pasted the verbatim language of ¶ 2(a) of the Lease pertaining to the Landlord's ability to approve demolition or construction of buildings, "which such approval shall not be unreasonably withheld."

13

Manoogian's email emphasized the following sentence in bold and underlined font: "**Landlord acknowledges that Tenant's present intention is to demolish the 865 Building and the 849 Building and replace with a prototypical Honda dealership facility.**"  In respect of the bold and underlined language, Manoogian wrote that "[i]n my opinion the lease clearly expresses the tenant's ability thereunder to construct more than one new building and demolish the existing structures."

The email also stated:

"Paragraph 2(a) does provide you with the ability to terminate the lease with written notice if you reasonably withhold consent to such new construction, however, the primary reason you provided to me over the phone does not appear to be a reasonable and sufficient basis to terminate the lease.

If you have specific concerns regarding the site plan and elevation proposed I suggest we meet early next week to review those plans so that I may attempt to establish a meeting with the tenant and its legal counsel and relay your concerns.

If we simply try to establish a meeting and/or give notice of termination of the lease based on the grounds that you did not contemplate the demolition of one building and its replacement together with the renovation of the other existing building, the tenant would not be responsive to any such invitation to meet and would regard the notice to be insufficient.

...

If you are concerned that two dealerships may ultimately operate from the leased premises there is no prohibition contained in the lease preventing such use, however, as I understand, given Honda's declaration to the tenant that only its franchise may operate from the premises this concern may never become a realty [sic] under the lease.  If this is your concern we may be able to address the issue my [sic] requesting an amendment to the lease that if more than one franchise operates from the premises a certain percentage rent increase would kick in."

On July 31, 2017, Manoogian again proposed a site visit, which the Defendants again declined.  That same day, Pariseault emailed to Manoogian, copying Dos Anjos, in which she

14

conditioned forgoing the site walk on Majestic's agreeing to a Honda-exclusivity lease amendment. Pariseault wrote:

> "[M]y father would like Balise to put in writing that there will be only one new car franchise on the property, that being Honda. So long as they attest to that my father does not need to walk the property with them. He is not concerned about offshoots of a new car franchise such as a separate quick lube or car wash building, or a collision center.
>
> However, if you cannot get them to memorialize this in writing then we would need to reschedule the walk through for a day and time when you will be available as well.
>
> Thanks,
>
> Lisa"

On the morning of August 4, 2017, Manoogian conveyed to Majestic's attorney, Joseph Pacella, the Defendants' position that a site visit would not be necessary so long as Majestic agreed to the Honda exclusivity amendment. In order to secure site plan approval, Majestic's counsel agreed to Honda exclusivity in principal, pending review of the actual amendment language. In turn, on August 4, 2017, at 1:59 pm, Manoogian emailed a "proposed lease amendment" to Dos Anjos and Pariseault, which limited Majestic's use of the Leased Property to a Honda dealership only. Manoogian's email stated, "[u]pon your approval I'll send it to Balise's counsel."

On August 4, 2017, at 4:34 pm, Manoogian sent to Majestic's counsel the "proposed lease amendment" that he had sent to Dos Anjos for approval earlier that day. Manoogian's email stated, "Attached for your consideration is the lease amendment my client requests the parties sign." Dos Anjos acknowledged that the original Lease did not limit Majestic to use a Honda dealership only.

As of August 9, 2017, at 10:16 am, Dos Anjos remained troubled by his "two building" objection to the site plan, even if such buildings were to be Honda-exclusive.  For example, Dos Anjos sent an email to Manoogian that stated:

> "I was never told there would be more than one building on the property, regardless of the manufacturer.  I entered into good faith dealings that were centered around one building and one franchise.  The plans presented depict otherwise.  Right now I feel as though I was taken advantage of.
>
> If Mr. Balise wishes to live up to the arrangements discussed in that meeting in my office then we can move forward.  If not the deal is off and we'll take all necessary measures to cancel it even if that means having to go to court."

Shortly thereafter, at 10:57 am on August 9, 2017, Manoogian emailed Dos Anjos and Pariseault, stating:

> "Lisa and Al:
>
> I have attached hereto the proposed notice to terminate the lease with Balise.  If acceptable, Al should sign in the two places indicated ....
>
> ...
>
> While I understand Al's frustrations as set forth in his most recent email, the lease is very specific as to grounds for termination and the attached notice attempts to follow the lease so that the cause for termination reflects the specific lease language.
>
> Please contact me should you have any questions.
>
> Thanks.
>
> Dave"

Manoogian's email indicates that as of August 9, 2017, Mr. Dos Anjos continued to object to Majestic's concept site plan because he objected to either two buildings on the site and/or to the possibility of two dealerships on the site.

Manoogian's August 9, 2017, email enclosed a draft termination letter that recited the following reasons for termination:

"The proposed site plan depicts additional land not owned or controlled by the Landlord that will likely be part of a special permit application for a planned business development within the Town of North Attleborough, Massachusetts. Should such a special permit be granted based on the site plan presented, at the conclusion of the Lease the Landlord may be left with one or more buildings that violate any special permit that may issue. In addition, the Landlord is unwilling to place the parcels that comprise the leased premises in common ownership nor grant easements permitting the common use of any planned access drives and/or utility systems."

The reasons stated in the termination letter were not the same as the reasons discussed among the Defendants, which Manoogian had earlier described as not "reasonable" or "sufficient" in his July 28, 2017, email.

The Defendants mailed the termination letter to the Plaintiff on August 9, 2017, by overnight mail. That same day at 4:52 pm Majestic accepted the Defendants' Honda exclusivity amendment to the Lease by emailing and mailing the signed amendment to Manoogian. Attorney Manoogian immediately forwarded that email to Pariseault and Dos Anjos and represented, "I'm in court tomorrow morning but will discuss a response with you tomorrow afternoon. I still believe the site plan presents issues that have to be worked out and believe the termination notice was the right move at this point." On August 10, 2017, the Plaintiffs received the Termination Letter.

On August 10, 2017, Manoogian wrote to Dos Anjos and Pariseault:

"Al and Lisa:

Given Balise's apparent acquiescence to Al's original use limitation as embodied in the first amendment we originally suggested and now signed by Jeb Balise, should we open up communications to address the issues raised in the notice of termination we sent yesterday? Those issues may be resolved by amending the lease so that the tenant is obligated to sell Al the old Cash land at the lease's termination for a specific amount or at the then current fair market value as determined by the parties [sic] appraisers. Your thoughts?

Thanks.

17

Dave"

On August 11, 2017, Mr. Balise wrote to the Defendants, stating:

"Dear Al:

I thought it best to contact you directly businessman-to-businessman to see if we could discuss your concerns with the site plan. I have always been more than willing to meet with you at any time to make you comfortable with our plans for the property and to get your input, but for whatever reason you did not wish to have such a meeting. I believe we are both honorable businessmen, and that we both truly want to live up to our commitments. I am more than willing to consider any concerns you have with the site plan, and to make an effort to resolve them.

Since we first signed the Lease many months ago, I have poured my heart and soul into this project. I invested a significant amount of time and money in due diligence costs, engineering costs, architectural costs, legal costs, the Honda approval process, meetings with Town officials, meetings with neighbors, etc., all based on our mutual commitment to do business together. As long as you are willing to tell me exactly what your concerns are, we should be able to work out any issues. We could have an "off the record" discussion which would not affect any position either of us might need to take in the future if I am unable to satisfy your concerns.

I can come to your office to meet with you alone, or with you and Lisa, or with Josh if you wish. I'm willing to have our attorneys attend, but it might be better not to include them as we might be able to accomplish more working together as reasonable business people. My cell is [redacted].

Thanks,

Jeb"

Mr. Balise's August 11, 2017, email was sent in direct response to the Defendants' notice

of termination. Mr. Balise invited a meeting with the Defendants with or without counsel. Mr.

Balise's email satisfied ¶ 28 of the Lease insofar as it specified the Defendants' default in

terminating the Lease and demanded a cure.

In response to Mr. Balise's August 11, 2017, email, the Defendants informed Mr. Balise

that Dos Anjos would "be discussing the matter with his advisors over the weekend" and would

"have his attorney send [Majestic] an email early next week with his position." During their

18

discussions, Manoogian suggested to Dos Anjos that the Cash Land be transferred for fair market value at the end of the Lease period. Dos Anjos rejected Manoogian's proposal.

Instead, Dos Anjos authorized Manoogian to send a letter to Pacella on August 14, 2017, offering to "reinstate the lease" "[w]ithout waiving the effects of the notice of termination of lease sent to HI Lincoln, Inc." if Balise continued on with the Honda exclusivity amendment and sold the Cash Land to one of the "landlord entities for One ($1.00) Dollar" forthwith. "In return, the leased premises would be expanded to include the [Cash Land] without additional rent." Dos Anjos admitted that, at this point, he was "fishing for a deal."

On September 7, 2017, the Plaintiff accepted the Defendants' terms via email from Teverow to Manoogian. In reply, Manoogian informed Teverow that upon Dos Anjos's "confirmation I'll prepare a lease reinstatement document for the parties' signatures...."

Approximately one week later, on September 15, 2017, at 10:05 am, Manoogian sent a twelve-page (12-page) lease reinstatement document to Balise's representative, Teverow. In his e-mail, Manoogian stated, "See attached. If it meets with Mr. Balise's approval let me know and I'll advise Al accordingly and produce a final version for signing that contains the legal description and site plan." Paragraph 3 of the reinstatement document limited Majestic to selling Hondas only, and ¶ 4 effectuated an immediate transfer of the Cash Land from Balise to Dos Anjos "for the nominal consideration of One Dollar ($1.00)."

Forty-two minutes later, Manoogian sent Teverow an e-mail stating, "Just to be clear and to restate the substance of our phone call this morning, Al has not yet decided to sign the lease reinstatement agreement but was willing to provide same for the parties' review. He's still considering the matter."

During the period August 14, 2017, to early November, 2017, Balise contacted Dos Anjos in order to meet to no avail. Dos Anjos did not respond to Balise's calls.

In early November of 2017, Dos Anjos expressed to Teverow concerns that Majestic's use of the Cash Land could negatively impact his separate rental relationship with CarMax across the street. Dos Anjos was concerned about Balise becoming "a competitor with CarMax," his other tenant.

By letter dated November 22, 2017, Defendants "confirm[ed]" the termination letter sent in August." At that time, the Defendants returned the Plaintiff's rent checks from August 9, 2017 until November 22, 2017, along with prepaid rent through December 4, 2017, but not the $150,000 deposit.

Balise emailed the Defendants on December 4, 2017, notifying the Defendants of their default and failure to perform obligations under the Lease, and requesting the withdrawal of the Termination Letter. Balise wrote:

"Dear Al and Lisa,

I want to take one more last shot at resolving the issues before I meet with my attorneys on Thursday. The termination notice gives three reasons, all of which are not correct. They are:

1. The termination notice states that Al "may be left with one or more buildings which violate any special permits that may issue". This is not correct, Steve Cabral has told me that the special permit for Al's land and the Cash land can be obtained separately.

2. The termination notice state that Al is "unwilling to place the parcels that comprise the lease premises in common ownership", but in accordance with the lease and in a letter to Joe Pacella on May 30, 2017, Mr. Manoogian stated that Al had agreed to combining the property into one parcel, with conditions that I accepted.

3. The termination notice states that Al is unwilling "to grant easements permitting common use of any planned access drives and/or utility systems", but Steve Cabral

20

has told me that I do not need any easements or common use or access drives or utility systems.

Attached is a letter from Steve Cabral to me on these issues, and Mr. Manoogian's letter to Joe. It seem that every item in the termination notice had been resolved, so I would ask that the termination notice be withdrawn and we move forward with the lease.

Sincerely,
Jeb"

Balise enclosed an email from its civil engineer, Steve Cabral, explaining that the Defendants' termination reasons pertaining to permitting and easements could be easily overcome. Balise also enclosed Manoogian's letter agreeing to the merger of the two Dos Anjos parcels making up the Leased Property. The December 4, 2017, email constituted an offer to have Defendants' cure their non-monetary default of improperly claiming the Lease to be terminated under ¶ 2(a).

On December 26, 2017, the Defendants sent the Plaintiff and Teverow a three-way reciprocal release of all claims, rejecting Majestic's request that the Defendants cure their failure to perform obligations under the Lease. The proposed release did not require the return of Majestic's $150,000 security deposit. In response, Majestic commenced this action on December 27, 2017.

The Plaintiffs have established by a preponderance of the evidence that Defendants' reasons given in the August 9, 2017, Termination Letter were invalid and unreasonable for the following reasons:

First, Paragraph 9 of the Lease gives the Landlord discretion to approve or disapprove special permits sought by the Tenant, which may include an application for a planned business development. The language set forth in ¶ 9 of the Lease, does not, however, give the Landlord the right to cancel the Lease. Paragraph 2(a) of the Lease grants the Landlord the right to

21

terminate the Lease based on the construction and demolition of a building. The Defendants waived such right. Nowhere does the Lease permit the Landlord to terminate the Lease based upon the Tenant's use of land outside the purview of the Lease, such as the Cash Land.

Second, the Defendants had already given Majestic permission to merge the two parcels making up the Leased Property on May 30, 2017.

Third, the Landlord had already contracted away all control of easements to the Tenant in ¶ 25 of the Lease.

I have credited the Plaintiff's expert and lay testimony. Plaintiff has established by a preponderance of the evidence that all of the Defendants' purported reasons for termination were either incorrect or easily overcome by minor adjustments to the concept site plan.

Balise sustained damages in the form of both lost value of operating the dealership in North Attleborough (lost opportunity should the Plaintiff elect to not continue with the Lease) and delay damages resulting from the significant delay caused by the Defendants' unreasonable termination of the Lease. At the time of trial, the Plaintiff was delayed 21.5 months by the Defendants' refusals to sign any permits as required under the Lease, such as TIF applications and permitting applications to the Town of North Attleborough, and as a result of their purported termination of the Lease. Through to the date of hearing on October 26, 2018, the Defendants have refused to allow Majestic any access to the Property, refused to allow Majestic to engage in any pre-construction planning or assessment, and even refused to respond to Majestic's agent's requests for information related to the Property. I find that Majestic has demonstrated by a preponderance of the evidence that Majestic's delay damages total $2,100,000 per year. Dividing such value by twelve (12) and multiplying by 21.5 (the number of months Balise has been delayed at the time of trial), results in delay damages in the amount of $3,762,500.

Extending that value by the additional 4 months which have lapsed since the date of the jury's verdict, September 27, 2018, results in 25.5 months at $175,000 per month totaling $4,462,500. Should Majestic elect specific performance, as provided for in my Decision and Order on Plaintiff's Motion to Elect Its Remedy After Announcement of Findings and Before Entry of Judgment and Defendants' Motion to Enforce Plaintiff's Election of Specific Performance (Pleading #95), Majestic's delay damages of $175,000 per month will continue until such time as Defendants have complied with my orders relating to specific performance below.

In evaluating the Plaintiff's claim for damages should Plaintiff not elect specific performance, I find that the Plaintiff's delay damages are fully subsumed within those damages. At a minimum, hence, Majestic has suffered damages totaling $4,462,500. The components of Majestic's damages should it not elect specific performance, include, without limitation: the value of the fixed assets, the goodwill or blue sky value of the franchise, and expected earnings before depreciation, interest, and taxes (or EBDIT).

I accept the value Majestic's expert, Todd Berko, utilized in applying the ratio of new to used cars sold as well as his consideration of revenue other than sales, such as finance revenue and insurance revenue along with warranty/service packages and the parts and service business. I have accepted, similarly, Mr. Berko's calculations relating to operating costs and other expenses in assessing pre-tax profit resulting in an annual value of $1.75 million.

I differ with Mr. Berko's application of a factor of 5.5 to 5.8 in multiplying his valuation of $1.75 million. Whereas, Mr. Berko elected the higher end of the range of 5 – 6 (about 5.7) which he identified, I have multiplied $1.75 million by 5 resulting in a value of $8,750,000. Whereas Mr. Berko's value of $10,000,000 was reduced by a discount rate of about 5.64% to a present

day value of $7,600,000, I have applied the same discount rate, reducing $8,750,000 to $6,650,000.

In a separate regard, I accept Mr. Berko's valuation of a Honda dealership such as at the leased premises, were the dealership to be sold, as $1.5 million. Reducing $6,650,000 by the value of a Honda dealership, $1,500,000, results in total damages of $5,150,000. Such damages do not reflect the purchase price of the Cash Land in the amount of $891,600, and are not reduced by that amount, accordingly.

It is well settled that my calculations of damages need not be identical to that reflected in the jury's verdict. See *Exhibit Source* v. *Wells Avenue Business Center, LLC.*, 94 Mass. App. Ct. 497, 500 (2018), citing *Klairmont* v. *Gainsboro Restaurant, Inc.*, 465 Mass. 165, 186 (2013) (noting the "well-established principle" that a judge may deviate from the jury's factual findings when determining c. 93A liability). As set forth in my Decision and Order on Plaintiff's Motion to Elect Its Remedy After Announcement of Findings and Before Entry of Judgment and Defendants' Motion to Enforce Plaintiff's Election of Specific Performance (Pleading #95), Majestic may elect either to enforce the Lease and receive its delay damages of $4,462,500, to date, or it may walk away from the Lease and receive its total compensatory damages of $5,150,000.

### C. Rulings of Law

General Laws c. 93A, §2 makes unlawful any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." This prohibition is "extended to those engaged in trade or commerce in business transactions with others similarly engaged" by G. L. c. 93A, § 11. See *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 779 (1986) (citing *Manning* v. *Zuckerman*, 388 Mass. 8, 12 [1983]). The enactment

of G. L. c. 93A, § 11, ensured that "these protections were extended to persons engaged in trade or commerce in business transactions with other persons also engaged in trade or commerce." *Manning*, 388 Mass. at 12.

The SJC's opinion in *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 475 (1991), informs my analysis. In *Anthony's Pier Four, Inc.*, the SJC recognized that "there may be 'cases where an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business.'" *Id.*, quoting *Spence v. Boston Edison Co.*, 390 Mass. 604, 616 (1983). "In such circumstances, a claimant would have to show greater 'rascality' than would a less sophisticated party." *Id.* In particular, the SJC held that conduct "'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice" under G. L. c. 93A. *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. at 475, quoting *Wang Laboratories, Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 857 (1986). The SJC illustrated this concept by resort to two additional case parentheticals:

> *Hannon v. Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 825 (1982) (if proved, submission of low bid followed by demand for more money after award of contract would constitute violations of c. 93A); *Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 17–19 (1st Cir. 1985) (commercial extortion giving rise to c. 93A liability, and treble damages, where defendant withheld payment due under contract not because of dispute over liability or inability to pay but, rather, as "'wedge' against [plaintiff] 'to enhance [defendant's] bargaining power for more product'").

*Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. at 475.

Pertinent to the case before me, a breaching party's "knowing use of a pretext to coerce [the non-breaching party] into paying [the breaching party] more than the contract required establishes willfulness as a matter of law." *Anthony's Pier Four, Inc.*, 411 Mass. at 475 (citing *Pepsi-Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d at 18. See *id*, quoting

*Pepsi-Cola Metropolitan Bottling Co., Inc.*, 754 F.2d at 18 ("[T]he evidence is sufficient to support its determination that [the defendants] . . . were guilty of a willful violation of . . . c. 93A. The court was entitled to believe that [the defendants] . . . had withheld monies which they legally owed as a form of extortion -- to force Pepsi to do what otherwise it could not be legally required to do"); see also *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. at 780 ("Actions involving fraudulent representations in knowing disregard of the truth encompass culpable, 'willful' behavior under the statute"); *Service Publications, Inc. v. Goverman*, 396 Mass. 567, 578 n.13 (1986); *Shaw v. Rodman Ford Truck Center, Inc.*, 19 Mass. App. Ct. 709, 711-712 (1985); *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F.2d 59, 68 (1st Cir. 1984).

The Appeals Court's ruling in *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, (1992), similarly, is noteworthy.  There, the Appeals Court examined a series of breach of contract cases and concluded that:

> [T]here is in those cases a constant pattern of the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the breach of contract has an extortionate quality that gives it the rancid flavor of unfairness.

*Atkinson*, 33 Mass. App. Ct. at 226.

Of equal note, the Appeals Court has held that "[o]ne of the more specific categories of unfairness developed by the case law consists of coercive or extortionate tactics designed to extract undeserved concessions from other business entities or consumers." *Renovator's Supply, Inc. v. Sovereign Bank*, 72 Mass. App. Ct. 419, 430 (2008).  The *Renovator's Supply, Inc.* case cited several illustrative examples in this regard:

> See, e.g., *Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. at 472-476 (landowner's pretextual disapproval of a development plan attempted to squeeze additional compensation out of the developer); *Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995) (a contract breach employed to disrupt another party's remaining rights has the coercive character of a c. 93A violation); *Frank J.*

> *Linhares Co.* v. *Reliance Ins. Co.*, 4 Mass. App. Ct. 617, 622–623 (1976) (holding a truck hostage in exchange for the owner's waiver of warranty rights); *Community Builders, Inc.* v. *Indian Motocycle Assocs.*, 44 Mass. App. Ct. 537, 557–559 (1998) (nonpayment of contractual debt to pressure an opponent for a compromise of its claim); *Arthur D. Little, Inc.* v. *Dooyang Corp.*, 147 F.3d 47, 52 (1st Cir. 1998) (withholding validly owed payments as bargaining leverage).

*Renovator's Supply Inc.* v. *Sovereign Bank*, 72 Mass. App. Ct. at 430.

Contrary to the Defendants' assertion, the Plaintiff did not contractually waive its ability to seek damages under G. L. c. 93A.

> The limitation of liability clause does not aid the defendant here. In *Standard Register Co.* v. *Bolton-Emerson, Inc.*, 38 Mass. App. Ct. 545 (1995), this court similarly considered whether a limitation of remedies clause in a commercial contract applied so as to preclude remedies otherwise available under c. 93A. We held that the applicability of such a contract provision depends upon whether the c. 93A claim sounds more in contract, or in tort: '[A] chapter 93A claim analogous to a tort-based recovery overrides any contractual defenses, whereas a § 11 claim founded on a contract theory is subject to a contractual limitation of remedies provision.' Id. at 549. We went on to hold in *Standard Register* that the 'core' of the plaintiff's claim was based upon misrepresentations the defendant made as to its ability to provide the product it was offering. *Id.* at 550. We concluded that this conduct sounded in tort; it was 'deceitful,' and 'distinct' from the facts underlying the plaintiff's contract claim. *Id.*

*Exhibit Source Inc.* v. *Wells Avenue Business Center, LLC*, 94 Mass. App. Ct. 497, 502 (2018).

Here, too, the Plaintiff's c. 93A claim sounds in tort, for similar reasons.

Nor may the Defendants hide behind a curtain of their purported "advice of counsel" for their 93A transgressions. The Defendants' argument that they simply followed the mistaken advice of Manoogian is contradicted by the record. For example, the Defendants rejected Manoogian's advice regarding Dos Anjos's "two building" objection; the Defendants rejected Manoogian's advice that a site walk would be beneficial; the Defendants rejected Manoogian's advice that the parties meet to address Dos Anjos's site plan concern; and the Defendants rejected Manoogian's advice when he recommended a transfer of the Cash Land at the end of the Lease period and for fair market value as determined by the parties' appraisers. In general, Dos

Anjos freely admitted that he does not always follow his lawyer's advice and rejected it in matters pertaining to the Lease. Cf. *G.S. Enterprises Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 275 (1991) (listing elements of advice of counsel defense, including "honest[] compli[ance] with . . . counsel's advice").

Neither is Defendants' misconduct forgiven by Dos Anjos's testimony that he cannot read or understand legal documents. Dos Anjos's testimony is belied by his sophisticated experience in the automobile industry as well as his demonstrated ability to read and understand documents while on the witness stand. Regardless, a party's failure to read or understand a contract does not free him from his obligations thereunder. Dos Anjos's allegation that he failed to read the Lease does not free him of his obligations under the Lease. See *Miller* v. *Cotter*, 448 Mass. 671, 680 (2007), citing *Wilkisius* v. *Sheehan*, 258 Mass. 240, 243 (1927); and *Grace* v. *Adams*, 100 Mass. 505, 507 (1868). Even if Dos Anjos could not read the Lease, he had at least one attorney working for him who could do so and, in fact, who did explain the Lease to Dos Anjos.

It matters not that Defendants terminated the Lease and claimed no monetary benefit from their actions. Their unlawful conduct is notforgiven by virtue of the termination of the Lease. Rather, it is their actions leading to the termination of the Lease which were unfair, which were deceptive, and which violated G. L. c. 93A, §§ 2, 11. Under Massachusetts law the "coercive effort" need not succeed. Rather, "the party targeted for pressure may resist, absorb its losses, and pursue its remedies under the statute." *Renovator's Supply, Inc.*, 72 Mass. App. Ct. at 430 (citing *Anthony's Pier Four, Inc.*, 411 Mass. at 462).

Dos Anjos acted with willful and knowing disregard for his contractual obligations, which, as a matter of law, constitutes a violation of G. L. c. 93A. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. at 475; *Wang Laboratories, Inc.* v. *Business Incentives, Inc.*, 398 Mass.

at 857; *Hannon* v. *Original Gunite Aquatech Pools, Inc.*, 385 Mass. at 825. As in *Anthony's Pier Four, Inc.*, the Defendants' conduct "more than meets the standard of an 'unfair or deceptive act or practice' – even taking into account that both parties to the transaction were sophisticated business people." *Anthony's Pier Four, Inc.* at 475.

The Defendants South Washington Street willfully and knowingly committed the following unfair methods of competition and unfair and deceptive acts and practices in violation of G. L. c. 93A, §§ 2, 11:

1. The Defendants' purported reasons for terminating the Lease were a pretext for Dos Anjos's bitterness over Balise's purchase of the Cash Land. The Defendants asserted their termination reasons either with knowing or willful disregard of their contractual obligations for the following reasons:

   a. The Lease provides the Landlord with the "sole discretion" to consent or not consent to the Tenant's pursuit of "special use permits." The language of the Lease under ¶ 9 does not empower the Landlord to terminate the Lease upon such disapproval for a special use permit. Rather, the Tenant is left with the ordinary use permitted under the North Attleborough Zoning By-Law, which in this case would permit a new and used car dealership and vehicle storage such as tenant proposed. Regardless, special permits were available for the Cash Land and the Premises as separate parcels;

   b. Dos Anjos had agreed to combine the Lease parcels in common ownership pursuant to the conditions Balise accepted; and

   c. Easements or common use of access drives or utility systems were not

      required for Majestic to operate. The power to grant easements was provided

      to the Tenant under the Lease, ¶ 25.

2. The Defendants leveraged their approval power under ¶ 2(a) of the Lease which is

   limited to the demolition and construction of buildings "as a lever to obtain

   advantage[s]" (*Atkinson* v. *Rosenthal*, 33 Mass. App. Ct. at 226) and "to extract

   undeserved concessions from other business entities," in this case Majestic.

   *Renovator's Supply, Inc.*, 72 Mass. App. Ct. at 430 (landowner's pretextual

   disapproval of a development plan attempted to squeeze additional compensation out

   of the developer). In his December 4, 2017, correspondence to Dos Anjos, Balise

   addressed and satisfied every termination reason that had been tendered by the

   Defendants. Compare *Chapman* v. *Katz*, 448 Mass. 519, 534 (2007) ("In light of the

   [tenant's] agreement to address and satisfy each concern raised by the [landlord]

   before litigation commenced, the [landlord's] failure to consent to the erection of the

   ATM kiosk was unreasonable as a matter of law"). After the Defendants refused to

   withdraw the termination notice, Majestic was forced to commence this action in

   which it has proved that the Defendants breached the Lease, breached the implied

   covenant of good faith and fair dealing, and violated G. L. c. 93A.

3. The Defendant's demand for the Honda exclusivity amendment violated Majestic's

   usage rights as set forth in the Lease, ¶ 15. To obtain such coerced advantages or to

   improve the contract in this manner is impermissible. See *Massachusetts Employers*

   *Ins. Exch.* v. *Propac-Mass, Inc.*, 420 Mass. at 43 (contract breach employed to disrupt

   another party's remaining rights has coercive character of c. 93A violation); *Frank J.*

*Linhares Co.* v. *Reliance Ins. Co.*, 4 Mass. App. Ct. at 622-623, (1976) (withholding truck to coerce owner's waiver of warranty rights).

4. Dos Anjos admitted the Cash Land was his true reason for terminating the Lease when he testified, "I can assure you, and everybody, if I had discovered [the Cash Land was on the Concept Plan in May], I would have cancelled the deal right then and there. We would not have gone to July 25. It would have been done right then and there." It was Dos Anjos's intent to extract additional concessions from the Plaintiff that were not bargained for in the nature of a Honda exclusivity amendment and extracting the Cash land for one dollar ($1.00). The Defendants' knowing use of a pretext to coerce lease amendments and to obtain the Cash Land "establishes willfulness as a matter of law." *Anthony's Pier Four, Inc.*, 411 Mass. at 475 (citing *Pepsi-Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d at 18 [1st Cir. 1985]).

5. The Defendants leveraged their approval authority under ¶ 2(a) of the Lease in order to extract from Majestic the Cash Land for the price of $1.00.

6. The evidence supports a finding that the Defendants willfully and knowingly strung along Majestic to see what unwarranted benefits the Defendants could extract from Plaintiff. Such conduct violates G. L. c. 93A as a matter of law. *See Full Spectrum Software, Inc* v. *Forte Automation Sys.*, 858 F.3d 666, 674 (1st Cir. 2017) ("one business's stringing along of another to the other's detriment" can violate G. L. c. 93A, § 11), citing *Greenstein* v. *Flatley*, 19 Mass. App. Ct. 351, 358 (1985); and *Mass. Eye and Ear Infirmary* v. *QLT Phototherapeutics, Inc.*, 552 F.3d 47, 69–70 (1st Cir. 2009)). Dos Anjos was "fishing for a deal." The Defendants' disingenuous

31

offers went "beyond the toleration even of persons inured to the rough and tumble of the world of commerce" and so constituted a "stringing along" bargaining style that is, as a matter of law, in violation of M.G.L. c. 93A. *See Full Spectrum Software, Inc* v. *Forte Automation Sys.*, 858 F.3d at 674.; *Greenstein* v. *Flatley*, 19 Mass. App. Ct. at 358.

7.  Balise sent Dos Anjos an email on December 4, 2017, requesting withdrawal of the Termination Letter as all of the reasons listed therein were addressed and satisfied. Dos Anjos refused to cure his default and, as such, willfully failed to perform his obligations under the Lease.

8.  Dos Anjos willfully and knowingly withheld the $150,000 deposit. The Lease provided that the deposit was to be converted to rent. Yet, it was not returned with rent checks sent by the Defendants on November 22, 2017, and December 4, 2017. The only language in the Lease which entitled the Landlord to keep the deposit appeared under a section of the Lease describing the results of Tenant's cancellation of the Lease. As Justice Gants wrote in *Gentle Communs., L.L.C.* v. *Naggar*, this is "precisely the type of commercial unfairness that G.L.c. 93A, § 11 was intended to remedy." 17 Mass. L. Rep. 366 at *14 (Mass. Sup. Ct. 2004). A commercial landlord's wrongful withholding of a security deposit may also violate G. L. c. 93A, § 11. *See id.* In *Gentle Communs., L.L.C.*, the court found that the landlord had engaged in an "unscrupulous and therefore an unfair act or practice in violation of G. L. c. 93A, § 2 for the landlord to refuse to return the deposit in full" to the tenant. *Id.* at *13. The court held that the landlord "had no legal right to retain the deposit and was both legally and morally obligated to return it," and the court doubled the

32

damages and awarded attorneys' fees to the tenant under G. L. c. 93A. *Id.* at \*13–\*14.

Here, the jury found the Defendants breached the covenant of good faith and fair dealing. Nonetheless, a "finding of a breach of the covenant of good faith and fair dealing" may but does not "compel[] a finding of a violation of G. L. c. 93A." *Frostar Corp. v. Malloy*, 63 Mass. App. Ct. 96, 109 n.26 (2005). Based on the above findings of fact and rulings of law, I find that the Defendants' breach of contract and breach of the covenant of good faith and fair dealing were committed in violation of G. L. c. 93A, §§ 2, 11. The evidence warrants a finding that the Defendants' actions were committed in disregard of known contractual arrangements, intended to secure benefits for the Defendants' knowingly and willfully.

G. L. c. 93A provides for the recovery of actual damages as well as attorney's fees. "Actual" damages under c. 93A are similar to compensatory damages in tort in that an injured party can recover all such damages proximately caused by the defendant's unfair or deceptive conduct. A c. 93A claim analogous to a tort-based recovery overrides any contractual defenses. *Standard Register Co. v. Bolton-Emerson, Inc.*, 38 Mass. App. Ct. at 549.

Based on the Defendants' violations of G. L. c. 93A, Majestic "is entitled to multiple (not more than treble and not less than double) damages if [the breaching party] acted 'knowingly' or 'willfully' in violation of § 2." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. at 475. In a case of commercial extortion, double damages are appropriate. See *Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d at 17-19 (commercial extortion giving rise to c. 93A liability, and treble damages, where defendant withheld payment due under contract not because of dispute over liability or inability to pay but, rather, as "'wedge' against [plaintiff] 'to enhance [defendant's] bargaining power for more product.'").

33

## ORDER

Judgment is to enter in favor of Plaintiff on Count 5 of its Complaint.  Plaintiff's G. L. c.
93A damages shall be doubled so that the Defendants are hereby ordered to pay to Majestic
$10,300,000 should Majestic elect to not enforce the Lease. Whereas the jury has returned a
verdict on Counts 3 and 4 of the Complaint in the amount of $5,616,500, Plaintiff's recovery is
limited to judgment on Count 5.

If Majestic elects to enforce the Lease, its associated delay damages shall be doubled so
that Defendants are hereby ordered to pay to Majestic $8,925,000.  Whereas the jury has returned
a verdict on Counts 3 and 4 of the Complaint in the amount of $3,762,500, Plaintiff's recovery is
limited to judgment on Count 5.

Based on Defendants' violations of G. L. c. 93A, Defendants are ordered to pay
Plaintiff's attorneys' fees and costs, including the amounts I have ordered pursuant to the jury's
verdict in favor of Plaintiff on Count 3 of its Complaint, together with any additional fees and
costs relating to Count 5.  Plaintiff is to file and serve its Affidavit of Attorney's Fees and Costs
within 14 days of the docketing of my Findings and Order.  Defendants are to file their
opposition thereto within 30 days of the docketing of my Findings and Order.

If Majestic elects specific performance, as provided in my Decision and Order on
Plaintiff's Motion to Elect Its Remedy After Announcement of Findings and Before Entry of
Judgment and Defendants' Motion to Enforce Plaintiff's Election of Specific Performance
(Pleading #95), Majestic shall have thirty (30) days from the docketing of my Findings and
Order to elect its remedy by notice to the Court and Defendants.

34

If Plaintiff elects specific enforcement of the Lease:

    a.  the Defendants will cooperate with and approve any necessary paperwork for any permits or other items required for Majestic's full use and enjoyment of the Leased Property, planned construction, and operation of its business.

    b.  The Defendants will give Majestic unfettered access to the Leased Property for the duration of the Lease as permitted under the Lease.

    c.  Effective upon such election, Majestic shall have access to the Leased Property.

    d.  Majestic will begin paying rent under the structure provided in the Lease as of the date of this decision.

    e.  Majestic does not owe any back rent from 2016, 2017 or the time period during which Majestic was forced to pursue this action in court.

January 28, 2019

Mark D Mason
Justice of the Superior Court

35

# Exhibit E

# Judge Mason's Re-Opened 93A Findings of Fact and Rulings of Law, dated April 30, 2020

COMMONWEALTH OF MASSACHUSETTS

HAMPDEN, ss.                                    SUPERIOR COURT
                                                CIVIL ACTION
                                                NO. 1779CV899


HI LINCOLN, INC. D/B/A MAJESTIC HONDA,
Plaintiff/Defendant-in-Counterclaim
v.

SOUTH WASHINGTON STREET, LLC,

849 SOUTH WASHINGTON STREET, LLC,

849 SOUTH WASHINGTON STREET REALTY TRUST
UNDER DECLARATION OF TRUST DATED JUNE 9, 2000, ALFREDO DOS ANJOS,
TRUSTEE,

855 SOUTH WASHINGTON STREET REALTY TRUST
UNDER DECLARATION OF TRUST DATED OCTOBER 2, 2008, ALFREDO DOS
ANJOS, TRUSTEE,

865 SOUTH WASHINGTON STREET REALTY TRUST
UNDER DECLARATION OF TRUST DATED MAY 14, 1998, ALFREDO DOS ANJOS,
TRUSTEE,
and

COOPER AVENUE REALTY TRUST UNDER DECLARATION OF TRUST DATED
MAY 14, 1998, ALFREDO DOS ANJOS, TRUSTEE.
Defendants/Plaintiffs-in-Counterclaim

### FINDINGS OF FACT AND RULINGS OF LAW
### ON THE REOPENED 93A TRIAL

A.  **Background**

   1.  **The Jury Trial**

   I conducted a jury trial in the above-captioned matter during the period September 18,

2018 – September 27, 2018.  After trial, the jury returned the following Special Verdict:

a.  The Plaintiff/Defendant-in-Counterclaim (the "Plaintiff") proved by a preponderance of the evidence that the Lease is in full effect.

b.  The Defendants/Plaintiffs-in-Counterclaim (the "Defendants") did not prove by a preponderance of the evidence that their withholding of consent was exercised reasonably or that the termination of the Lease was valid.

c.  The Plaintiff proved by a preponderance of the evidence that the Defendants breached the Lease when it terminated the Lease.

d.  The Defendants' breach of contract occurred on August 9, 2017.

e.  The Plaintiff proved by a preponderance of the evidence that the Defendants breached their covenants of good faith and fair dealing implied in the Lease.

f.  The Defendants' breach of the implied covenant of good faith and fair dealing occurred on August 9, 2017.

g.  The Plaintiff proved by a preponderance of the evidence that it suffered money damages as a result of the Defendants' breach of the Lease.

h.  The Plaintiff proved by a preponderance of the evidence that it suffered money damages as a result of the Defendants' breach of the implied covenant of good faith and fair dealing.

i.  The amount that would compensate the Plaintiff for the Defendant's breaches is $5,616,500 in compensatory damages. Of this amount, $891,600 is for the Plaintiff's purchase of the Cash Land.

j.  The amount that would compensate the Plaintiff for the delay in operating the dealership to date is $3,762,500.

2

I reserved the plaintiff/defendant-in-counterclaim's claim for violations of G.L. c. 93A, §§ 2, 11 set forth in Count 5 of plaintiff/defendant-in-counterclaim's complaint.

### 2. The Initial 93A Bench Trial

On October 26, 2018 and December 10, 2018, I conducted a jury-waived trial on Count 5 of Plaintiff's Complaint. On January 28, 2019, I issued Findings of Fact and Rulings of Law finding in favor of Majestic on its c. 93A claim. I incorporate as if stated fully herein my prior Findings of Fact and Rulings of Law in this case through January 28, 2019. *See* Findings of Fact and Rulings of Law, January 28, 2019, pp. 21-24.

In my Findings of Fact and Rulings of Law, I found that the Defendants acted with willful and knowing disregard for their contractual obligations in violation of G.L. c. 93A c. 93A, §§ 2, 11. *Id.,* p. 28. In particular, I found that the "Defendants' actions were committed in disregard of known contractual arrangements, intended to secure benefits for the Defendants[] knowingly and willfully." *Id.,* p. 33. I found that the Defendants violated c. 93A through their misrepresentations, deceptions, deceit, and stringing along of Majestic. *Id.,* at 27.

Notably, I cautioned the Defendants on the possibility of additional damages continuing after the January 28, 2019 date of the Order with the following language:

> Should Majestic elect specific performance, …Majestic's delay damages of $175,000 per month will continue until such time as Defendants have complied with my orders relating to specific performance below.

*Id.,* p. 23.

On January 28, 2019, I issued the following order:

### ORDER

Judgment is to enter in favor of Plaintiff on Count 5 of its Complaint. Plaintiff's G. L. c. 93A damages shall be doubled so that the Defendants are hereby ordered to pay to Majestic $10,300,000 should Majestic elect to not enforce the Lease. Whereas the jury has returned a

verdict on Counts 3 and 4 of the Complaint in the amount of $5,616,500, Plaintiff's recovery is limited to judgment on Count 5.

If Majestic elects to enforce the Lease, its associated delay damages shall be doubled so that Defendants are hereby ordered to pay to Majestic $8,925,000. Whereas the jury has returned a verdict on Counts 3 and 4 of the Complaint in the amount of $3,762,500, Plaintiff's recovery is limited to judgment on Count 5.

Based on Defendants' violations of G. L. c. 93A, Defendants are ordered to pay Plaintiff's attorneys' fees and costs, including the amounts I have ordered pursuant to the jury's verdict in favor of Plaintiff on Count 3 of its Complaint, together with any additional fees and costs relating to Count 5. Plaintiff is to file and serve its Affidavit of Attorney's Fees and Costs within 14 days of the docketing of my Findings and Order. Defendants are to file their opposition thereto within 30 days of the docketing of my Findings and Order.

If Majestic elects specific performance, as provided in my Decision and Order on Plaintiff's Motion to Elect Its Remedy After Announcement of Findings and Before Entry of Judgment and Defendants' Motion to Enforce Plaintiff's Election of Specific Performance (Pleading #95), Majestic shall have thirty (30) days from the docketing of my Findings and Order to elect its remedy by notice to the Court and Defendants.

If Plaintiff elects specific enforcement of the Lease:

    a. the Defendants will cooperate with and approve any necessary paperwork for any permits or other items required for Majestic's full use and enjoyment of the Leased Premises, planned construction, and operation of its business.
    b. The Defendants will give Majestic unfettered access to the Leased Premises for the duration of the Lease as permitted under the Lease.
    c. Effective upon such election, Majestic shall have access to the Leased Premises.
    d. Majestic will begin paying rent under the structure provided in the Lease as of the date of this decision.
    e. Majestic does not owe any back rent from 2016, 2017 or the time period during which Majestic was forced to pursue this action in court.

Judgment was entered on August 6, 2019, which calculated the total delay damages,

doubled those damages in accordance with my ruling of January 28, 2019, and added attorneys'

fees, costs, and expert costs for a total award without prejudgment interest of $9,573,367.13.

As set forth in my Decision and Order on Plaintiff's Motion to Elect Its Remedy After

Announcement of Findings and Before Entry of Judgment and Defendants' Motion to Enforce

Plaintiff's Election of Specific Performance (Pleading #95), Majestic was ordered to elect either to enforce the Lease and receive its delay damages of $4,462,500 to date, or walk away from the Lease and receive its total compensatory damages of $5,150,000. On February 12, 2019, Majestic elected specific performance under the Lease and delay damages of $4,462,500 to date.

### 3. The Reopened 93A Trial

Majestic filed a Motion under Mass. R. Civ. Proc. 60, seeking, *inter alia*, additional delay damages as a result of the Defendants' continued alleged misconduct causing additional delay from January 28, 2019 through the date the Defendants turned over all signed permits. After hearing on Majestic's Rule 60 Motion on August 15, 2019, I issued an order to re-open the trial on Majestic's c. 93A claim.

On September 23, 2019, I reiterated and expanded on my ruling of August 15, 2019, in response to the Defendants' "Emergency Motion to Limit the Scope of the c. 93A Hearing." In my Order of September 23, 2019, I informed the parties that:

> Because title to the premises is core to issues such as the approval of municipal permitting, plaintiff may present evidence at the 93A hearing relating to defendants' alleged misrepresentations relating to title as those representations bear upon matters affecting, for example, municipal permitting. Accordingly, the plaintiff is permitted to adduce certain evidence at the 93A hearing that defendants' alleged misrepresentations relating to title contributed to additional delay damages. What is relevant for the purposes of the 93A hearing is whether the evidence demonstrates a delay in the execution of this Court's orders and judgment as a result of the defendants' misrepresentations of title.

### Findings of Fact

I held two additional days of trial on October 4, 2019 and December 13, 2019, including witness testimony and the submission of additional exhibits. On October 4, 2019, Majestic offered three witnesses: Alfredo Dos Anjos ("Dos Anjos"), Lisa Pariseault, Esq. (Pariseault), and David Manoogian, Esq. (Atty. Manoogian). Each answered only questions related to their

personal identity and thereafter invoked the privileges to avoid responding to further inquiry. Dos Anjos and Pariseault invoked their Fifth Amendment privilege against self-incrimination under the United States Constitution and Art. 12 of the Massachusetts Declaration of Rights. *See* Tr. Oct. 4, 2019, pp. 40:23, *et seq.*, and 64:24, *et seq.* Atty. Manoogian invoked both the attorney-client privilege and privilege against self-incrimination. *Id.* I advised the witnesses and Defendants that the invocation of such privileges could trigger my ability to draw adverse inferences against the Defendants. *See* Court's Order of October 9, 2019; Tr. of Oct. 4, 2019, pp. 55:23 – 56:3, 138:25 – 141:4; 142:12-25. Noting that the attorney-client privilege belongs not to Atty. Manoogian, but to the Defendants, his clients, I advised the witnesses and Defendants that an adverse inference may be drawn against the Defendants. Mass. G. Evid, § 502(c).

In turn, I ordered Majestic's counsel to submit in writing their proposed questions for Dos Anjos, Pariseault and Atty. Manoogian. I ordered the witnesses to respond in writing simply identifying whether they would invoke any privilege with regard to each question. *See* Order of October 9, 2019. Those questions and responses were entered into the record as 93A Exs. 97 (Dos Anjos), 98 (Pariseault), and 99 (Atty. Manoogian). Together, those exhibits evince a written record of the questions posed and, for each witness, the nature of the privileged invoked. *Id.*

Majestic then called Dr. Steven Cabral ("Dr. Cabral"), a licensed civil engineer employed by Majestic to assist in the design and permitting of the construction of the new and used Honda automobile dealership at the leased premises (the "Leased Premises"). Thereafter, upon the entry into evidence of 93A Exs. 14 through 100, Majestic rested.

The Defendants called Edward J. Casey, Esq. ("Atty. Casey") an attorney also employed by Majestic to provide professional services in the permitting of its proposed new and used

6

automobile dealership. Finally, the Defendants called the Plaintiff's principal, James E. Balise, Jr. ("Balise"). Thereafter, upon the entry of 93A Exs. 101 through 113, the Defendants rested. The parties agreed to waive closing arguments. Each party submitted Proposed Findings of Fact and Rulings of Law, which I have reviewed and considered.

I also reviewed and considered all exhibits and testimony from the underlying jury trial and the initial c. 93A bench trial, which the parties agreed to incorporate into the re-opened c. 93A trial.

After a review of the record, I find based upon a preponderance of the credible evidence as follows:

1. On October 28, 2016, the Defendants drafted and signed a Lease provided a warranty of title in the LLCs in "fee simple," as follows:

> Landlord represents, warrants and covenants to Tenant that ... Landlord's fee simple interest in the Premises is free and clear of any mortgages, deeds encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, or any other encumbrance which would restrict Tenant's use of the Premises....

See Jury Ex. 2, ¶ 16(a)(ii).

2. Majestic was aware, as early as 2016 or 2017, after it signed the Lease, that the Defendants did not own the Leased Premises. Instead, Balise understood that the titleholder to the Leased Premises was the "Dos Anjos Realty Trusts." Tr. of December 13, 2019, pp. 101, 102, 104, 122).

3. Based upon his significant experience in car dealership development, Balise minimized the discrepancy between the named Landlords and the record title holders at that time. In Balise's mind, such discrepancy would be worked out as a matter of "clean-up." Tr. of Oct. 4, 2019, p. 104.

7

7.     The deed to Balise Automotive Realty, the so-called "Cash Premises," dated July 30, 2017, identified Alfredo Dos Anjos as "Trustee" of 849 South Washington Street LLC and South Washington Street LLC. Exh. 37

4.   In or around summertime 2017, Majestic drafted an Application for Planned Business Development listing the Dos Anjos Realty Trusts. Trial Ex. 42.   The application was never submitted however, because Dos Anjos refused to sign the application and otherwise cooperate with its processing.   His refusal to do so contributed to Majestic's confusion surrounding true ownership of the Leased Property as discussed below.

5.   On February 12, 2019, Majestic elected specific performance and provided notice of the same to the Court and Defendants. *See* 93A Ex. 60, ¶ 5.

6.   On February 13, 2019, Majestic asked the Defendants for "immediate unfettered access" to the Leased Premises and removal of Nissan Village vehicles. *See* 93A Ex. 19.  Under the Lease, the removal of the Defendants' prior tenant (an owner of Nissan Village vehicles that was using the site for storage) would mark the "Land Delivery Date" between Defendants and Majestic. *See* Jury Ex. 2, ¶ 4(I)(a).

8.     Majestic's letter of February 13, 2019 provided to the Defendants prorated rent for the month of February 2019, and it requested that the Defendants complete and return W-9 forms. *See* 93A Ex. 19.

9.     The Defendants failed to reply to Majestic's February 13, 2019 letter asking for "immediate unfettered access" to the Leased Premises.  Defendants provided no justification for this failure to reply to Majestic's request for access to the land.

10.     Having not received a reply, Majestic wrote to Defendants on February 28, 2019. *See* 93A Ex. 20.  Majestic again asked Defendants for "unfettered access" so that Majestic could

pursue pre-construction testing and referenced "continued damages" caused by defendants' delay and failure to respond, but nonetheless provided March rent. *Id.*

11.   The Defendants replied later that day claiming that Majestic had access to the Leased Premises all along. *See* 93A Ex. 21.

12.   Commencing February 13, 2019, Majestic had started the process to determine what it needed to do in order to procure necessary permits. Majestic's preliminary work included geotechnical testing which it completed on March 15, 2019; asbestos testing which it completed on May 21, 2019, receiving an asbestos clearance letter (July 3, 2019); and the commencement of demolition on July 3, 2019. As noted below, Majestic was unable to obtain a building permit until September 16, 2019.

13.   On March 4, 2019, Majestic asked Defendants to remove the Nissan Village vehicles so that Majestic may "commence demolition and construction as soon as possible." *See* 93A Ex. 23. In the same letter, Majestic proposed communicating through appropriate business contacts (Majestic proposed Balise employee, Becky Bragga, as its contact) to save time. *Id.*

14.   The Defendants failed to reply to Majestic's March 4, 2019 letter.

15.   On March 14, 2019, Majestic sent another letter to Defendants seeking to confirm whether the Land Delivery Date would be April 1, 2019 so that Majestic could prepare for its construction planning purposes. *See* 93A Ex. 24. In the letter, Majestic renewed its request to make communications easier among the parties by communicating through designated business contacts. *Id.*

16.   Later that day, the Defendants responded to Majestic's letter agreeing to communicate through designated business contacts, Beckie Bragga for Majestic, and Lisa Pariseault for Defendants. *See* 93A Ex. 25.

9

17.     On March 18, 2019, Majestic learned from a third party that the Defendants
agreed to a Land Delivery Date of April 1, 2019. *See* 93A Ex. 26.

18.     After Majestic made its election for specific performance of the Lease, on
February 12, 2019, Dr. Cabral began planning by working on the necessary permits for the
project with Majestic's permitting attorneys, Atty. Edward Casey and Atty. Joshua Teverow.
Trial Transcript ("Tr."), Oct. 4, 2019, pp. 79:6-12, 80:1, 84:15, and 87:4-9; *see also* Tr. Dec. 13,
2019, p. 33:15-19.

19.     Dr. Cabral drafted permits for construction and use of the new and used Honda
dealership at the Leased Premises, including the "lot merger application, Form A, special permit
with the planning board and then a notice of intent with the conservation commission." Tr. Oct.
4, 2019, p. 79:14-22. The lot merger application was necessary because the proposed building
will "overlap the existing Premises lines ... but [Majestic] could avoid seeking dimensional
relief by merging the lots." *Id.,* p. 83:19 – 84:4. Defendants had already agreed to the merger by
letter on May 30, 2017. *See* Jury Ex. 31.

20.     Atty. Casey transmitted a Tax Increment Financing and Economic Development
Incentive Program (TIF) letter to be submitted to the Town of North Attleborough. Tr. Oct. 4,
2019, pp. 79:23 – 80:1. All permits in this case required listing the actual owner of the Premises
signifying the owner's authorization. *Id.,* p. 80:2-9. Dr. Cabral testified that the permits would
be submitted to the Town's Planning Board. *Id.,* p. 85:11-13.

21.     Atty. Casey, Atty, Teverow, and Dr. Cabral were confused in March 2019 about
who to list as "owner" in the various permit applications due to a discrepancy between the record
title holder (four Dos Anjos Realty Trusts, as shown on 93A Ex. 62, and the two Dos Anjos
LLCs, as represented in the Lease, ¶ 16(a)(ii), Dos Anjos affidavit (93A Ex. 69)).

22. The original applications Majestic drafted on March 18, 2019,

identified the record titleholders. In his transmittal letter to Dr. Cabral, however, Atty.

Casey underscored the discrepancy and lack of clarity surrounding ownership of the Leased

Premises when he stated, "Joshua [Tevereau] and I disagreed about the properties that are

involved in the TIF. Would you mind checking the accuracy of the references in my TIF

application (last two pages) for accuracy?" See 93A Ex. 101.

23.    The source of the confusion was that the record titleholders for the land making

up the Leased Premises were four realty trusts that each listed Dos Anjos as the trustee (the "Dos

Anjos Realty Trusts"). *See* 93A Ex. 103.

24.    Shortly after receiving Atty. Casey's e-mail on March 18, 2019, Dr. Cabral e-

mailed the Application for a Planned Business Development to Atty. Tevereau identifying

"Alfredo M. DosAnjos, Trustee**" as the Owner of the Leased Premises. The double asterisks

listed the Dos Anjos, Trustee of the DosAnjos Trusts. *See* 93A Ex. 63.

25.    On March 20, 2019, Dr. Cabral e-mailed Atty. Casey and Atty. Teverow pointing

out the discrepancies between the box/page information on the assessor sheets and the land area

on the assessor sheets. See 93A Ex. 105.

26.    Later on March 20, 2019, and in reliance upon Teverow's instructions, Dr. Cabral

amended the applications (the "amended applications") and transmitted it to Teverow for his

review. See 93A Ex. 65.

27.    On March 22, 2019, Teverow emailed the amended application to Balise. The

amended applications did not identify all the Dos Anjos Trusts, but identified "Alfredo M. Dos

Anjos, Trustee**" The asterisks denoted the following:

- "Alfredo Dos Anjos Trustee, 849 S Washington Street Realty Trust (BK 08832 Pg
  232),"

11

- "Alfredo Dos Anjos Trustee 865 S Washington Street Realty Trust

  (Bk 07642 Pg 302)"

  *See* 93A Exhs. 65. 66 (Day 1 (Cabral) Tr. at 114)

28.    The permit applications called for the actual owner of the land, which could be different from the record title holder in the case of a private or unrecorded deed.  Tr. Oct. 4, 2019, p. 123:4-13.  None of the applications called for the "record title holder."  Id., at p. 123:14-15.

29.    By e-mail dated April 1, 2019, Majestic (Bragga) provided the Landlord Defendants the Amended applications prepared by Cabral and approved by Casey and which Balise had signed.  In the e-mail, Majestic and requested that "Al Dos Anjos sign as Owner on the application. Jeb has already signed." See 93A Exh. 29.

30.    While the Lease represented that the Dos Anjos LLCs owned the Lease Premises, the record title to the Lease Premises was with the Dos Anjos Realty Trusts.

31.    A "record title-holder" is to be distinguished from a "Premises owner."  It is possible for the Premises owner not to be the record title-holder to the extent the Premises owner holds onto a deed without recording it. *Id.*, p. 32:18 – 33:5.

32.    Majestic believed that the record title-holders were not the actual Premises owners by virtue of Defendants' representations that the LLCs owned the Leased Premises – not the record title-holding Realty Trusts – on at least the following occasions prior to March 18, 2019:

12

a. On October 28, 2016, the Defendants drafted and signed a Lease that stated that it provided a warranty of title in the LLCs in "fee simple," as follows:

Landlord represents, warrants and covenants to Tenant that ... Landlord's fee simple interest in the Premises is free and clear of any mortgages, deeds encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, or any other encumbrance which would restrict Tenant's use of the Premises....

*See* Jury Ex. 2, ¶ 16(a)(ii).

b. The Lease imposed an obligation on Defendants that "Landlord's representations, warranties and covenants, including but not limited those set forth in section 16 herein [which would include the warranty of title at ¶ 16(a)(ii)], being true and accurate as of the Land Delivery Date," which in this case was on April 1, 2019. *See* Jury Ex. 2, ¶ 34(d). Accordingly, the Lease required the Defendants to put title in the LLCs by April 1, 2019.

c. On February 8, 2017, Pariseault signed and provided to Majestic a "Landowner Consent Form" that represented that the LLC defendants were the "owners" of the Leased Premises. *See* 93A Ex. 67. The form provides no mention of any realty trusts.

d. On May 30, 2017, Atty. Manoogian as attorney for the LLCs agreed to merge the lots that made up the Leased Premises into one lot, indicating that that the LLCs had the power as owners to do so. *See* Jury Ex. 31.

e. On February 2, 2018, in response to Majestic's Complaint in this action, the Defendants filed a "Consolidated Opposition to Majestic's Request for Preliminary Injunction and Lis Pendens and Cross-Special Motion to Dismiss," signed by Attys. Briansky and Manoogian, which represented that Dos Anjos "owns the Premises through two limited liability companies ... [the Dos Anjos LLCs]." *See* 93A Ex. 68 (p. 3, ¶ 1).

f. The Defendants submitted with opposition an "Affidavit of South Washington Street, LLC and 849 South Washington Street, LLC," which was signed by their "member and manager" Alfredo Dos Anjos (hereinafter the "Dos Anjos Affidavit"). The Dos Anjos Affidavit asserted that upon reviewing "personal knowledge, public records, business records of the Landlord, and communications with other members and managers of the Landlord," the LLC defendants owned the Leased Premises. *See* 93A Ex. 69 (¶¶ 1-3, and Ex. A). Majestic did not have access to the business records Dos Anjos cited and reasonably relied upon the Defendants' misrepresentations that the Dos Anjos LLCs owned the Leased premises. *Id.* at p. 128:11-25.

f. The Dos Anjos Affidavit attached as Exhibit A two site plans with the Leased Premises outlined in black marker. In the first site plan, next to the Leased Premises were the words "South Wash St. LLC" and "849 S. Wash. St. LLC," the names of the LLC Defendants. In the second site plan, next to the Leased Premises were the words "Dos Anjos Parcels." *See* 93A Ex. 69, Ex. A.

13

g. On March 12, 2018, the Defendants served upon the Court and Majestic an Answer which specifically admitted that the LLCs owned the Leased Premises. *See* 93A Ex. 70.

h. Also on March 12, 2018, the Defendants served on the Court and Majestic a counterclaim in which the Defendants affirmatively asserted that the LLCs owned the Leased Premises. *See* 93A Ex. 70.

i. Balise reasonably relied upon Defendants' Answer and Counterclaim representing that the Dos Anjos LLCs owned the Leased premises. Tr. Dec. 13, 2019, p. 129:14 – 130:5.

j. During his deposition on May 23, 2018, Dos Anjos referred to the Leased Premises as Premises that he owned and referred to the "Dos Anjos Parcels." *See* 93A Ex. 97, ¶¶ 448-449.

k. During opening statements on September 18, 2018, the Defendants' lead trial counsel (Atty. Briansky) asserted to the jury that the LLC Defendants "own" the Leased Premises. *See* 93A Ex. 72; Tr. Sep. 18, 2018, pp. 214:3-19 and 215:10-17.

l. At trial on September 24, 2018, Pariseault testified that the two LLC defendants each own one of the two parcels making up the Leased Premises. *See* 93A Ex. 73; Tr. Sep. 24, 2018, pp. 114-115; *see also* 93A Ex. 98, ¶¶ 496-497.

m. At trial on September 24, 2018, Defendants' trial counsel (Atty. Briansky) argued to the Court that "these entities [the LLC defendants] just hold real estate." *See* 93A Ex. 73; Tr. Sep. 24, 2018, p. 121:10.

n. At trial on September 25 and 26, 2018, Dos Anjos testified to the Leased Premises as belonging to Dos Anjos as the "Dos Anjos Parcels." *See* 93A Ex. 97, ¶¶452-453.

o. In closing arguments at trial on September 27, 2018, Defendants' lead trial counsel repeatedly argued to the jury that the LLC defendants "own" the Leased Premises and referred to the Leased Premises as "Mr. Dos Anjos's Premises" *See* 93A Ex. 74; Tr. Sep. 27, 2018, pp. 44:14-15, 18; 45:2, 5, 9; 47:16, 24; 49:24-25; 51:6, 17; 52:5; 53:8, 14-15, 25; and 54:9.

p. On October 16, 2018, the Defendants filed with the Court and served on Majestic an Affidavit of Lisa Pariseault (the "Pariseault Affidavit"), in which Pariseault asserted that the LLC defendants own the Leased Premises. *See* 93A Ex. 71, p. 1, ¶ 1. Like Dos Anjos in the Dos Anjos Affidavit, Pariseault swore that her representations were based upon "my personal knowledge and the business records of Defendants maintained in the course of its regularly conducted business activities." *Id.* Balise reasonably relied on Pariseault's and Dos Anjos's representations.

q. On October 19, 2018, the Defendants filed with the Court and served on Majestic the Defendants' Proposed Findings of Fact and Rulings of Law, which asserted that the LLC Defendants owned the Leased Premises.

14

r. On December 5, 2018, the Defendants served on the Court and Majestic the Defendants' Amended Proposed Findings of Fact and Rulings of Law, which asserted that the LLC Defendants owned the Leased Premises. *See* 93A Ex. 75 p. 1, ¶ 1.

s. On January 28, 2019, the Defendants and their attorneys remained silent when I included in my Findings of Fact and Rulings of Law the following:

Defendant South Washington Street, LLC and Defendant 849 South Washington Street, LLC (together "Defendants," South Washington Street," the "Dos Anjos entities," and "Landlord") own two adjacent properties located at 849 and 865 South Washington Street, north Attleborough, Massachusetts (hereinafter collectively referred to as the "Leased Premises").

t. On February 28, 2019, the Defendants counsel (Atty. Briansky) asserted in a Motion served on Majestic and filed with the Court that the LLC defendants "hold" the "value of the raw land" as an asset against which Majestic can collect. *See* 93A Ex. 76, p. 10.

u. On March 15, 2019, Defendants' counsel (Atty. Briansky) asserted in a Legal Memorandum filed with the Appeals Court of Massachusetts and served on Majestic that the LLC defendants owned the Leased Premises. *See* 93A Ex. 77, p. 1. Balise reasonably relied upon such representations. Tr. Dec. 13, 2019, p. 133:3-12.

33.     Many of the above-referenced pleadings, motions, oppositions and documents in which the Defendants asserted that the LLCs owned the Leased Premises were entered into evidence at trial for the purpose of showing Majestic's reliance on the Defendants' representations in drafting all of Majestic's permit applications with the LLCs as the owners. *See* 93A Exs. 67–79, and 113.

34.     Balise reasonably relied on all of Defendants' false representations set forth above. Tr. Dec. 13, 2019, p. 141:5-16.

35.     As a result of Defendants' misrepresentations, Majestic incurred a delay in its municipal permitting. Dr. Cabral was unable to submit the draft applications from early 2019 until beginning in September of 2019 because Majestic "didn't have an application signed by the owner." *Id.,* at p. 125:7-8, 20-22 and 126:5.

36.    As a result of Defendants' misrepresentations, none of the permit applications were valid or useful to Majestic because they did not identify the correct landowner. Tr. Oct. 4, 2019, p. 86:1. Those misrepresentations resulted in months of delay. *See* 93A Exs. 106-108.

37.    As a result of Defendants' misrepresentations, Majestic was unable to obtain a building permit until September 16, 2019. The building permit was necessary for Majestic to conduct necessary demolition of the premises.

38.    During the course of Majestic's efforts to permit the Leased Premises, Mr. Dos Anjos refused to speak directly with Balise. Tr. Dec. 13, 2019, p. 102:15-18. Balise attempted to talk to Dos Anjos "[r]epeatedly," but was never given an opportunity to do so. *Id.,* at p. 126:11-15.

39.    Relying upon the Defendant's misrepresentations that the Dos Anjos LLCs owned the Leased premises, Majestic reasonably sought to cover all bases and protect itself in its representations to the Town. Accordingly, Majestic referenced "Trustee" under a double asterisk on the name of the owner in the applications to include both the LLCs and the Trusts on the applications. *See* 93 Exs. 29, 112; Tr. Dec. 13, 2019, pp. . 109:20-25,  144:10 – 145:17, p. 145:3-17.

40.    By letter dated March 22, 2019, Majestic attempted to confirm the April 1, 2019 Land Delivery Date and notified Defendants that permit applications were forthcoming to Pariseault as Defendants' designated business contact. *See* 93A Ex. 27.

41.    On April 1, 2019, Majestic (Bragga) sent to Defendants (Pariseault) Majestic's Planned Business Development application and requested Dos Anjos's signature on behalf of the LLCs as "owner" of the Leased Premises. *See* 93A Exs. 29 and 33; *see also* 93A Ex. 60, ¶ 6.

16

42.     After receiving and reviewing the Planned Business Development application

listing the LLCs as the owners of the Leased Premises on April 1, 2019, the Defendants did not

correct or raise the issue of ownership in any way with Majestic, nor did Defendants make "true

and accurate" the warranty of title in the landlord LLCs as required by the Lease, ¶ 34(d).

43.     More than one month after Casey prepared the TIF application, Teverow reviewed

the TIP and recommended that it be amended to reflect the Landlord Defendants. (Day 2 (Casey)

Tr. 57, 58).

44.     By email dated April 25, 2019, Teverow instructed Casey to:

> [R]e-date the attached letter and change the
> names of the Landlord signatories/lots at the end
> of the letter to be consistent with the attached
> final Planned Business Development
> Applications already signed by the Landlord.
> You will also need to change the second full
> paragraph on Page 2 of the letter to correctly
> reflect that the Landlord is the Trustee of the
> TWO separate trusts that are the owners of the
> 6.42 acres parcel of land (see attached paragraph
> from Lease).

*See* 93A Ex. 107.

45.     Casey complied with Teverow's request and by email dated April 29, 2019, Majestic

requested that "Al sign page 5 as landlord" of the "letter Attorney Casey will be submitting to the

Town of North Attleboro." (Trial Exhibit 37).

46.     The communications between Atty. Casey, Dr. Cabral, Atty. Teverow, Majestic and

the Defendants evince the unresolved confusion surrounding owner of the Leased Premises.

47.     On April 10, 2019, the Defendants served on Majestic a Motion for a New Trial

which asserted that the LLC Defendants were the owners of the Leased Premises, once again

17

providing false assurance to Majestic that it had chosen correctly in listing the LLCs as landowners on the application sent to Defendants on April 1, 2019. *See* 93A Ex. 78, p. 1.

48.     On April 11, 2019, the Defendants informed Majestic that the Planned Business Development application "was sent out for review," the defendants were "just waiting to get it back with necessary signatures."

49.     On April 18, 2019, received from the Defendants the signed Planned Business Development Application. *See* 93A Exs. 35 and 36; *see also* 93A Ex. 60, ¶ 8. Importantly, the Defendants did not inform Majestic that the application was drafted with the incorrect owner.

50.     On April 29, 2019, Majestic (Bragga) requested from Defendants (Pariseault) Dos Anjos's signature on an Economic Development and Incentive Program ("EDIP") application letter to the Town. *See* 93A Ex. 37; *see also* 93A Ex. 60, ¶ 9.

51.     The Defendants did not reply to Majestic's request.

52.     On April 30, 2019, the Defendants filed with the Court the Motion for a New Trial, which falsely representing that the LLC defendants are the owners of the Leased Premises. *See* 93A Ex. 79.

53.     Having received no response from Defendants on Majestic's request for Defendants' signature on the EDIP application letter, on May 3, 2019, Majestic (Bragga) asked Defendants (Pariseault) for a status update on the application. *See* 93A Ex. 38.

54.     The Defendants did not reply, and on May 6, 2019, Majestic's counsel (Atty. McDonough) requested an update from Defendants' counsel (Atty. Hackett) on the status of Dos Anjos's signature on the EDIP letter to the Town. *See* 93A Ex. 39, p. 3.

55.     On May 10, 2019, Defendants' counsel (Atty. Hackett) replied by referring Majestic's counsel to Defendants' lead trial counsel. *See* 93A Ex. 39, p. 2.

18

56.     On May 15, 2019, Majestic received the signed EDIP letter 16 days after

providing it to Defendants for signature. *See* 93A Ex. 41; *see also* 93A Ex. 60, ¶ 10. The

Defendants did not inform Majestic that the application was drafted with the incorrect owner, a

fact Defendants withheld from Majestic until August 15, 2019.

57.     During the second half of May 2019, Majestic went about its plans for

construction at the Leased Premises, which included a title search by Majestic's lender. *See* 93A

Ex. 45. At that time, the record title to the land was still in the Dos Anjos Realty Trusts. *See*

93A Ex. 62. The Dos Anjos Realty Trusts were:

> a.      849 South Washington Street Realty Trust, dated June 9, 2000,
> with Alfredo Dos Anjos as Trustee;
>
> b.      Declaration of Trust of 865 South Washington Street Realty Trust,
> dated May 14, 1998, with Alfredo Dos Anjos as Trustee;
>
> c.      Declaration of Trust of 855 South Washington Street Realty Trust,
> dated October 2, 2008, with Alfredo Dos Anjos as Trustee; and
>
> d.      Declaration of Trust of Cooper Avenue Realty Trust, dated May
> 14, 1998, with Alfredo Dos Anjos as Trustee.

58.     The title search revealed that Defendants' representations about the LLCs owning

the land were false, and the Defendants had failed to make their warranty of title in the LLCs

"true and accurate" as of the Land Delivery Date of April 1, 2019 as required under the Lease, ¶¶

16(a)(ii)) and 34(d). *See* Jury Ex. 2.

59.     On May 31, 2019, Majestic's counsel (Atty. McDonough) emailed a letter to

Defendants' counsel notifying the Defendants that the LLC defendants were not the owners as

warranted in the Lease and as represented on numerous occasions by Defendants and their

agents. *See* 93A Ex. 43. In an attempt to remedy the problem, Majestic's May 31, 2019 letter

proposed that the Defendants transfer the land from the Dos Anjos Realty Trusts to the Dos

Anjos LLCs and merge the lots making up the Leased Premises as one parcel as the parties had previously agreed. *Id.; see also* Jury Ex. 31.

60.     Within 2 minutes of receiving the May 31, 2019 letter, Defendants' privilege log reveals that the Defendants' counsel (Atty. Briansky) forwarded the letter to Pariseault. *See* 93A Ex. 96, p. 4. Atty. Manoogian separately also forwarded the May 31, 2019 letter to Pariseault one minute later. *Id.*, p. 4.

61.     Defendants' counsel (Atty. Briansky) and Pariseault continued emailing about the title issue from May 31, 2019 through June 10, 2019, including conversations among themselves and email and telephone calls with employees of Dos Anjos's estate planning law firm, Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C. (hereinafter, "Mintz Levin"). *Id.*, pp. 2-3.

62.     In these emails and conversations, the Defendants shared and discussed documents that bear on true ownership of the Leased Premises, including a document titled "Dos Anjos – Real Estate Holdings Chart" and the schedules of beneficiaries for the four Dos Anjos Realty Trusts. *Id.*

63.     Despite discussing the title issues internally, the Defendants did not respond to Majestic's letter raising the issue, dated May 31, 2019. *See* 93A Ex. 43.

64.     On June 10, 2019, Majestic's lead trial counsel (Egan) sent an email to Attys. Briansky, Hackett and Manoogian asking for a response to its May 31, 2019 letter. *See* 93A Ex. 44. Majestic's counsel proposed, "I assume we can resolve this issue by stipulation once you have executed deeds to conform ownership to you[r] pleadings," and he requested merger of the leased premises lots pursuant to Atty. Manoogian's agreement (Jury Ex. 31) to do so before the jury trial. *See* 93A Ex. 44, pp. 1-2.

65.     On June 11, 2019, Majestic's counsel emailed Atty. Briansky again, reiterating the importance of clarifying ownership for Majestic's plans. *See* 93A Ex. 46.

66.     Despite possessing the "Dos Anjos – Real Estate Holdings Chart" on June 4, 2019 and the "Schedule of Beneficiaries" (*id.*), the Defendants refused to transfer the deeds in compliance with the Lease's warranty of title or promise to make all warranties "true and accurate," a known contractual obligation under the Lease, ¶¶ 16(a)(ii) and 34(d).

67.     The Defendants also refused to confirm who truly owned the land, the Dos Anjos LLCs or the Dos Anjos Realty Trusts, and rejected all of Majestic's proposals to transfer the land and stipulate to ownership as dictated by the Lease.

68.     The Defendants began negotiating with Majestic over the issue, including a telephone call between counsel on June 13, 2019 (*see* 93A Ex. 60, ¶ 11), an email suggestion by Atty. Briansky later that day to enter into an attornment (*See* 93A Ex. 48, p. 1), and a follow-up email from Atty. Briansky on June 18, 2019 providing a draft attornment or subordination in lieu of fee simple guaranteed in Lease. *See* 93A Exs. 49 and 50.

69.     The subordination or attornment document proposed that the Majestic accept from just two of the four record title owner trusts language that those two "...recognize the Lease, Tenants' rights under the Lease and agree to attorn to the rights of Tenant thereunder." *See* 93A Exs. 49 and 50.

70.     The agreement was less than the unencumbered fee simple interest guaranteed to the Majestic under the Lease, ¶¶ 16(a)(ii) and 34(d), and purported to bind half of the actual owners of the land. *See* 93A Ex. 50; *see also* 93A Ex. 62.

71.     On June 19, 2019, Majestic declined the Defendants' offer of attornment or subordination. *See* 93A Exs. 50-51.

72.     On June 28, 2019 Majestic's counsel wrote to Defendants' counsel again asking to merge the Leased Premises into one parcel. *See* 93A Ex. 81.

73.     On July 1, 2019, the Defendants continued representing that the Dos Anjos LLCs owned the Leased Premises when Dos Anjos authorized Atty. Briansky to file a complaint against Atty. Teverow in Bristol County Superior Court. *See* 93A Ex. 15. The Dos Anjos LLCs' Bristol County complaint against Atty. Teverow falsely asserted that the Dos Anjos LLCs owned the leased premises. *Id.*, at ¶ 3

74.     Attempting again to resolve the ownership and merger issues, from July 22 through July 26, 2019, Majestic's counsel provided to the Defendants (Atty. Briansky) various deeds and trust certificates drafted to place title in fee simple in the landlord LLC Defendants, along with applications for lot merger. *See* 93A Exs. 54-57. These proposals would have satisfied the Lease's warranty of title at ¶¶ 16(a)(ii) and 34(d) as well as the parties' prior agreement to merge the land. *Id.*

75.     The Defendants rejected all such proposals.

76.     On August 15, 2019, at oral argument on Majestic's Rule 60 Motion, the Defendants (Briansky), for the first time, admitted that the LLC Defendants did not own the Leased Premises, that there was no private deed, and the land was owned by the Dos Anjos Realty Trusts – not the Dos Anjos LLCs. *See* 93A Ex. 83, Tr. Aug. 15, 2019, pp. 28:3-16, 33:13-15.

77.     At the hearing, the Defendants agreed to stipulate to add the Dos Anjos Realty Trusts as defendants in the case *nunc pro tunc* to the date of filing. I issued an order (1) memorializing the Defendants' representation as to actual ownership of the land and the stipulation to add the Dos Anjos Realty Trusts as defendants, (2) ordering the Defendants to

execute all permit applications and deeds to effectuate merger, and (3) re-opening the 93A trial

as to the issue of additional delay damages and attorneys' fees claimed by Majestic. *See* Order

of Aug. 15, 2019.

78.   I also took under advisement whether I should refer the Defendants' alleged

perjurious behavior to an appropriate law enforcement agency. *See* Order, August 15, 2019.

79.   On August 16, 2019, Majestic's counsel (Atty. Pacella) sent to Defendants (Attys.

Briansky and Manoogian) proposed deeds to accomplish the transfer and merger of the parcels

ordered by the Court on August 15, 2019. *See* 93A Ex. 84.

80.   The Defendants did not reply, and on August 19, 2019, Majestic's counsel (Atty.

Egan) wrote a letter to the Defendants (Atty. Briansky) requesting an update on status of

documents to transfer and merge lots. See 93A Ex. 85.

81.   On August 26, 2019, the parties filed the Stipulation and Amended Complaint

adding the Dos Anjos Realty Trusts as defendants in the case *nunc pro tunc* to the date of filing.

82.   On August 26, 2019, Defendants instead filed an "Emergency Motion" objecting

to adding the Dos Anjos Realty Trust Defendant that now owned the merged Premises as a

landlord under the Lease. See 93A Ex. 89.

83.   On August 27, 2019, I denied the Defendants' Emergency Motion, ruling that the

merged entity "is to be one or both of the defendant LLCS landlords, or ...such [other] entity is

to be added to the lease as a Landlord *nunc pro tunc* to October 28, 2016." *See* Order, August

27, 2019; *see also* 93A Ex. 89.

84.   After the denial of Defendants' first Emergency Motion, the Defendants persisted

in unreasonably refusing to cooperate with Majestic as ordered by the Court, this time by

refusing to define the Leased Premises with a "red lease line" in the ANR application. *See* 93A Ex. 90.

85.    On September 5, 2019, rather than executing Majestic's permits and paperwork with the Town, the Defendants filed an  Emergency Motion, now objecting to Majestic's inclusion of a "red lease line" in the ANR plan that Majestic asked Defendant to sign. *See* 93A Exs. 91-93.

86.    The Defendants also unreasonably refused to approve the Amendment of Lease and Notice of Lease. *See* 93A Exs. 91-93.

87. On Sep. 10, 2019, I denied the Defendants' second Emergency Motion, stating:

> [D]efendants are ordered to cooperate by approving the ANR Plan including the red lease line defining the Leased Premises thereby allowing the completion of the ANR application and ... cooperate with the plaintiff in executing the plaintiff's proposed Amendment of Lease and Notice of Lease. The defendants are to comply with this order immediately.

*See* 93A Ex. 94 (Order, Sep. 10, 2019).

88.    Eight days after the Order, on September 18, 2019, the Defendants sent Majestic most of the signed permit and application documents then outstanding, but did not return Majestic's signed application to the Conservation Commission. *See* 93A Ex. 95.

89.    In order for Majestic to move forward with the project, it required Conservation Commission approval.  It could not procure approval without the signed application to the Conservation Commission.   The Planning Board required the signed Conservation Commission application in order to move forward.  As a result, Majestic was at a standstill with the town until November 16th. Tr. of Dec. 13, 2019, pp. 139:21 – 140:5.

90.     Despite having submitted the Conservation Commission application to the Defendants for approval "before September 18," Balise testified that he "did not get it back signed until November 16[, 2019]." Tr. Dec. 13, 2019, p. 138:14-18.

91.     Defendants' delays and misinformation left Majestic's permitting process at a "standstill," as Majestic had "told [Defendants] that [Majestic] needed the signatures in order to move forward with the Town of North Attleboro, with the Planning Board." Tr. Dec. 13, 2019, p. 138:21-25.

92.     Majestic was unable to file the permits due to the uncertainty, misinformation, and delays all created by the Defendants and, ultimately, because they "didn't have an application signed by the owner" to go forward to the Planning Board. *See* Tr. Oct. 4, 2019, pp. 125:7-8, 20-22 and 126:5; *see also* Tr. Dec. 13, 2019, p. 153:19. The permitting process for this proposed development required the signature of the actual on "all permits" involved. Tr. Oct. 4, 2019, pp. 82 and 86:1.

93.     All sample applications submitted at trial called for a signature of the owner. *See* 93A Exs. 64-66, 10-108, and 112. Based on testimony at the jury trial, the Defendants were well aware of this requirement as Dos Anjos (their owner, manager and trustee) and their attorney, Manoogian, were experienced in the development of the very parcels in question for this same purpose, which was to build an automobile dealership. Further, Majestic submitted applications to the Defendant LLCs requiring the owners' signatures which were executed and returned to the Majestic without any correction or explanation as to correct entities which owned the Leasehold Premises. *See* 93A Exs. 35, 36 and 41; *see also* 93A Ex. 60, ¶¶ 8, 10. *See* 93A Exs. 69-71.

94.    Majestic's access to the Leased Premises during the period February 12 through November 16, 2019, was insufficient without Defendants' full cooperation in the municipal permitting process. Tr. of Dec. 13, 2019, p. 149:11-17. The Defendants' repeated misrepresentations as to the true owner of the leased premises halted meaningful permitting and approval processes pursued by Majestic. *Id.* As I have acknowledged, "title to the premises is core to issues such as the approval of municipal permitting." *See* Order, dated September 23, 2019, p. 3. Therefore, I attribute no weight or merit to Defendants' "partial access" theory. By stalling Majestic's access the Defendants delayed Majestic's ability to build and open its doors and thereby stop losing $175,000 per month in lost profits.

95.    I find that after Majestic elected specific performance on the Lease, February 13, 2019, the Defendants knowingly ignored their contractual obligations, including Defendants' failure to "cooperate" with Majestic in its permitting (Lease, ¶ 9); failure to honor the warranty of title (Lease, ¶ 16(a)(ii)); failure to make the warranty of title true and accurate on the Land Delivery Date (Lease, ¶ 34); and, failure to cooperate in defining the Leased Premises (Lease, ¶ 1). The Defendants also violated my orders of January 28, 2019 and August 15, 2019 to "cooperate and approve any necessary paperwork for any permits or other items required for Majestic's full use and enjoyment of the Leased Premises, planned construction, and operation of its business." The Defendants further failed to "give Majestic unfettered access to the Leased Premises." As Balise testified, all of these actions made it impossible for Majestic to go forward to the Town of North Attleborough Planning Board until Majestic obtained the last approved permit on November 16, 2019. Tr. Dec. 13, 2019, p. 149:11-17.

96.    I find that the Defendants were dishonest about the issue of ownership from January 29, 2018 until August 15, 2019. Thereafter, the Defendants failed to timely respond to

reasonable requests for permit signatures until November 16, 2019, in order to improve its position.

97.     In total, the Defendants caused Majestic 9 months and 3 days of unnecessary and intentional delay from February 13, 2019 through November 16, 2019. *Id*, at p. 146:14.

98.     At the jury trial in September of 2018, the jury agreed with Majestic's expert witness Todd Berko in calculating Majestic's delay damages as $175,000 per month. *See* Special Verdict Sheet; Tr. Dec. 13, 2019, p. 147:5-13. I adopted that same $175,000 per month finding in my earlier c. 93A decision of January 28, 2019.

99.     The parties agreed to incorporate all evidence offered in the jury trial and prior c. 93A trial to be considered in the re-opened c. 93A trial. As such, I have incorporated and relied upon earlier evidence on this topic. In the re-opened 93A trial, Balise ratified Majestic's monthly damages in the amount of "$175,000 ... based on the average month present -- at present value that the dealership in operation would generate for profit." Tr. Dec. 13, 2019, p. 148:20-22.

100.     I find that Plaintiff has proved by a preponderance of the evidence that the Defendants caused Majestic to sustain economic delay damages of $175,000 per month for the relevant additional time-period of the re-opened c. 93A trial, which I have found to be February 13, 2019 through November 16, 2019.

101.     Applying $175,000 in damages per month to the 9 month 3 day period of delay from February 13, 2019 until November 16, 2019, I find that Majestic has demonstrated by a preponderance of the evidence that Majestic's actual delay damages in this re-opened c. 93A trial amount to an additional total of $1,592,260.

## A. Effect of the Privilege Against Self-Incrimination and the Attorney-Client Privilege

Every witness has a right, in any proceeding, to refuse to answer a question unless it is perfectly clear, from a careful consideration of all the circumstances, that the testimony cannot possibly have a tendency to incriminate the witness. *See* Mass. G. Evid., § 511(b). However, "[c]omment may be made and an adverse inference may be drawn against a party when that party, or in certain circumstances a witness, invokes a privilege" in a civil case." *Id.,* § 525; *Frizado v. Frizado,* 420 Mass. 592, 596 (1995) (privilege against self-incrimination); *Phillips v. Chase,* 201 Mass. 444, 450 (1909) (attorney-client privilege).

In *Labor Relations Comm'n v. Fall River Educators' Ass'n,* 382 Mass. 465, 471-472 (1981), the Supreme Judicial Court expanded the rule to allow an adverse inference to be drawn against an organizational party as a result of a claim of the privilege against self-incrimination by its officers who had specific knowledge of actions taken on behalf of the organization in connection with the underlying claim. In *Lentz v. Metropolitan Prop. & Cas. Ins. Co.,* 437 Mass. 23, 26-32 (2002), the Supreme Judicial Court expanded the principle to include circumstances in which the court finds, as a preliminary question of fact, that the witness who invokes the privilege against self-incrimination is acting on behalf of or to further the interests of one of the parties.

When a non-party witness is closely aligned with a party in a civil case, and the non-party witness invokes the privilege against self-incrimination, the factfinder is permitted to draw an inference adverse to the party from the witness's invocation of the privilege against self-incrimination. *Lentz,* 437 Mass. at 26-32. Moreover, counsel has the right to comment on an opposing party's failure to testify in a civil case. *See Kaye v. Newhall,* 356 Mass. 300, 305 (1969); *Silveira v. Kegerreis,* 12 Mass. App Ct. 906, 906-907 (1981).

At trial on October 4, 2019, Dos Anjos, Pariseault and Atty. Manoogian refused to testify to any questions beyond essentially providing their name by asserting the privilege against self-incrimination under the Fifth Amendment of the United States Constitution and Art. 12 of the Mass Declaration of Rights. *See* Tr. Oct. 4, 2019, pp. 40:23, *et seq.*, and 64:24, *et seq.*

Each initially asserted through counsel that the basis for the invocation was my earlier taking under advisement the suggestion that their conduct be referred to an appropriate law enforcement agency for potential perjurious behavior, based upon their extended and numerous pattern of misrepresenting the true ownership of the Leased Premises under oath. *Id.*

I instructed Majestic's counsel to commit to writing lists of all questions intended for Dos Anjos, Pariseault, and Atty. Manoogian to be served on their respective counsel in advance of the next day of trial. *See* Order of October 9, 2019; Tr. Oct. 4, 2019, pp. 138:25 – 141:4. I instructed the attorneys for Dos Anjos, Pariseault, and Atty. Manoogian to provide in writing in advance of the next trial whether each witness in response to each question (1) would refuse to answer by invoking the privilege against self-incrimination, (2) maintained some other objection to the question, or (3) would answer the question at trial. *See* Order of October 9, 2019; Tr. Oct. 4, 2019, pp. 138:25 – 141:4. I informed all parties that the written responses would be entered into evidence at trial, and "I may draw an adverse inference against a witness in a civil case if he elects to assert the Fifth Amendment privilege," and "I will feel free to do that." *See* Order of October 9, 2019; Tr. Oct. 4, 2019, pp. 55:23 – 56:3, 138:25 – 141:4; 142:12-25.

In line with my Order of October 9, 2019, at the next day of trial on December 13, 2019, the parties agreed to enter into evidence 93A Ex. 97: Majestic's Questions to Dos Anjos and his Responses; 93A Ex. 98: Majestic's Questions to Pariseault and her Responses; and, 93A Ex. 99: Majestic's Questions to Manoogian and his Responses. Dos Anjos and Pariseault refused to

answer most of Majestic's questions by asserting the privilege against self-incrimination. 93A

Exs. 97 and 98. Atty. Manoogian did not assert the privilege against self-incrimination, but did

assert the attorney-client privilege in refusing to answer most of Majestic's questions. 93A Ex.

99,

Applying *Lentz* to this case, I find that Dos Anjos, Pariseault and Atty. Manoogian were

acting on behalf of Defendants and furthering the interests of the Defendants. As I found in my

Order of January 28, 2019, at all relevant times, Dos Anjos acted on behalf of the Defendants

and Pariseault served as Dos Anjos's agent on behalf of Dos Anjos and the Defendants. *See*

Order of January 28, 2019, p. 3. Further, at all relevant times, Manoogian acted as attorney and

agent for Defendants, Dos Anjos, and Pariseault. *Id.*, at 5. No evidence was introduced at the re-

opened 93A trial to alter these findings bearing on *Lentz*. As a result, I have drawn adverse

inferences against the Defendants based upon these three witnesses' privilege invocations in 93A

Exs. 97, 98 and 99.

As their written responses indicated, Dos Anjos, Pariseault and Atty. Manoogian all

appeared at the December 13, 2019 day of trial represented by criminal defense attorneys.

According to 93A Exs. 97 and 98, Dos Anjos and Pariseault each refused to answer questions by

adopting a blanket invocation of the privilege against self-incrimination under the Fifth

Amendment to the United States Constitution and pursuant to Art. 12 of the Mass. Declaration of

Rights. *See* 93A Exs. 97 and 98.

Atty. Manoogian likewise refused to answer the bulk of Majestic's questions. However,

Atty. Manoogian's basis for refusing to answer questions was the attorney-client privilege stating

in each invocation that he "does not have the informed consent of his client(s) to [answer]." *See*

93A Ex. 99. Majestic asked Dos Anjos if he instructed Atty. Manoogian not to answer in each

instance in which Atty. Manoogian invoked the attorney-client privilege. *See* 93 Ex. 97, ¶¶ 552-554. In response to this question, Dos Anjos refused to answer and invoked the privilege against self-incrimination. *Id.* Based upon these blanket cross invocations by the Defendants' principal and real estate attorney, I first draw a negative inference against Defendants that Dos Anjos and Atty. Manoogian are using the privilege against self-incrimination and the attorney-client privilege in a manner to conceal the Defendants' intentional, willful and knowing misconduct perpetuated against Majestic.

With respect to specific questions in response to which Dos Anjos and Pariseault invoked the privilege against self-incrimination, and Atty. Manoogian invoked the attorney-client privilege, I have drawn negative inferences against the Defendants in the following areas:

      a.    Dos Anjos and Pariseault each invoked the privilege against self-incrimination in refusing to reveal information about the Defendant entities in this case, the two Dos Anjos LLCs and the four Dos Anjos Realty Trusts. This included basic information such as the role Dos Anjos and Pariseault each played in organizing each entity; the identity of the attorney that formed each entity; the purpose, function, and use of each entity; the identities of the trustees and beneficiaries of the Dos Anjos Realty Trusts and the manager and owners of the Dos Anjos LLCs; and, with respect to the last four years, each witness refused to reveal what role and duties the witness had fulfilled on behalf of each entity; compensation to the witness from each entity; the business of each entity; whether the witness or the witness's family held a beneficial interest in each entity; the nature of any such beneficial interests; the identity of other individuals who held beneficial interests in each entity and the nature of such interests; the location of the records pertaining to each entity; whether the entity had filed or prepared tax returns, who

31

filed the returns, and the location of the returns; and, the assets held by each entity. *See* 93A Ex. 97, ¶¶ 8 – 375; *see also* 93A Ex. 98, ¶¶ 9 – 463. Similarly, Atty. Manoogian invoked the attorney-client privilege in a blanket manner to all of these topics. *See* 93A Ex. 99, ¶¶ 7-312. I have drawn an adverse inference against the Defendants on all of these topics.

b.       Dos Anjos and Pariseault each invoked the privilege against self-incrimination in refusing to reveal whether they or their family members had contributed funds to purchase the real estate that makes up the Leased Premises. *See* 93A Ex. 97, ¶¶ 377-380; *see also* 93A Ex. 98, ¶¶ 465-468. Atty. Manoogian likewise refused to answer these questions citing the attorney-client privilege. *See* 93A Ex. 99, ¶¶ 313-317. I have drawn an adverse inference against the Defendants on all of these topics.

c.       Dos Anjos and Pariseault invoked the privilege against self-incrimination in refusing to answer whether Dos Anjos signed the Lease; whether either witness reviewed the Lease; what land made up the Leased Premises; whether the Leased Premises is accurately depicted by the "red lease line" in page 2 of 93A Ex. 58; whether either witness knew who owned the Leased Premises when the Lease was executed; whether any deeds had been signed conveying title for any parcel making up the Leased Premises; the identity of persons or entities that have owned or controlled the Leased Premises since 2016; whether Dos Anjos or Pariseault had been beneficiaries of the Dos Anjos Realty Trusts; the identity of the drafters of the trust instruments; whether Dos Anjos or Pariseault had reviewed the trust instruments; the identity of the persons that operated or assisted in operating the Dos Anjos Realty Trusts; and, whether the Dos Anjos Realty Trusts required the consent of the beneficiaries as a prerequisite for the

trustee of each Dos Anjos Realty Trust to deal with the Trust assets and what the beneficiaries had directed Dos Anjos to do as Trustee since 2016. *See* 93A Ex. 97, ¶¶ 381-428; *see also* 93A Ex. 98, ¶¶ 469-482. Atty. Manoogian likewise refused to answer similar questions about the Lease and ownership or control of the Leased Premises by invoking the attorney-client privilege. *See* 93A Ex. 99, ¶¶ 318-362. I have drawn an adverse inference against the Defendants on all of these topics.

       d.    Dos Anjos invoked the privilege against self-incrimination in refusing to reveal whether he was aware that the Lease contained a warranty of title in the LLCs at ¶ 16(a)(ii) and a requirement to make that warranty "true and accurate" by the Land Delivery Date at ¶ 34(d) of the Lease; whether he agreed that the Land Delivery Date was April 1, 2019; and, whether he complied with either the warranty to title or his obligation to make it true and accurate as of April 1, 2019. *See* 93A Ex. 97, ¶¶ 429-435. Atty. Manoogian refused to answer similar questions by invoking the attorney-client privilege. *See* 93A Ex. 99, ¶¶ 364-369. I have drawn an adverse inference against the Defendants on all of these topics.

       e.    Dos Anjos invoked the privilege against self-incrimination when asked if he refused to transfer the title before or by the Land Delivery date to avoid applying the judgment to the Leased Premises. *See* 93A Ex. 97, ¶ 436. Atty. Manoogian also refused to answer this question by invoking the attorney-client privilege. *See* 93A Ex. 99, ¶ 370. I have drawn an adverse inference against the Defendants on this topic.

       f.    Dos Anjos invoked the privilege against self-incrimination and refused to answer questions related to his misrepresentations, false testimony and failures to cooperate, including whether he signed an affidavit on February 2, 2018 that represented

that the LLCs owned the Leased Premises (93A Ex. 69); what private business and public

records of the LLCs he reviewed before signing the affidavit as represented in the

affidavit; who drafted the affidavit; who drew the black marker lines and writings in

Exhibit A of the affidavit; who he understood to be the land-owners on the date he signed

the affidavit; on what facts he based his understanding that the LLCs owned the land

when he signed the affidavit; and, whether, when and how he subsequently learned that

the LLCs did not own the Leased Premises as he maintained in the affidavit. *See* 93A

Ex. 97, ¶¶ 437-446.  I have drawn an adverse inference against the Defendants on all of

these topics.

        g.     Dos Anjos invoked the privilege against self-incrimination and refused to

answer questions related to his knowledge of the Defendants' Answer and Counterclaim

in March of 2018 admitting and asserting that the LLCs owned the Leased Premises;

whether he testified under oath at his deposition in May of 2018 that the LLCs owned the

Leased Premises and upon what facts he based that testimony; whether he was aware that

his attorneys were repeatedly submitting motions and memoranda representing that the

LLCs owned the Leased premises; whether he listened to Atty. Briansky's opening

statement and closing argument asserting the LLCs owned the Leased Premises; whether

he testified under oath at trial that the LLCs owned the Leased Premises and upon what

facts he based that testimony; whether, when and how he learned that all of the above

representations were false; and, whether he ever discussed the falsity of the above

misrepresentations with Pariseault, Atty. Manoogian, his attorneys and if he took any

steps to correct the misrepresentation. *See* 93A Ex. 97, ¶¶ 447-463.  I have drawn an

adverse inference against the Defendants on all of these topics.

h.     Pariseault invoked the privilege against self-incrimination and refused to answer questions related to her misrepresentations, false testimony, and failures to cooperate, including whether she reviewed her father's affidavit of February 2, 2018 or helped draft the affidavit; whether she spoke with her father at that time or discussed private and public records related to the LLCs as her father represented in the affidavit; who drafted the affidavit; who drew the black lines and markings on Exhibit A of the affidavit; who she believed to own the Leased Premises at the time of the affidavit; and, whether, when and how she subsequently learned that the affidavit's representation as to ownership of the Leased Premises was false. *See* 93A Ex. 98, ¶¶ 483-492. I have drawn an adverse inference against the Defendants on all of these topics.

i.     Pariseault invoked the privilege against self-incrimination and refused to answer additional questions about her misrepresentations, false testimony, and failures to cooperate, including whether she herself signed documents as or on behalf of the "owner" of the Leased Premises; whether she on February 8, 2017 signed a "Landowners Consent Form" representing that the LLCS owned the Leased Premises and upon what facts she did so; whether she testified at trial that the LLCs owned the Leased Premises and upon what facts she based her testimony; whether she signed an affidavit on October 16, 2018 stating that the LLCs owned the Leased Premises and upon what facts she based this (93A Ex. 71); who drafted the affidavit; whether, when and how she learned that her trial testimony, representations and affidavit were false; what she did to correct her false testimony and affidavit; whether she ever discussed her false testimony and affidavit with Dos Anjos, Atty. Manoogian or her attorneys; whether she discussed with her attorneys the Defendants' pleadings, motions, memoranda, and arguments they had submitted with

35

false information on ownership as well as the false testimony regarding the same; whether she had done anything to correct the false statements and testimony; whether as a Massachusetts attorney she had considered her obligations under Rule 3.3 of the Massachusetts Rules of Professional Conduct; and, whether she had taken any steps to comply with Rule 3.3 after realizing that she, her father and her attorneys had elicited and given false testimony under oath and submitted false information to the tribunal regarding ownership to the Court in the Defendants' pleadings, motions, memoranda and through the Defendants' witnesses. *See* 93A Ex. 98, ¶¶ 493-516. I have drawn an adverse inference against the Defendants on all of these topics.

      j.    Dos Anjos invoked the privilege against self-incrimination and refused to answer when he was asked directly if he decided not to correct his misstatements, false affidavit and false testimony in order to gain a litigation advantage or to avoid the judgment being attached to the Leased Premises. *See* 93A Ex. 97, ¶¶ 464-465. I have drawn an adverse inference against the Defendants on this topic.

      k.    Atty. Manoogian refused to answer questions about assisting the Defendants with their misrepresentations or his actions to correct the Defendants misstatements and false testimony, again invoking the attorney-client privilege. *See* 93A Ex. 99, ¶¶ 372-373, 376-379, 385, 395, 397-400, 402-403, and 405-406. I have drawn an adverse inference against the Defendants on all of these topics.

      l.    With respect to the Land Delivery Date, Pariseault invoked the privilege against self-incrimination and refused to answer questions about sending and receiving notices with Beckie Bragga on behalf of Majestic; her role in providing notices or assisting her father with permitting; her communications with the Nissan Village vehicle

storage tenant, including instructing the tenant to vacate the Leased Premises within 30 days on March 1, 2019; her understanding that this act would trigger the "Land Delivery Date" under the Lease; the significance of this date to Majestic's planning; whether she recalled that Majestic had repeatedly asked to know when this date would occur; why she failed to tell Majestic about this date on March 1, 2019; whether Dos Anjos intentionally told her to delay removing the Nissan Village Owners; and, whether anyone instructed her to withhold this information from Majestic. *See* 93A Ex. 98 ¶¶ 518-530. I have drawn an adverse inference against the Defendants on all of these topics.

m.    Dos Anjos and Pariseault invoked the privilege against self-incrimination and refused to answer questions relating to municipal permitting. For example, Dos Anjos refused to answer whether he had owned and managed commercial real estate for car dealerships for over thirty years. *See* 93A Ex. 97, ¶ 466. Dos Anjos and Pariseault also refused to answer whether they were aware that Majestic would require various permits to build a dealership at the Leased Premises; why it took Defendants 17 days to sign Majestic's Planned Business Development application; why it took Defendants 16 days to sign Majestic's TIF application; why it took until November 16, 2019 for Defendants to sign Majestic's Conservation Commission application; the extent of Pariseault's involvement in obtaining Dos Anjos's signatures; what entities they believed owned the Leased Premises when Dos Anjos signed the Planned Business Development application on April 18, 2019 and when he signed the TIF letter on May 15, 2019; whether municipal permitting applications require the signature of the actual land owner; whether the witnesses took any steps to correct the listing of the true land owner on the applications; whether Majestic's representatives had indicated to the Defendants that

37

"time was of the essence" when it came to the permits; why it took multiple requests for status updates and second and third requests to obtain a response from the Defendants about each permit; whether the Defendants' permit delays were aimed at frustrating Majestic's progress at the Leased Premises;. *See* 93A Ex. 97, ¶¶ 467-489; *see also* 93A Ex. 98, ¶¶ 517-521, 531-545. Atty. Manoogian refused to answer questions on permitting by invoking the attorney-client privilege. *See* 93A Ex. 99, ¶¶ 412-416, 418-424. I have drawn an adverse inference against the Defendants on all of these topics.

      n.      On May 31, 2019, Defendants were directly confronted about the ownership discrepancy in a letter from Majestic's counsel. *See* 93A Ex. 43. However, Dos Anjos and Pariseault invoked the privilege against self-incrimination and refused to answer any questions about the Defendants' responses to the letter. The topics on which Dos Anjos and Pariseault refused to answer included whether Dos Anjos and Pariseault had received the letter; whether they were aware that the Lease, ¶ 9, required Defendants to "cooperate with Tenant in obtaining any and all licenses, building permits, certificates … and Landlord shall execute, acknowledge and delivery any documents reasonably required in furtherance of such purposes;" whether the witnesses were aware the Court had required them to "cooperate with and approve any necessary paperwork;" whether the witnesses were ever informed after May 31, 2019 that the Dos Anjos LLCs did *not* own the Leased Premises; whether the witnesses considered correcting their misrepresentations on ownership in light of the contractual and court-ordered obligations to cooperate; whether either witness reviewed a document titled "Dos Anjos – Real Estate Holdings Chart" as it appears they did on June 4, 2019 according to Defendants' privilege log at 93A Ex. 96; whether either witness reviewed beneficiary schedules for

the Dos Anjos Realty Trusts as it appears they did in June of 2019 according to

Defendants' privilege log at 93A Ex. 96; who drafted "Dos Anjos – Real Estate Holdings

Chart;" who drafted the beneficiary schedules; the purpose of the "Dos Anjos – Real

Estate Holdings Chart" and the beneficiary schedules; whether the "Dos Anjos – Real

Estate Holdings Chart" and the beneficiary schedules contained information on actual

ownership of the Leased Premises; and, whether either witness took any steps to correct

their misrepresentations on ownership after reviewing the "Dos Anjos – Real Estate

Holdings Chart" and the beneficiary schedules in early June 2019. *See* 93A Ex. 97, ¶¶

490-510; *see also* 93A Ex. 98, ¶¶ 546-569. I have drawn an adverse inference against the

Defendants on all of these topics.

      o.     Dos Anjos and Pariseault invoked the privilege against self-incrimination

and refused to answer whether they believed it was important to Majestic's permitting

process for Majestic to know the correct owner of the Leased Premises; whether they

would agree that Majestic's permits drafted with the wrong actual owner would be

ineffective and cause Majestic delay; how, when and from whom they each first learned

that the LLCs did not own the Leased Premises; what steps they each took to cooperate

with Majestic once they learned that the LCCs did not own the Leased Premises; whether

they ever discussed or considered amending the multitude of misstatements and false

testimony with their attorneys pursuant to Massachusetts Rule of Professional Conduct

3.3; whose idea it was to take no steps to correct the deceptions until Atty. Briansky was

required to answer truthfully by the Court on August 15, 2019; whether they continued to

accept monthly rent checks in 2019 while perpetuating the misrepresentations on

ownership; and, whether they agreed that by refusing to clarify ownership Dos Anjos and

Pariseault delayed Majestic's ability to construct a dealership. *See* 93A Ex. 97, ¶ 510-

522; *see also* 93A Ex. 98, ¶¶ 573-574, 577-589. Atty. Manoogian refused to answer

similar questions by invoking the attorney-client privilege. *See* 93A Ex. 99, ¶¶ 461-462,

466, 467-470. I have drawn an adverse inference against the Defendants on all of these

topics.

p.      Dos Anjos and Pariseault invoked the privilege against self-incrimination

and refused to answer questions about Defendants' extortionate behavior in June of 2019,

including why the Defendants never responded to Majestic's letter of May 31, 2019;

whether Dos Anjos or Pariseault had reviewed Majestic's counsel's emails of June 10

and 11, 2019, which were forwarded to Pariseault according to Defendants' privilege log

at 93A Ex. 96, in which Majestic's counsel reiterates Majestic's concerns about

ownership and the witnesses' misrepresentations; why the Defendants would not agree to

transfer the parcels to the LLCs as the correct owner under the Lease, ¶¶ 16(a)(ii) and

34(d) or merge the lot under the parties' prior agreement seen at Jury Ex. 31; what

Defendants did to investigate Majestic's claims in the May 31, 2019 letter and June 10-

11, 2019 emails; whether Dos Anjos or Pariseault authorized Atty. Briansky to try to

force Majestic to accept a subordination of the lease signed by only two of the four Dos

Anjos Realty Trusts as non-landlord owners rather than the Lease's requirement that the

LLCs would own the land as landlords; whether the witness agreed that subordination

sent by Defendants' counsel at 93A Ex. 50 represented less than fee simple ownership by

the landlord; whether by submitting the subordination the Defendants were attempting to

leverage the ownership issue to improve Defendants' rights under the lease; whether by

offering the subordination the Defendants were attempting to shield the land that makes

up the Leased Premises from the judgment in this case; and, despite Majestic rejecting

this attempt, whether it was Dos Anjos's idea to still withhold confirmation of the true

owner of the Premises until August 15, 2019. *See* 93A Ex. 97 ¶¶ 523-536; *see also* 93A

Ex. 98 ¶¶ 570-572, 575-576, 590-596.  I have drawn an adverse inference against the

Defendants on all of these topics.

       q.    Atty. Manoogian refused to answer questions about the Defendants'

responses to Majestic's May 29, 2019 letter and June 10-11, 2019 emails, and the

Defendants' actions in June 2019, by invoking the attorney-client privilege. *See* 93A Ex.

99, ¶¶ 426-431, 433-448, 450-453, 455-460.  I have drawn an adverse inference against

the Defendants on all of these topics.

       r.    Dos Anjos and Pariseault invoked the privilege against self-incrimination

and refused to answer questions about their refusal to cooperate in merging the Dos

Anjos lots, including on topic such as their prior agreement to do so by letter from Atty.

Manoogian dated May 30, 2017 and in evidence as Jury Ex. 31; their failure to merge the

lots or even respond to Majestic's requests to merge the lots from February 13, 2019

through August 27, 2019; whether they agreed that refusing to merge the Dos Anjos lots

delayed Majestic's ability to submit plans and begin construction on one lot as required

by the Town. *See* 93A Ex. 97 ¶¶ 537-539; *see also* 93A Ex. 98 ¶¶ 597-598.  Atty.

Manoogian also refused to answer these questions by invoking the attorney-client

privilege. *See* 93A Ex. 99, ¶¶ 473-474.  I have drawn an adverse inference against the

Defendants on all of these topics.

       s.    Dos Anjos and Pariseault invoked the privilege against self-incrimination

and refused to answer questions about their refusal to cooperate with Majestic by refusing

to agree to amend the Lease to add the Dos Anjos Realty Trusts that owned the Leased Premises as a landlords until ordered to do so by the Court on August 27, 2019; refusal to cooperate in signing an ANR permit application with a "red lease line" that defined the Leased Premises pursuant to the Lease's requirement at ¶ 1 until ordered to do so by the Court on September 10, 2019; refusal to cooperate by signing a Notice of Lease until ordered to do so by the Court on September 10, 2019; refusal to cooperate by signing a Lease Amendment until ordered to do so by the Court on September 10, 2019; and, whether the witnesses agreed that the Defendants' refusals to merge the lots, sign the ANR permit application, define the Leased Premises, sign a Notice of Lease, and sign the Lease Amendment did in fact delay Majestic's ability to build its dealership and open its doors. *See* 93A Ex. 97 ¶¶ 540-551; *see also* 93A Ex. 98 ¶¶ 597-608.  Atty. Manoogian also refused to answer these questions about Defendants' failures to cooperate by invoking the attorney-client privilege. *See* 93A Ex. 99, ¶¶ 475-484.  I have drawn an adverse inference against the Defendants on all of these topics.

t.      Dos Anjos and Pariseault invoked the privilege against self-incrimination when asked whether their conduct on behalf of the Defendants delayed Majestic's municipal permitting along with Majestic's ability to build, open and enjoy profits from its intended new and used automobile dealership at the Leased Premises until permits were finally executed in proper form on or about November 16, 2019. *See* 93A Ex. 97 ¶¶ 482-483, 551; *see also* 93A Ex. 98, ¶ 609.  Atty. Manoogian likewise refused to answer this question based on his blanket invocation of the attorney-client privilege. *See* 93A Ex. 99, ¶ 489.  I have drawn an adverse inference against the Defendants on all of these topics.

I have considered additional objections made by the Defendants to questions that Majestic has posed on the above topics beyond the privileges that were invoked, which objections included that the subject matter sought was "confidential" employment information, the question impinged the witness's right to privacy, the question was beyond the scope of the hearing, and other objections memorialized by Defendants in writing in 93A Exs. 97, 98, 99 and 100. These objections are overruled.

As a result of the above invocations I have drawn the following specific negative inferences against the Defendants: that the Defendants intentionally deceived Majestic as to the true ownership of the Leased Premises to improperly leverage and secure for itself greater rights under the Lease than they had before and to improperly avoid subjecting the real estate to the judgment; that the Defendants knew about the true ownership of the Leased Premises the entire time but did nothing to correct it even when Majestic submitted applications that listed the wrong owner in reliance on Defendants' misrepresentations or when Majestic brought the issue to Defendants' attention in May and June of 2019; that the Defendants purposely stalled, delayed, provided false information and omitted helpful information to sabotage Majestic's municipal permitting in knowing contradiction of Defendants' contractual obligations and court-ordered obligations to cooperate with Majestic in its permitting; that the Defendants did so to gain leverage over Majestic for whom time was of the essence; that Defendants knowingly and willfully continued their breaches of the Lease and the implied covenant of good faith and fair dealing and violated their obligations under the Lease to define the Leased premises (¶ 1), cooperate with all permitting (¶ 9), warranty title (¶ 16(a)(ii)), and to make title true and accurate (¶ 34(d)); that in May and June 2019 the Defendants leveraged the ownership issue to try to extort from Majestic an agreement to new Lease terms that were not bargained in the original

contract, namely a subordination (*see* 93A Ex. 50) that was less than fee simple ownership by the landlord and only represented recognition of Majestic's rights by two of the four land-owning Dos Anjos Trusts; that Defendants impermissibly strung Majestic along with the subordination proposal to try to insulate Defendants' real estate from attachment and remove the land from attachment in this case and any future action upon Landlord's default under the lease, ¶ 28, thereby stripping a contractual right from Majestic; that even after revealing the true ownership on August 15, 2019, the Defendants continued to fail cooperate with and approve Majestic's permits, ANR application, Lease Amendment, Notice of Lease, and "red lease line" until ordered to do so by the Court on September 10, 2019; that the Defendants knowingly, willfully and intentionally failed to heed this Court's Orders of January 28, 2019 and August 15, 2019; and, that the Defendants knowingly, willfully and intentionally failed to cooperate and delayed permit approvals and cooperation until November 16, 2019 when Majestic received the final permit application for the Conservation Commission.

### Rulings of Law

G.L. c. 93A, § 2 makes unlawful any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." This prohibition is "extended to those engaged in trade or commerce in business transactions with others similarly engaged" by G.L. c. 93A, § 11.

The SJC has held that conduct "'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice" under G.L. c. 93A. *Anthony's Pier Four, Inc.*, 411 Mass. at 475 (citing *Wan Laboratories, Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 857 (1986). See *Hannon v. Original Gunite Aquatech Pools Pools, Inc.*, 385 Mass. 813, 825 (1982 (if proved, submission of low bid followed by

44

demand for more money after award of contract would constitute violations of c. 93A); *Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc.,* 754 F.2d 10, 17-19 (1st Cir. 1985) (commercial extortion giving rise to c. 93A liability, and treble damages, where defendant withheld payment due under contract not because of dispute over liability or inability to pay but, rather, as "'wedge' against [plaintiff] 'to enhance [defendant's] bargaining power for more product'").

A breaching party's "knowing use of a pretext to coerce [the non-breaching party] into paying [the breaching party] more than the contract required establishes willfulness as a matter of law." *Anthony's Pier Four, Inc.,* 411 Mass. at 475 (citing *Pepsi-Cola Metropolitan Bottling Co.,* 754 F.2d at 18 ("[T]he evidence is sufficient to support its determination that [defendants] ... were guilty of a willful violation of ... c. 93A. The court was entitled to believe that [defendants] ... had withheld monies which they legally owed as a form of extortion – to force Pepsi to do what otherwise it could not be legally required to do"); *see also Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760, 780 (1986) ("Actions involving fraudulent representations in knowing disregard of the truth encompass culpable, 'willful' behavior under the statute")). See *Atkinson v. Roenthal,* 33 Mass.App.Ct. 219, 226 (1992). ("[T]here is in those cases a constant pattern of the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the breach of contract has an extortionate quality that gives it the rancid flavor of unfairness.")

Here, Majestic's c. 93A claim is a continuation of the claim that I ruled on in my Order dated January 28, 2019 and is likewise based upon Defendants' misrepresentations and which sounds in tort for similar reasons. As such, Majestic did not contractually waive its ability to seek damages under G.L. c. 93A. See *Exhibit Source, Inc., v. Wells Avenue Business Center,*

45

*LLC,* 94 Mass. App. Ct. 497, 502 (2018) (citing *Standard Register Co. v. Volton-Emerson, Inc.,* 38 Mass. App. Ct. 545 (1995)).

Nor does it matter that the Defendants' scheme was unsuccessful in renegotiating the Lease or obscuring the correct land-owning Dos Anjos entities from the judgment. Under Massachusetts law, the "coercive effort" need not succeed. Rather, "the party targeted for pressure may resist, absorb its losses, and pursue its remedies under the statute." *Renovator's Supply, Inc.,* 72 Mass. App. Ct. at 430 (citing *Anthony's Pier Four, Inc.,* 411 Mass. at 462).

I am unpersuaded by the Defendants' argument that the Defendants' repeated misrepresentations and deceptions are absolved by the litigation privilege for the following reasons. At trial, the Defendants decided not to object based upon the litigation privilege when Majestic entered 93A Exs. 67-79, which consist of numerous examples of statements, pleadings, judicial admissions, sworn testimony, and affidavits in which agents of the Defendants assert that the Leased Premises was owned by the Dos Anjos LLCs. Further, the case the Defendants cite with respect to the litigation privilege is *Doe v. Nutter, McClennen & Fish,* 41 Mass. App. Ct. 137 (1996), in which the litigation privilege was applied to bar a defamation claim. In *Nutter,* the court limited the privilege, however, to claims for negligence, defamation, intentional infliction of emotional distress and violation of Massachusetts Civil Rights Act based on communications preliminary to litigation and during pendency of litigation. *Id.,* at 141. The privilege does not apply to the within claims for breach of contract and violations of G.L. c. 93A. Majestic entered into evidence Defendants' misrepresentations, as seen in Dos Anjos's and Pariseault's affidavits, (93A Exs. 69 and 71), in pleadings such as the Answer and Counterclaim (93A Ex. 70) for the purpose of establishing Majestic reasonably relied upon the Defendants'

representations that ownership was not in the record title holders but rather in the Defendant

lessor Dos Anjos LLCs.

The Defendants' conduct "more than meets the standard of an 'unfair or deceptive act or

practice' – even taking into account that both parties to the transaction were sophisticated

business people." *Anthony's Pier Four, Inc.*, 411 Mass. at 475.  By refusing to cooperate with

Majestic in its permitting (Lease, ¶ 9), definition of the Leased Premises (*id.*, ¶ 1), and warranty

of title (*id.*, ¶¶ 16(a)(ii) and 34(d)), the Defendants have violated G.L. c. 93A causing delay

damages to Majestic that extend from February 12, 2019 until November 16, 2019, the date of

the last permit application approval by Defendants.

In *Motsis v. Ming's Supermarket, Inc.*, 96 Mass. App. Ct. 371 (2019), the Appeals Court

affirmed a jury's finding, as well as the trial judge's adoption of the same in his separate findings

under c. 93A, finding that a commercial landlord's failure to cooperate with its tenant in

furtherance of a tenant's permit application process constituted breach of contract, breach of the

covenant of good faith and fair dealing, and a violation of c. 93A warranting both specific

performance, delay damages, doubling of the damages, and attorneys' fees and costs.  In *Motsis,*

the lease at issue required the landlord to cooperate with the tenant in effectuating repairs to the

leased premises.  Similarly, Majestic's expectations in the way of "cooperation," *i.e,* the

signature of applications and honest disclosure of ownership, were reasonable.

Here, instead of cooperating, the Defendants either mistakenly or intentionally misled

Majestic and the court as to actual ownership.  Even once the record established true ownership,

Defendants attempted to compel Majestic to take an attornment in lieu of an unencumbered fee

simple interest in the Leasehold Premises.  *See* Jury Ex. 2, ¶¶ 16(a)(ii) and 34(d).  Indeed, the

Defendants not only delayed the permitting process from February 2019 to November 16, 2019,

47

they used that time to attempt to extract additional concessions from Majestic. *See* 93A Exs. 49-50.

The Defendants, through Dos Anjos, willfully and knowingly committed the following unfair methods of competition and unfair and deceptive acts and practices in violation of G.L. c. 93A, §§ 2, 11:

     a. Providing a false warranty of title in the Lease at ¶ 16(a)(ii) and ignoring known contractual obligation to provide such a warranty.

     b. Repeatedly deceiving Majestic as to ownership of the Leased Premises, as described more fully above, including in sworn testimony in depositions, trial, and affidavits, as well as in pleadings and motions submitted not only to Majestic but also to the jury, the Superior Court in Hampden County, the Superior Court in Bristol County and the Appeals Court.

     c. Failing to correct incorrect filings the Defendant submitted to the Court as to ownership of the Leased Premises.

     d. Failing to correct incorrect findings made by the Court relying on the Defendants' misstatements, false pleadings, and false testimony as to ownership of the Leased Premises.

     e. Failing to correct the issue of ownership when Majestic relied upon the Defendants' misstatements as to ownership and listed the LLCs as owners in Majestic's municipal permitting applications. In this regard, the Defendants clearly violated known contractual obligation to "cooperate" with Majestic in its permitting as required by the Lease, ¶ 9, the covenant of good faith and fair dealing, and my Orders of January 28, 2019 and August 15, 2019

     f. Refusing to make its warranty of title "true and accurate" on the Land Delivery Date of April 1, 2019 as required under the lease, ¶ 34(d), by simply conveying the land to the Dos Anjos LLCs. In this regard, Defendants clearly ignored their known contractual obligation in an effort to avoid the judgment reaching the true Dos Anjos entity that owned the land.

     g. Failing to cooperate with Majestic to resolve the ownership problem when Majestic learned of and brought the issue to Defendants' attention in May and June of 2019, necessitating the Rule 60 litigation that was not resolved until the hearing on August 15, 2019. *See* 93A Exs. 80, 82.

     h. Instead of cooperating with Plaintiff by stipulating as to the correct ownership as later ordered by the Court, the Defendants used the ownership discrepancy "as a lever to obtain advantage for [Defendants] in relation to the [Plaintiff]" of an "extortionate

48

quality that gives it the rancid flavor of unfairness." *Atkinson*, 33 Mass. App. Ct. at 226.

i. In the first week of June, the Defendants possessed a chart of actual ownership and a list of beneficiaries of the Dos Anjos Realty Trusts. Rather than providing this information to Majestic so that it could correct its permits and rather than confirming that Majestic was listing the wrong owner, the Defendants attempted to negotiate with Majestic to improve the Lease from the Defendants' perspective. The Defendants submitted an attornment proposal to Majestic on behalf of only two of the Dos Anjos Realty Trusts. *See* 93A Ex. 50. An attornment or subordination is less than "fee simple" in the landlord as guaranteed by the Lease at ¶¶ 16(a)(ii) and 34(d). This would have negatively affected Plaintiff's other rights in the lease without consideration. For example, under the Lease, Majestic has the right upon "Landlord's Default" to assert "liens against Landlord's interest in the Premises." *See* Jury Ex. 2, ¶ 28. By converting the landlord from a landowner to an entity with no ownership interest in the land, the Defendants were improperly securing for themselves an undue benefit (protection from any liens) for the 23-40 year life of the Lease. *Id.* Accordingly, Majestic would be unduly deprived of its mechanism for redressing the Landlord's defaults. By offering the attornment or subordination (*see* 93A Ex. 50) the Defendants improperly attempted to shield the land from the jury's verdict and Court's judgment. Tr. Dec. 13, 2019, p. 136.

The actions by Dos Anjos and his agents on behalf of the Defendants constituted the "pattern of a breach of contract as a lever to obtain advantage" for the Defendants when the Defendants should have simply fixed the problem in line with fee simple ownership as promised by the Lease at ¶¶ 16(a)(ii) and 34(d). As set forth in my findings above, the Defendants used "time" against Majestic in an unfair and deceptive manner to excise the above contractual concessions.

The evidence supports a finding that the Defendants willfully and knowingly strung along Majestic to see what unwarranted benefits the Defendants could extract from Plaintiff such as contract improvements. Such conduct violates G.L. c. 93A as a matter of law. *See Full Spectrum Software, Inc. v. Forte Automation, Sys.*, 858 F.3d 666, 674 (1st Cir. 2017) ("one business's stringing along of another to the other's detriment" can violate G.L. c. 93A, § 11) (citing *Greenstein v. Flatley*, 19 Mass. App. Ct. 351, 358 (1985); and *Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 f.3d 47, 69-70 (1st Cir. 2009)). As it did so in

49

negotiating the Lease, the Defendants were fishing for a deal and leveraging the ownership issue

to renegotiate the Lease or secure better terms for the Defendants. The Defendants'

disingenuous offers went "beyond the toleration even of persons inured to the rough and tumble

of the world of commerce," and so constituted a "stringing along" bargaining style that is, as a

matter of law, in violation of M.G.L. c. 93A. *See Full Spectrum Software, Inc. v. Forte

Automation Sys.*, 858 F.3d at 674; *Greenstein*, 19 Mass. App. Ct. at 358. Further evidence of the

Defendants' unlawful intent is that after their stringing along failed and Plaintiff rejected the

attornment, the Defendants refused to even discuss stipulating to what the Lease provided until

the Court suggested such an outcome at the August 15, 2019 hearing. *See* 93A Exs. 54-57.

The overwhelming mass of the Defendants' misrepresentations far outweighs their

argument that Majestic's confusion as to the true ownership served to either mitigate its damages

or release the Defendants of liability. The Defendants' contemptuous rejection of Majestic's

legitimate repeated requests for signatures necessary for permitting, standing alone, supports

Majestic's claim for violations of G.L. c. 93A.

General Laws c. 93A provides for recovery of actual damages and attorney's fees.

"Actual" damages under 93A are similar to compensatory damages in tort in that an injured party

can recover all such damages proximately caused by the defendant's unfair or deceptive conduct.

A 93A claim analogous to a tort-based recovery, as here, overrides any contractual defenses. *See

Exhibit Source, Inc., v. Wells Avenue Business Center, LLC*, 94 Mass. App. Ct. 497, 502 (2018)

(citing *Standard Register Co. v. Volton-Emerson, Inc.*, 38 Mass. App. Ct. 545 (1995)).

I am not persuaded by the Defendants' argument that there is no legal basis for an award

of specific performance in addition to delay damages. I rejected this position each time that it

has been advanced in the Defendants' motions. Recently, in the case of *Motsis v. Ming's*

50

*Supermarket, Inc.*, 96 Mass. App. Ct. 371, 372 (2019), the Appeals Court of Massachusetts came to the same conclusion on similar facts in another commercial lease dispute between landlord and tenant. There, the Appeals Court held that the trial judge "reasonably could have concluded that [the breaching landlord] should be required both to perform the relevant obligations of the lease in the future and to pay damages caused by his previous failure to do so and for any period of delay in completing specific performance." *Ming's Supermarket, Inc.*, 96 Mass. App. Ct. at 379. The Court noted that a "party who seeks specific performance or an injunction may … be entitled to damages to compensate him for delay in performance.'" *Id.* at 378 (citing *Perroncello v. Donahue*, 448 Mass. 199, 205-206 (2007); Restatement (Second) of Contracts, § 378 comment d, at 230 (1981)).

Further, in *Ming's Supermarket, Inc.*, the Appeals Court had "no difficulty affirming the judge's conclusion that [the breaching landlord] violated G.L. c. 93A." *Id.*, at 380. The Appeals Court agreed with the trial judge that "conduct in disregard of known contractual arrangements and intended to secure benefits for the reaching party constitutes an unfair act or practice for c. 93A purposes" and decline[d] to disturb the judge's conclusion that [the breaching landlord] violated G.L. c. 93A." *Id.*, at 380-81 (citing *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 474 (1991); *Exhibit Source, Inc. v. Wells Ave. Business Ctr., LLC*, 94 Mass. App. Ct. 497, 501, 114 N.E.3d 993 (2018)).

Based on the Defendants' violations of G.L. c. 93A, Majestic "is entitled to multiple (not more than treble and not less than double) damages if [the breaching party] acted 'knowingly' or 'willfully' in violation of § 2." *Anthony's Pier Four, Inc.*, 411 Mass. at 475. A factor in my decision is that the Defendants ignored my Order of January 28, 2019, which included a recitation of the prohibition on knowingly violating contractual obligations, using a breach of

contract as a lever, and stringing along a party on the other side of a contract in search of

extortionate advantages.   Moreover, the Defendants ignored my cautionary reminder that:

> Should Majestic elect specific performance, ...Majestic's delay damages of
> $175,000 per month will continue until such time as Defendants have complied
> with my orders relating to specific performance below.

Order, dated January 28, 2019, p. 23.

The Defendants argued that title is a matter of public record and Majestic was on record

notice that title was in the name of the four Dos Anjos Realty Trusts not the LLCs so there is no

harm resulting from Defendants' continued misrepresentation.  The Defendants' argument lacks

merit because it conflates record title with actual ownership. *See Davidson v. Stafford*, 210

Mass. 145, 146 (1911) (differentiating the concepts of the "record title" holder and the "real

owner").  As discussed above, record title can be superseded by a private or unrecorded deed.

Here, I note that the Defendants' reliance on *Lafata v. Lafata*, 65 Fed. R.D.3d, 260 (2006) is

misplaced.

It was reasonable for Majestic to set aside the record title based upon the over two dozen

examples, many of which in sworn testimony, affidavits, and pleadings to the Court, in which the

Defendants notified Majestic that title was not in the record title holder but in the Dos Anjos

LLCs and because the Lease stated in ¶ 34(d) that notwithstanding the current state of the record

title, the Lease's warranty of title at ¶ 16(a)(ii) would be made true and accurate upon the Land

Delivery Date of April 1, 2019 in any event.

My findings and rulings relative to 93A and damages are only bolstered by the

Defendants' witnesses' (Dos Anjos, Pariseault and Atty. Manoogian) invocations of the privilege

against self-incrimination and the attorney-client privilege, described in greater detail above, and

upon which I am entitled and I have elected to draw adverse inferences against the Defendants.  I

arrived at my Findings of Fact and Rulings of Law on Plaintiff's re-opened c. 93A claim and

damages, as stated herein, independent of these adverse inferences. However, the existence of

the adverse inferences adds tremendous and overwhelming weight to support my independent

findings, rulings of law, and damages awards as described herein.

Having been warned by my previous Order of January 28, 2019, the Defendants

improperly attempted to deceive Majestic as to the proper owners of the Leased Premises and,

when exposed, refused to abide by known contractual obligations opting instead to attempt to

renegotiate and extract from Majestic more favorable terms for the Defendants that were not in

the original contract. See *Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d at

17-19. In a case of commercial extortion, such as herein, double damages are appropriate. See

*Pepsi-Cola Metropolitan Bottling Co.* v. *Checkers, Inc.*, 754 F.2d at 17-19 (commercial extortion

giving rise to c. 93A liability, and treble damages, where defendant withheld payment due under

contract not because of dispute over liability or inability to pay but, rather, as "'wedge' against

[plaintiff] 'to enhance [defendant's] bargaining power for more product.'").

## ORDER

Judgment is to be amended on Count 5 of the Complaint to include additional delay

damages for the period of February 12, 2019 until November 16, 2019, in the amount of

$1,592,250 doubled to the amount of $3,184,500. Interest on such amount of $3,184,500 will

run from the date of the Amended Judgment. Interest on the initial amount of $8,925,000 under

my Order of January 28, 2019, will continue to run, separately, and as has been previously

ordered.

Based upon Defendants' willful and knowing violations of G.L. c. 93A, Defendants are

ordered to pay Plaintiff's attorneys' fees and costs, including amounts I have already ordered

pursuant to the jury's verdict in favor of Plaintiff on Count 3 of its Complaint, together with the amounts I have already ordered pursuant to my Order of January 28, 2019 as to costs associated with Count 5.

Plaintiff is to file and serve its Affidavit of Attorney's Fees and Costs within 15 days of the docketing of my Findings and Order.  Defendants are to file their opposition thereto within 15 days of service of Plaintiff's Affidavit of Attorney's Fees and Costs.


April 30, 2020                                              _____/s/_____

                                                           MARK D MASON
                                                           Justice of the Superior Court


54

# Exhibit F

# Amended Judgment, dated June 16, 2020

| AMENDED JUDGMENT | Trial Court of Massachusetts The Superior Court |
|---|---|
| **DOCKET NUMBER**<br>1779CV00899 | Laura S Gentile, Clerk of Courts |
| **CASE NAME**<br>H1 Lincoln, Inc. Doing Business as Majestic Honda<br>vs.<br>South Washington Street, LLC et al | **COURT NAME & ADDRESS**<br>Hampden County Superior Court<br>Hall of Justice - 50 State Street<br>P.O. Box 559<br>Springfield, MA 01102 |

This action came before the Court, Hon. Mark D Mason, presiding, and upon consideration thereof,

It is ORDERED and ADJUDGED:

1. That judgment under G.L. C231, sec.1 hereby enters declaring that the lease dated October 28, 2016 between the plaintiff and all of the defendants, as more fully described and agreed to in the Stipulation filed by the parties on August 16, 2019, is in full force and effect, that the defendants' attempt to terminate the lease was invalid and that their withholding of consent was unreasonable.

2. That a money judgment for damages hereby enters on the jury verdict and Court finding for the plaintiff as follows:

On Counts 3 and 4 of the verified complaint in the amount of $4,462,500.00 representing delay damages together with an award after a finding by the Court of attorneys fees of $413,673.50 and costs of $12,239.12.
On Count 5 of the verified complaint the delay damages are doubled after a finding by the Court together with and award of attorneys fees of $108,947.00, expert fees and expenses of $102,494.90 and non-expert expenses of $11,012.61 all as set forth below:

| | |
|---|---:|
| Delay damages under Counts 3 and 4 | $ 4,462,500.00 |
| Delay damages doubled under Count 5 | $ 8,925,000.00 |
| Attorneys fees for Counts 3 and 4 | $ 413,673.50 |
| Costs for Counts 3 and 4 | $ 12,239.12 |
| Attorneys fees under Count 5 | $ 108,947.00 |
| Expert fees and expenses under Count 5 | $ 102,494.90 |
| Non-expert expenses under Count 5 | $ 11,012.61 |
| Total Award: | $ 9,573,367.13 |

together with statutory interest thereon as provided by law from the date of breach of the contract, to wit, August 9, 2017.

3. That the defendants are ordered and enjoined to specific performance of the lease dated October 28, 2016 including without limitation:

    a. The defendants will cooperate with and approve any necessary paperwork for any permits or other items required for plaintiff's full use and enjoyment of the leased property, planned construction and operation of its business;

| DATE JUDGMENT ENTERED<br>06/17/2020 | CLERK OF COURTS/ASST. CLERK<br>X  _Stephanie Roscoe_ |
|---|---|

Date/Time Printed: 06-17-2020 09:36:01

SCV131: 05/2016

*177.0*

| AMENDED<br>JUDGMENT ON FINDING OF THE COURT | | Trial Court of Massachusetts<br>The Superior Court | |
|---|---|---|---|
| DOCKET NUMBER<br>1779CV00899 | | Laura S Gentile, Clerk of Courts | |
| CASE NAME<br>H1 Lincoln, Inc. Doing Business as Majestic Honda<br>vs.<br>South Washington Street, LLC et al | | COURT NAME & ADDRESS<br>Hampden County Superior Court<br>Hall of Justice - 50 State Street<br>P.O. Box 559<br>Springfield, MA 01102 | |

JUDGMENT FOR THE FOLLOWING PARTY(S)
H1 Lincoln, Inc. Doing Business as Majestic Honda

JUDGMENT AGAINST THE FOLLOWING PARTY(S)

South Washington Street, LLC
849 South Washington Street, LLC
849 South Washington Stret Realty Trust under Declaration of Trust dated June 9, 2000, Alfredo Dos Anjos, Trustee
855 South Washington Street Realty Trust under Declaration of Trust dated October 2, 2008, Alfredo Dos Anjos, Trustee
865 South Washington Street Realty Trust under Declaration of Trust dated May 14, 1998, Alfredo Dos Anjos, Trustee
Cooper Avenue Realty Trust under Declaration of Trust dated May 14, 1998, Alfredo dos Anjos, Trustee

This action came on before the Court, Hon. Mark D Mason, presiding, and upon consideration thereof,

After Jury Waived Trial, it is ORDERED AND ADJUDGED:

That judgment enter as outlined below, Jointly & Severally
with interest thereon as provided by law, and the statutory costs of action.

| | |
|---|---|
| 1. Date of Breach, Demand or Complaint | 06/16/2020 |
| 2. Date Judgment Entered | 06/16/2020 |
| 3. Number of Days of Prejudgment Interest *(line 2 - Line1)* | 0 |
| 4. Annual Interest Rate of 0.12/365.25 = Daily Interest rate | .000329 |
| 5. Single Damages | $3,184,500.00 |
| 6. Prejudgment Interest *(lines 3x4x5)* | $ |
| 7. Double or Treble Damages Awarded by Court *(where authorized by law)* | $ |
| 8. Statutory Costs | $.00 |
| 9. Attorney Fees Awarded by Court (where authorized by law) | $ |
| 10. JUDGMENT TOTAL PAYABLE TO PLAINTIFF(S) *(Lines 5+6+7+8+9)* | $3,184,500.00 |

SEE PAGE 2 FOR FURTHER ORDERS

| DATE JUDGMENT ENTERED<br>06/16/2020 | CLERK OF COURTS/ ASST. CLERK<br>X *Stephanie Roscoe* |
|---|---|

SCV087: 09/2016

Date/Time Printed: 06-16-2020 12:06:44

176.0

| AMENDED<br>JUDGMENT ON FINDING OF THE COURT | DOCKET NUMBER<br>1779CV00899 | Trial Court of Massachusetts<br>The Superior Court  |
|---|---|---|

**FURTHER ORDERS OF THE COURT:**

This Judgment pertains to the 93A claims only.  Interest on the original Judgment dated August 6, 2019 will continue to run separately as previously ordered.

| DATE JUDGMENT ENTERED | CLERK OF COURTS/ ASST. CLERK |
|---|---|
| 06/16/2020 | X  *Stephanie Roscoe* |

Date/Time Printed:  06-16-2020 12:06:44

SCV087: 09/2016